**G. HEILEMAN BREWING COMPANY, INC., Plaintiff–Counterdefendant,**

v.

**ANHEUSER–BUSCH INCORPORATED, Defendant-Counterclaimant.**

**MILLER BREWING COMPANY, Plaintiff–Counterdefendant,**

v.

**ANHEUSER–BUSCH INCORPORATED, Defendant–Counterclaimant.**

Nos. 84–C–511, 84–C–738.

United States District Court, E.D. Wisconsin.

Dec. 31, 1987.

David E. Beckwith, Michael Lechter, Mark Foley, Foley & Lardner, Milwaukee, Wis., for G. Heileman Brewing Co., Inc.

Laurence C. Hammond, Jr., Allan Leiser, George Whyte, Jr., Wayne Babler, Quarles & Brady, Milwaukee, Wis., for Miller Brewing Co.

Beverly Pattishall, Pattishall, McAuliffe & Hofstetter, Chicago, Ill., George Solveson, Glenn O. Starke, Andrus, Sceales, Starke & Sawall, Milwaukee, Wis., Peter E. Moll, Howrey & Simon, Washington, D.C., for defendant Anheuser–Busch Inc.

### MEMORANDUM OF DECISION

CURRAN, District Judge.

The G. Heileman Brewing Company, Inc. and the Miller Brewing Company, plaintiffs in the above-captioned consolidated cases, compete with defendant Anheuser–Busch, Inc. in the business of brewing and selling beer. Hoping to repeat Miller's success in marketing low calorie LITE beer, Anheuser–Busch developed and began to market a beer with low alcohol content which it

called "LA."[1] When Heileman announced plans to use the LA name on its own low alcohol beer, Anheuser–Busch demanded that it cease and desist. Shortly thereafter, Heileman, later joined by Miller, filed suit asking this court to declare that, by using the LA mark, they are not engaging in trademark infringement or unfair trade practices. The plaintiffs claim that Anheuser–Busch, by attempting to prevent competitors from using the LA name, has engaged in unfair trade practices and has attempted to monopolize the low alcohol beer market.

## I. PRETRIAL PROCEEDINGS

Several days after filing its complaint, Heileman brought a motion for a temporary restraining order asking this court to enjoin all proceedings in a mirror-image lawsuit which Anheuser–Busch had filed against Heileman in the United States District Court for the Southern District of Illinois. In part, because the Illinois case was filed several hours after Heileman's action, the court granted Heileman's motion. *See* Temporary Restraining Order of April 24, 1984. Heileman then moved for a preliminary injunction, while Anheuser–Busch moved to vacate the restraining order and to dismiss the complaint. On May 12, 1984, following a hearing, the court denied Anheuser–Busch's motion, but granted Heileman preliminary relief, ordering that:

> Defendant is hereby ENJOINED from proceeding with its claims against Heileman in the United States District Court for the Southern District of Illinois and from commencing any other action involving the same claims or arising out of

the same transactions or occurrences, pending final judgment, including any appeal, in this action.

Order of May 12, 1984, at 6.

After the preliminary injunction was in effect, the defendant moved for an order temporarily restraining Heileman from using the term "LA" in its advertising until after the issuance of a decision in a related case pending in the Eastern District of Missouri in which Anheuser–Busch was suing to enjoin another competitor, the Stroh Brewery Company, from using the LA mark. *See Anheuser–Busch, Inc. v. Stroh Brewery Company,* 587 F.Supp. 330 (E.D. Mo.), *aff'd,* 750 F.2d 631 (8th Cir.1984). After a hearing, this court denied the Anheuser–Busch motion on May 21, 1984.[2]

With its preliminary motions denied, Anheuser–Busch filed its answer and asserted a counterclaim for trademark infringement, unfair competition and trademark dilution. The defendant also moved for a preliminary injunction preventing Heileman from using the name "LA" during the pendency of this action. This motion was held open until trial. Meanwhile, on June 4, 1984, the Miller Brewing Company filed a parallel action against Anheuser–Busch which was consolidated with Heileman's case for all purposes. *See* Decision and Order of August 21, 1984.

## II. CLAIMS AND ISSUES

By the time the pleadings closed, Heileman, asserting jurisdiction under 15 U.S.C. §§ 15 and 26 and 28 U.S.C. §§ 1332(a), 1337 and 1338, had alleged four causes of action against Anheuser–Busch:

---

1. Depending upon their positions at the time, the parties to these lawsuits have used the letters "L" and "A" with or without periods. Whether or not periods are used, the name is always pronounced in two syllables, as two letters. Yet, throughout these proceedings, Anheuser–Busch has maintained that the two letters are not initials for anything. In attempting to explain why Anheuser–Busch at one time used periods after the letters, Michael Roarty, spokesperson for the Anheuser–Busch LA project, testified that:

 > L period A period was simply an effort to get people to pronounce these two letters L A as

opposed to La, which we were afraid that some people might misinterpret.

Transcript at 1131. *See also* Transcript at 1141, 1145–47.

For convenience, the court will use the term "LA" without periods throughout this opinion.

2. Four days later the Missouri district court issued an order permanently enjoining Stroh from using the "LA" mark throughout the United States. *See Anheuser–Busch, Inc. v. Stroh Brewery Company,* 587 F.Supp. 330 (E.D.Mo.), *aff'd,* 750 F.2d 631 (8th Cir.1984).

*Count I:* seeking injunctive relief and a declaratory judgment of noninfringement under the trademark laws;

*Count II:* seeking injunctive relief and a declaratory judgment that it is not unfairly competing with Anheuser–Busch under federal law, Wisconsin statutory law, or the common law;

*Count III:* seeking damages, claiming that Anheuser–Busch is engaging in unfair competition under 15 U.S.C. § 1125(a) and the common law;

*Count IV:* seeking treble damages, claiming that Anheuser–Busch is attempting to monopolize the low alcohol beer market in the United States in violation of 15 U.S.C. § 2.

Based on these claims, Heileman seeks a declaration and judgment as follows:

1. Declaring:

(a) Plaintiff's use of "BLATZ L.A.", "CARLING BLACK LABEL L.A.", "OLD STYLE L.A.", "SCHMIDT L.A.", "LONE STAR L.A.", and "RANIER L.A." on its low alcohol beers does not infringe any rights of or constitute unfair competition with defendant;

(b) Plaintiff's use of the description [sic] and generic terms "low alcohol", "LA" or "L.A." is not in violation of any right of defendant;

(c) The term "L.A." is a generic and descriptive term properly denominating and describing beers, particularly those beers having a low alcohol or lesser alcoholic content than regular beer; and

(d) Plaintiff's use of the term "BLATZ L.A.", "CARLING BLACK LABEL L.A.", "OLD STYLE L.A.", "SCHMIDT L.A.", "LONE STAR L.A.", or "RANIER L.A." is not confusingly similar to, or in conflict with, the use of the word "L.A." and/or "LA" as asserted to be the mark(s) of defendant.

2. Ordering:

(a) In accordance with 15 U.S.C. §§ 1119 and 1056, that defendant disclaim the descriptive and generic term "L.A." and/or "LA" as forming any part of its registration to issue on said application Serial No. 461,853 filed January 20, 1984 and Serial No. 462,371 filed January 23, 1984;

(b) That all or a portion of the trademark registration applications Serial No. 461,853 filed January 20, 1983 and Serial No. 462,371 filed January 23, 1984 be cancelled; and

(c) That defendant advise the trade that it no longer will threaten suit or make demands against persons using the generic and descriptive term "L.A." and/or "LA" to denominate and describe low alcohol beer, or otherwise assert purported rights to the terms "low alcohol", "LA" or "L.A." for low alcohol beer.

3. Preliminarily and permanently enjoining defendant, its officers, agents, servants, employees, representatives, successors and assigns, and all persons in active concern or participation with them, and any and all persons acting by, through or under authority from defendant, either separately or jointly, from:

(a) in any way interfering or threatening to interfere with use by plaintiff or its distributors or retailers of the generic and descriptive term "L.A." to denominate and describe low alcohol beer, particularly its beer sold in association with the labels illustrated herein as "BLATZ", "CARLING BLACK LABEL", "OLD STYLE", "SCHMIDT", "LONE STAR" and "RANIER" labels;

(c) interfering with plaintiff's use of the abbreviation "L.A." to describe its low alcohol beers, or from otherwise engaging in unlawful acts complained of herein.

4. Awarding to Plaintiff:

(a) any and all damages it has or will sustain by reason of defendant's aforesaid unfair competition;

(b) the sum of $500,000 as punitive damages for defendant's deliberate and willful unfair competition;

(c) the costs of this action, including reasonable attorneys' fees pursuant to 15 U.S.C. § 1117;

(d) treble the amount of damages sustained by plaintiff as the proximate result of defendant's aforesaid violations of the antitrust laws, including costs and

reasonable attorneys' fees incurred by plaintiff; and

(e) such other and further relief as this court may deem just and equitable.

Amended Complaint [of G. Heileman Brewing Company, Inc.] at 12–15.

Miller Brewing Company's complaint raises similar claims and asks for the following relief:

(a) For a declaration that "LA," or its equivalents, as used for low alcohol beer, is an unprotectable designation, that A–B has no protectable rights therein, and that Miller is free to use the same as it sees fit.

(b) For an order permanently enjoining A–B, and any person or party in privity or concert with it, from claiming, seeking (by registration or otherwise), asserting, or attempting to enforce any rights in "LA," or its equivalents, as against Miller or its customers, or otherwise engaging in the unlawful acts complained of.

(c) For an award to Miller of its damages, trebled, all profits of A–B attributable to its unlawful acts, costs and attorneys' fees.

(d) For such other and further relief as this court may deem just or equitable.

Complaint [of Miller Brewing Company] at 5.

Anheuser–Busch answered both complaints and filed counterclaims against both plaintiffs. Alleging jurisdiction under 15 U.S.C. § 1121 and 28 U.S.C. §§ 1332 and 1338, the counterclaimant asserts causes of action for trademark infringement and unfair competition, arising under 15 U.S.C. § 1125(a) and the common law, and for trademark dilution, arising under the laws of Illinois and "various other states," asking that:

1. Counterdefendant, its officers, agents, servants, employees, attorneys and all others in active concert or participation with counterdefendant, be enjoined and restrained, during the pendency of this action and permanently thereafter, from:

(a) using, in the advertising, promotion or sale of counterdefendant's beer, counterclaimant's LA trademark or any color-able imitation thereof which is likely to dilute the distinctiveness of counterclaimant's LA trademark, or counterclaimant's distinctive advertising for its LA beer;

(b) using, in the advertising, promotion or sale of counterdefendant's beer, counterclaimant's LA trademark or any colorable imitation thereof which is likely to be mistaken or confused with counterclaimant's LA trademark; and

(c) doing any other acts that are likely to cause confusion, mistake or deception with counterclaimant or counterclaimant's business, or that are likely to cause counterclaimant's LA trademark to lose its distinctiveness by becoming a generic designation for a type of beer, or that are likely to destroy the commercial value of counterclaimant's LA trademark or the business and good will represented and symbolized by said trademark.

2. Counterdefendant be required to deliver up for destruction, in accordance with the court's directions, all labels, signs, prints, packages, wrappers, displays and advertisements bearing the LA trademark, and all plates, molds, matrices and other means of making the same.

3. Counterdefendant be required to account for and pay to counterclaimant all profits derived by counterdefendant from its aforesaid wrongful use of LA.

4. Counterdefendant be required to pay counterclaimant any and all damages it has or will sustain by reason of counterdefendant's aforesaid acts.

5. Counterdefendant be required to pay to counterclaimant a sum of money sufficient to enable counterclaimant to have effective corrective advertising to overcome the dilution of counterclaimant's LA trademark and distinctive advertising in each market in which counterdefendant has used LA or has advertised that LA is a generic or descriptive term for low alcohol beer.

6. Counterdefendant be required to pay to counterclaimant punitive damages in an amount sufficient to deter counterdefendant from further unfair competition, infringement or dilution of counterclaimant's LA trademark in the future.

7. Counterdefendant be required to pay to counterclaimant the costs of this action, together with counterclaimant's reasonable attorneys' fees.

8. Counterclaimant have such other and further relief as this court deems just and equitable.

Answer to Amended Complaint and Amended Counterclaim at 13-15.

### III. TRIAL

A trial on the merits of these two cases was heard by the court, sitting without a jury, for nine days, with the following witnesses testifying:

*Mortimer Brenner:* plaintiffs' expert witness; consultant to the brewing industry;

*Michael J. Roarty:* executive vice president of Anheuser–Busch, Inc.; director of marketing; spokesperson for Anheuser–Busch's LA beer;

*Russell G. Cleary:* president and chairman of the board of the G. Heileman Brewing Company, Inc.;

*John S. Isherwood:* senior executive vice president of operations for the G. Heileman Brewing Company, Inc.;

*John S. Pedace:* executive vice president of marketing for the G. Heileman Brewing Company, Inc.;

*Henry Ostberg:* plaintiffs' expert witness; president of Admar Research Company, Inc.;

*John A. Bunge:* plaintiffs' expert witness; president of Legal Marketing Research, Inc.;

*John R. Nevin:* plaintiffs' expert witness; professor of business at the University of Wisconsin Graduate School of Business;

*Victor F. Imbimbo, Jr.:* brand manager of new products for the Miller Brewing Company;

*Dennis P. Long:* at the time of trial, president and chief operating officer of Anheuser–Busch, Inc.;

*Arch M. Ahern:* associate general counsel of Anheuser–Busch Companies, Inc.; [3]

*Yoram Wind:* defendant's expert witness; Lauder Professor and Professor of Marketing and Management at the Wharton School, University of Pennsylvania.

The following three witnesses did not appear at trial, but portions of their deposition testimony were read during trial:

*James R. Buell, Jr.:* Anheuser–Busch director of new product planning and development;

*Mark C. Lamping:* Anheuser–Busch product manager for LA;

*David R. Wood:* president of Interbrand Corporation, a company which developed brand names for Anheuser–Busch's low alcohol beer.

In addition, almost 700 exhibits were offered by the parties and, after the close of testimony, the parties designated for inclusion in the transcript several sets of interrogatory responses plus 250 pages of deposition testimony from the following additional witnesses [4] who did not appear at trial:

*Robert A. Toledo:* vice president, brand management, Miller Brewing Company;

*Jon B. Reynolds:* marketing services manager, G. Heileman Brewing Company, Inc.;

*Donald R. O'Brien:* director of advertising, G. Heileman Brewing Company, Inc.;

*Thomas Godwin:* director of brand development, G. Heileman Brewing Company, Inc.;

*Thomas J. Myers:* vice president, brand management, G. Heileman Brewing Company, Inc.;

*James G. Martin:* vice president of marketing, Ranier Brewing Company;

**3.** Anheuser–Busch Companies, Inc. is the holding company of Anheuser–Busch, Inc. *See* Transcript at 239, 1324.

**4.** Some of these witnesses were not identified in the parties' final pretrial report and were not otherwise identified by the party offering the testimony. Therefore, the court was left to guess the identity of the witnesses from the portions of deposition testimony offered.

*Donald S. McDonald:* vice president and senior counsel, Anheuser–Busch;

*Charles W. Wirtel:* head of beer planning department, Anheuser–Busch;

*John F. Bruemmer:* senior vice president of D'Arcy MacManus Masius, an advertising agency retained by Anheuser–Busch;

*Paul J. Siemer:* executive vice president of Fleishman–Hillard, Inc., a public relations firm retained by Anheuser–Busch;

*Alvin L. Kacin:* former chairman of D'Arcy MacManus Masius, an advertising agency retained by Anheuser–Busch;

*August A. Busch III:* president and chairman of Anheuser–Busch Companies, Inc.

Finally, the plaintiffs offered additional deposition excerpts which are not included in the transcript. Besides eleven witnesses already identified above, the plaintiffs' deposition witnesses include:

*William J. Morgan:* account executive for D'Arcy MacManus Masius, an advertising agency retained by Anheuser–Busch;

*James L. Morice:* executive vice-president of Fleishman–Hillard, Inc., a public relations firm retained by Anheuser–Busch;

*James M. Palumbo:* employee of D'Arcy MacManus Masius, an advertising agency retained by Anheuser–Busch;

*Zanvel A. Zack:* director of creative services within the merchandising department of Anheuser–Busch.

Having now considered the testimony and exhibits received at trial as well as the posttrial submissions, the court sets forth its Findings of Fact separately from its Conclusions of Law pursuant to Federal Rule of Civil Procedure 52.

## IV. UNCONTESTED FACTS

In their final pretrial report the parties stipulated to the following facts, which the court adopts and incorporates into this decision:

1. Plaintiff G. Heileman Brewing Company, Inc. ("Heileman") is a corporation organized and existing under the laws of the State of Wisconsin, having its principal place of business at 100 Harborview Plaza, LaCrosse, Wisconsin 54601.

2. Plaintiff Miller Brewing Company ("Miller") is a Wisconsin corporation with its principal place of business at 3939 West Highland Boulevard, Milwaukee, Wisconsin.

3. Defendant, Anheuser–Busch, Inc. ("Busch") is a corporation organized and existing under the laws of the State of Missouri, having its principal place of business at 1 Busch Place, St. Louis, Missouri 63118. Defendant is registered to do business and conducts business in Wisconsin and in the Eastern District of Wisconsin.

. . . . [5]

6. Busch, Miller and Heileman have for many years been engaged in the business of brewing, packaging, marketing, distributing and selling brewed fermented malt beverages, including beer, and are direct competitors in that business throughout the United States.

7. The Bureau of Alcohol, Tobacco and Firearms (BATF) of the U.S. Government regulates labeling of alcoholic malt beverages pursuant to 27 CFR Part 7.

8. Early in 1981, August A. Busch III ("Mr. Busch"), Busch's Chairman and Chief Executive Officer, toured various breweries in Australia, including the Tooth brewery, and learned of the success of its low alcohol beer.

9. At a meeting in September 1983, Busch's Beer Planning Group presented a Phase II New Venture Analysis recommending that Busch produce a 1.7% alcohol beer.

10. On November 21, 1983, Busch filed applications with BATF for approv-

---

**5.** In paragraphs 4 and 5 the parties attempted to stipulate to jurisdiction and venue, which are not "facts" but conclusions of law. Parties may not stipulate to conclusions of law or confer jurisdiction by consent. *See Kanzelberger v. Kanzelberger,* 782 F.2d 774, 776–77 (7th Cir. 1986).

al of three beer labels having the letters "L.A.", L.A.B.", "L.A.D.", respectively. . . . .[6]

12. Busch's President and Chief Operating Officer, Dennis P. Long, and its Executive Vice President, Michael J. Roarty, were selected as spokespersons within Busch to handle media inquiries and to be available for interviews regarding its new product.

13. On February 16, 1984, Busch filed applications with BATF for approval of four beer labels having the letters "R.A.," "X.L.A.," "U.L.A.," and "N.A."

14. On March 16, 1984 Busch conducted a kickoff meeting at the Clarion Hotel in St. Louis, Missouri for those wholesalers who would be participating in the test marketing of Busch's new beer.

15. On March 29, 1984, Heileman issued a press release announcing its intent to introduce two low alcohol beers in April 1984, called "BLATZ" L.A. and "BLACK LABEL" L.A.

16. On April 18, 1984 Busch filed separate suits against The Stroh Brewery Company and Heileman for an injunction against their use of "LA" or "L.A." on beer. Earlier that same day, Heileman brought this action for, *inter alia*, a declaratory judgment that the letters "LA" were a generic description for a type or category of beer and inherently not protectible as a trademark.

17. On May 11, 1984, Busch conducted a teleconference via satellite originating from the Chase Hotel in St. Louis, Missouri in which Busch announced the rollout of its new product to all Busch's U.S. wholesalers and distributors.

18. Busch is the largest brewer in the United States, with annual revenues in excess of $5 billion. In 1983, Busch sold approximately 60.5 million barrels of beer. Miller, the second largest brewer in the U.S., sold approximately 37.7 million barrels of beer that year. Heileman

sold approximately 17.5 million barrels of beer in 1983, making it the fourth largest U.S. brewer. U.S. beer sales totalled 180.5 million barrels in 1983.

19. The two names initially presented to Miller as brand names for its 1.7% alcohol beer product were SHARP'S and BARKING DOG.

20. In March, 1984, Miller decided to use Sharp's LA for its 1.7% alcohol beer.

21. On August 13, 1984, Miller began marketing a 1.7% alcohol beer with LA and the "Sharp's" name in test markets in Atlanta, Georgia, Columbus, Ohio, Houston, Texas, Springfield, Illinois and San Diego, California. Presently Miller is not marketing Sharp's L.A. in any other markets.

## V. FINDINGS OF FACT

In addition to the foregoing uncontroverted facts, the following facts[7] have been established by a preponderance of the evidence or a higher burden, where applicable.

### A. PARTIES

1. Plaintiff and counterclaim defendant G. Heileman Brewing Company, Inc. is a corporation organized and existing under the laws of the State of Wisconsin. It has its principal place of business at 100 Harborview Plaza, LaCrosse, Wisconsin 54601.

2. Plaintiff and counterclaim defendant Miller Brewing Company is a corporation organized and existing under the laws of the State of Wisconsin. It has its principal place of business at 3939 Highland Boulevard, Milwaukee, Wisconsin.

3. Defendant and counterclaimant Anheuser-Busch, Inc. is a corporation organized and existing under the laws of the State of Missouri. It has its principal place of business at 1 Busch Place, St. Louis, Missouri 63118. The defendant is registered to do business and conducts busi-

---

**6.** Anheuser-Busch later withdrew its agreement to paragraph 11. *See* Defendant-Counterclaimant's Supplement to the Joint Pretrial Report at 2.

**7.** Some of these findings of fact will duplicate, at least in part, certain of the uncontroverted facts set forth above. However, the court's findings will add essential detail to the stipulations.

ness in Wisconsin and in the Eastern District of Wisconsin.

4. For many years the parties have been engaged in the business of brewing, packaging, marketing, distributing and selling brewed fermented malt beverages, including beer, and are direct competitors in that business throughout the United States.

### B. LOW ALCOHOL BEER

5. Low alcohol beer was launched in Australia in 1979. Among the low alcohol beers sold in Australia have been Tooth LA, South Australian LA, Courage LA, and Carling LA. *See* Trial Exhibits 74, 77, 100, 101, 102, 103, 400, 401, 426, 427. *See also* Transcript at 41–43, 68, 82–85, 109–10, 240, 944–48, 959, 2132–34.

6. The United States Bureau of Alcohol, Tobacco and Firearms (BATF) regulates the labeling and advertising of alcoholic malt beverages pursuant to the Federal Alcohol Administration Act (FAA), 27 U.S.C. §§ 201–211, and the regulations implementing the FAA, particularly 7 C.F.R. § 7.[8] *See* Trial Exhibit 63. *See also* Transcript at 1357–59. Beer cannot be shipped in commerce unless the BATF has approved the label. *See* Transcript at 1358.

7. The BATF has defined low alcohol beer as a beer containing less than 2.5% alcohol by volume and less than 2% alcohol by weight. *See* Trial Exhibits 63, 762. *See also* Transcript at 49–50, 103, 245, 294, 2152. Regular malt beverages contain 3.5–5.0% alcohol by volume. *See* Trial Exhibits 63, 762.

8. Low alcohol beers contain less alcohol than regular malt beverages and they can also contain fewer calories. *See* Transcript at 49–50, 102, 245, 294, 332, 412, 435, 1311, 2063, 2073–74.

9. Low alcohol beer can be produced in a number of ways: (1) by diluting conventional beer with water; (2) by removing the alcohol through distillation, vacuum distillation, or reverse osmosis; or (3) by follow-

ing the usual brewing process using a slightly reduced bill of materials and altering the time and temperatures to reduce the amount of fermentable sugars available to the yeast to use during the fermentation part of the process, thus limiting the formation of alcohol. *See* Transcript at 411. *See also* Transcript at 48–49, 1313.

10. Prior to April 27, 1984, the BATF, acting pursuant to its interpretation of the FAA, would not approve beer labeling or advertising describing a product as having a low or reduced alcoholic content. *See* Transcript at 58–59, 297–99, 434, 951, 984–85, 1226–35, 1294.

11. Under the Twenty-First Amendment to the United States Constitution, the states may choose to adopt the FAA or they may choose to enact their own regulations of alcoholic beverages. *See* Transcript at 2154–59.

12. Prior to April 27, 1984, seventeen states did not permit advertising the alcoholic strength or weakness of beer. *See, e.g.*, Trial Exhibit 65. *See also* Transcript at 370, 2155–59.

13. The laws of some states which did not adopt the FAA allowed advertising the alcoholic weakness of beer. *See* Transcript at 984–85, 2154. Thus, in 1983, the Hudepohl Brewery marketed reduced alcohol beer under the PACE trademark in Ohio and the Christian Schmidt Brewing Company marketed a reduced alcohol beer under the BREAK trademark in Pennsylvania. *See* Transcript at 294, 369–72, 385–86, 976–92, 2134–35, 2234. *See also* Trial Exhibit 24. The labels and advertising of these two beers used the description "reduced alcohol." *See* Trial Exhibits 701, 702, 702A, 704, 704A, 705 and 706. Neither brewery used the term "LA." *See* Transcript at 372, 991. No other brewers in the United States were marketing low alcohol beer prior to December of 1983. *See* Transcript at 369–76, 427–28, 495–96, 923, 976–

---

**8.** Laws and regulations governing alcoholic beverages are more properly the subject of judicial notice. However, this information has been included among the court's findings as back-

ground information and because the court found that one or more of the parties had actual knowledge of these laws and regulations.

92, 1164, 1179–80, 1191, 1308, 1329, 2060, 2117, 2132, 2135, 2161, 2233–34.

## C. UNFAIR COMPETITION

### (1) *Adoption of LA Mark*

#### (a) Anheuser–Busch

14. In 1981, August A. Busch III, the president and chief executive officer of Anheuser–Busch Companies, studied the production and marketing of low alcohol beer while traveling in Australia. *See* Transcript at 240–42, 2212–13.

15. Sometime after returning from Australia, Mr. Busch directed his company to begin research and development of a low alcohol beer.[9] *See* Transcript at 126, 129, 242, 1360–63. *See also* Trial Exhibit 300.

16. In September of 1983, Anheuser–Busch engaged the Interbrand Corporation to develop and test potential names for a low alcohol beer. *See* Transcript at 140, 262, 1095.

17. On November 21, 1983, Anheuser–Busch obtained BATF approval for beer labels using the names "L.A.," "L.A.B.," and "L.A.D." *See* Trial Exhibits 44, 55, 280, 760. *See also* Transcript at 169, 993–94, 1213, 1363–65, 1475–85. There is no evidence that the BATF was aware that these labels might be used on low alcohol beer products. *See* Transcript at 169–70, 1343–45, 1478–84, 2216. *See also* Trial Exhibit 526.

18. On November 28, 1983, Interbrand submitted a report recommending against marketing a low alcohol beer as a line extension[10] of an existing brand. Interbrand believed that, in the long run, a line extension would weaken the parent brand, particularly if the new product was not successful. The company also pointed out

---

**9.** Mr. Busch testified at his deposition that he first directed the development of a low alcohol beer in the summer or fall of 1983. *See* Transcript at 242. James Buell, director of new product planning and development for Anheuser–Busch, testified that development of a low alcohol beer was underway when he joined the company in April of 1982. *See* Transcript at 126, 129. *See also* Trial Exhibit 758 (trademark search for LA dated February 24, 1981); Transcript at 1360–63, 1456.

that a new "breakthrough" product, which would be heavily advertised in the hope that it would become the leading seller in its category, should not be presented as an extension of an existing brand. Instead, Interbrand recommended "power branding," using a single brand name stressing the unique quality of the product. *See* Trial Exhibits 20, 113, 114. *See* Transcript at 180–81, 2148–49.

19. On December 20, 1983, Interbrand submitted its final brand name report and recommendations. *See* Transcript at 179, 236–37, 2169. *See* Trial Exhibits 12, 116, 116A. Interbrand warned Anheuser–Busch that using "LA" as a brand name would lead to problems:

> Our problem with the use of L.A. as a stand-alone brand name is that it clearly and obviously stands for low alcohol, and as such has two major problems:
> \*it would not, in all likelihood, be protectible since it clearly and obviously stands for low alcohol, and as such is clearly an abbreviation of the generic decriptor.
> \*Since products in the segment can all claim low alcohol, it is reasonable to assume that the category will be known as, and referred to as, the low, low alcohol or L.A. category. And since A–B will not be the only entrant there would be ample opportunity for confusion, switching, etc.

Trial Exhibit 12.

20. Based on the Interbrand research, James Buell, director of new product planning and development, issued a report recommending rejection of the line extension[11] names and recommending a corporate source approach using the name "L.A. from Anheuser–Busch." *See* Trial Exhibits 18, 18A, 18B, 87. *See also* Transcript at 144–45, 151–52.

---

**10.** According to David Wood, president of Interbrand, a "line extension" is "the extension of an existing names [sic] into new products," e.g., BUDWEISER LA. *See* Transcript at 235–36. *See also* Transcript at 281–83, 899–902.

**11.** At his deposition Buell professed not to know the meaning of the term "line extension." *See* Transcript at 181.

21. Within a month, Mr. Busch decided to adopt the name "LA from Anheuser–Busch." *See* Trial Exhibits 19, 304. *See also* Transcript at 170, 203, 249–50, 993, 995–96, 1140, 2179, 2215–18.

22. On January 20, 1984, Anheuser–Busch issued a press release announcing its new product. The release stated that:

> The new product, which will be called "L.A. from Anheuser–Busch," has an alcohol content of approximately half that of regular beer. "L.A. from Anheuser–Busch" will be covered by all laws regulating the sale of alcoholic beverages, offering customers of legal drinking age a light alcohol product with the full taste of beer.

Trial Exhibit 22. *See also* Transcript at 202–04, 264, 996, 1146–47, 1236–37; Trial Exhibit 303.

23. At the outset Anheuser–Busch encountered problems planning a marketing strategy for LA because, on one hand, it was trying to use LA as an arbitrary or suggestive trademark, while, on the other hand, it needed to describe the unique low alcohol characteristic of the new type of beer to consumers without running afoul of state, federal and television network regulations forbidding the advertising of alcoholic weakness. *See* Transcript at 1102–03, 1139, 1216–35, 2152–59. *See also* Trial Exhibits 12, 50, 51, 52, 53, 64, 65, 244, 396.

24. Anheuser–Busch retained Fleischman-Hillard, Inc., a public relations firm, to develop public awareness of LA. *See* Transcript at 156, 203, 267–68, 1183–87, 1211–12, 1237, 1239–44, 253, 254, 256, 257, 259, 262, 264, 265, 268, 271, 272, 274, 275, 336, 337, 338, 343, 355.

25. Many of the popular news media (often aided by interviews or background briefings with employees of Fleischman-Hillard or Anheuser–Busch) reported that "LA" means "low," "less," or "light" alcohol. *See, e.g.,* Trial Exhibits 194, 246, 330, 332, 333, 457, 458, 460, 462, 463, 464, 465, 466, 470, 472, 473, 474, 477, 479; Transcript at 264–74, 996–1001, 1183–87.

26. Although Anheuser–Busch executives reviewed many of these articles for accuracy, there is no evidence that Anheuser–Busch took any steps to discourage or correct this publicity equating "LA" with "low alcohol." [12] *See* Transcript at 264–74, 1084–86, 1211–13, 1237–84, 2196–2204, 2218–19.

27. On February 16, 1984, after beginning its efforts to publicize its LA beer, Anheuser–Busch filed applications for BATF approval of labels containing the names: "X.L.A.," "U.L.A.," "R.A.," and "N.A." On February 22, 1984, the BATF approved these names "for trademark purposes only," meaning that the initials could not be used as labels for beer. *See* Trial Exhibits 55, 298, 529. *See also* Transcript at 171–72, 1213–15, 1487–1505.

28. Anheuser–Busch, through its attorney Donald S. McDonald, made an effort to persuade the BATF to change its interpretation of the FAA to permit labels and advertising to describe beer as being low in alcoholic content. *See* Transcript at 1228, 1294–1301, 2153–54. *See also* Trial Exhibits 59, 64.

29. On March 7, 1984, the Stroh Brewery Company obtained BATF approval for two beer labels: SCHAEFER LA and OLD MILWAUKEE LA. *See* Transcript at 301. *See also Anheuser–Busch, Inc. v. Stroh Brewery Company,* 587 F.Supp. 330, 333 (E.D.Mo.), *aff'd.,* 750 F.2d 631 (8th Cir. 1984). Shortly thereafter, Stroh announced plans to market a low alcohol beer labeled with the LA mark. *See* Transcript at 210, 434, 2111–12.

30. On March 13, 1984, Anheuser–Busch filed applications for BATF approval of labels for a beer can and beer bottle bearing the LA mark. These applications were approved on March 13, 1984. *See* Trial Exhibits 296, 761.

31. On March 16, 1984, Anheuser–Busch filed an application for BATF approval of a label for draught beer bearing

---

**12.** Michael Roarty, spokesperson for the Anheuser–Busch LA project, explained that consultants "advised that to make an issue out of these things would just confuse the marketplace." Transcript at 1259. *See also* Transcript at 1141.

the LA mark. This label was approved on March 21, 1984. *See* Trial Exhibit 297.

32. On April 27, 1984, the BATF issued a circular announcing that it now interpreted 27 U.S.C. § 205(e) and (f) as not prohibiting the labeling and advertising of alcoholic weakness. The circular provided that:

> ... the Bureau has determined that statements of low or reduced alcohol content when used with malt beverage products containing less than 2.5 percent alcohol by volume are not misleading. Since the alcohol content of regular malt beverages falls within the range of 3.5 to 5.0 percent alcohol by volume, malt beverage products containing less than 2.5 percent content by volume have a substantially lower alcohol content and may accurately be described as low alcohol or reduced alcohol malt beverages.

Trial Exhibits 63, 762. *See also* Transcript at 58–59, 1300–03.

33. After the BATF issued this circular, affected states changed their laws and regulations to allow descriptive references to low alcohol on beer labeling and advertising. By the time of trial, all the states had made these revisions. *See* Transcript at 2156–59.

(b) Heileman

34. In early 1982, Heileman (aware of the Australian experience) began to develop a low alcohol beer. *See* Transcript at 291–93, 407–10, 2036, 2229.

35. In March of 1984, Heileman decided to use brand or line extensions, *e.g.*, BLATZ LA, BLATZ II, in positioning its low alcohol beer. *See* Transcript at 281–83, 325–28, 330–33, 344–46, 356–59, 2037–39, 2076, 2114–15.

36. With knowledge of the Anheuser–Busch LA product, of the Stroh Brewery Company's announced plans to market SCHAEFER LA, and of the BATF approval of the Anheuser–Busch and Stroh labels, Heileman announced on March 29, 1984, that it would market low alcohol beers under labels using its house marks with "L.A." as a category descriptor, e.g., CARLING BLACK LABEL L.A. and BLATZ L.A. *See* Transcript at 291–309, 328–38, 343, 359–79, 385–91, 425–37, 493–96, 2037–55, 2057–64, 2076–81, 2108–17, 2229. *See also* Trial Exhibits 514, 515, 521.

(c) Miller

37. In March of 1984, Miller began to develop a low alcohol beer. Victor Imbimbo, brand manager of new products for the Miller Brewing Company, traveled to Australia to study the low alcohol beer market there. *See* Transcript at 931–39, 2010–13, 2126, 2132–34, 2237.

38. After consultation with its advertising agency, Leo Burnett, Miller adopted a single product mark, "Sharp's," combined with "L.A." as a category descriptor, as the name for its low alcohol beer. At the time this name was selected, Miller was aware of Anheuser–Busch's low alcohol product and of the BATF labeling decisions. *See* Transcript at 940–48, 2012–20, 2024–25, 2124–41, 2232–42. *See also* Trial Exhibit 748.

### (2) *Use of LA Mark*

39. On March 16, 1984, Anheuser–Busch began continuous use of the LA mark in commerce by shipping its low alcohol beer with LA labels affixed to wholesalers.[13] *See* Transcript at 1013–18, 1158, 1454–55.

---

**13.** Anheuser–Busch attempted to prove that it made token use of the L.A. (with periods) mark in interstate commerce on December 5, 1983, by offering into evidence a three-page document consisting of an Anheuser–Busch invoice and two cash receipts from a dealer, Illinois Distributing Company. *See* Transcript at 1366–1434. *See also* Trial Exhibit 764 (not received). Because of lack of foundation and lack of indicia of reliability, the court refused to receive the third page of the exhibit. *See* Transcript at 1408. Moreover, substantial doubts were raised about the reliability of the other two pages. For example, the invoice described the beer shipped as containing 5% alcohol, indicating that it was not a low alcohol beer, which would contain 1.8% alcohol. Arch Ahern, associate general counsel of Anheuser–Busch Companies, Inc., testified that this misdescription was made "to shield the fact that there were any shipments of low alcohol beer being made from other employees within the company...." *Id.* at 1412. *See also* Transcript at 1426–34; Trial Exhibits 765, 766 (not received) (purported records of

40. On April 2, 1984, Anheuser–Busch began retail sales of its LA beer in twelve test markets in Arizona, California, Florida, Georgia, Iowa, Nebraska, North Carolina, Ohio, Oregon, Rhode Island, Washington and Wisconsin. *See* Transcript at 207–08, 1014, 1017–18, 1027, 1205, 1229, 1454–55. *See also* Trial Exhibits 713, 714, 767 (received except for first three pages).

41. On May 21, 1984, Anheuser–Busch began shipping LA beer to retail outlets in twenty additional states: Alabama, Arkansas, Illinois, Kansas, Kentucky, Louisiana, Maryland, Michigan, Mississippi, Missouri, Nevada, New Jersey, New York, Oklahoma, South Carolina, Tennessee, Texas, Vermont, Virginia, West Virginia and the District of Columbia. *See* Transcript at 1018, 2174. *See* Trial Exhibit 714.

42. By the time of trial, Anheuser–Busch was selling LA beer in all states except Connecticut. *See* Transcript at 1043–44. *See also* Trial Exhibit 714.

43. In April of 1984, Heileman began to use the "LA" mark on beer shipped and sold in interstate commerce. On April 19, 1984, Heileman shipped two half-barrels of BLATZ LA from Illinois to LaCrosse, Wisconsin. On April 24, 1984, cans of Heileman's low alcohol beer, affixed with labels bearing the mark BLATZ LA, were shipped from a brewery in Belleville, Illinois and sold to retailers in Wisconsin. *See* Transcript at 334, 363–66, 392–93, 414, 438–41, 467–68. *See also* Trial Exhibit 379.

44. In May of 1984, Heileman began selling its low alcohol beer in California. By June of 1984,[14] Heileman was selling its low alcohol beers in Illinois, Maryland, Minnesota, Montana, North Dakota and Washington. *See* Transcript at 365–66, 467–79. *See also* Trial Exhibit 379.

45. By the time of trial, Heileman was using the LA mark on beer sold throughout "most of the United States." *See* Transcript at 446, 466.

46. Miller began to use the mark Sharp's LA on beer shipped and sold in interstate commerce on August 13, 1984. *See* Transcript at 2007.

47. By the time of trial, Miller was selling Sharp's LA at retail outlets in five test markets: Atlanta, Georgia; Houston, Texas; Columbus, Ohio; Springfield, Illinois; and San Diego, California. *See* Transcript at 2007.

48. Anheuser–Busch has met its burden of proving by a preponderance of the evidence that it was the first or senior user[15] of the "LA" mark on beer sold in Wisconsin and at least thirty-one other states.

### (3) *Trademark Registration Applications*

49. On January 20, 1984, Anheuser–Busch filed application No. 461853 with the federal Patent and Trademark Office to register "LA" as a trademark. *See* Trial Exhibit 315. *See also* Transcript at 1485–87, 1508.

50. On January 23, 1984, Anheuser–Busch filed application No. 462371 with the federal Patent and Trademark Office to register "L.A." as a trademark. *See* Trial Exhibits 299, 387. *See also* Transcript at 1506.

51. On February 9, 1984, Anheuser–Busch filed an application with the federal Patent and Trademark Office to register "L.A.B." as a trademark. *See* Trial Exhibits 49, 388. *See also* Transcript at 1507.

52. On February 9, 1984, Anheuser–Busch filed an application with the federal Patent and Trademark Office to register

token shipment of beer labeled with LA (without periods) mark made on January 20, 1984).

**14.** Russell Cleary, chief executive officer of the G. Heileman Brewing Company, testified that he thought Heileman's LA beers were being sold in Illinois and other midwestern states in April or May of 1984. *See* Transcript at 365–66, 467–68. However, this belief was not supported by the shipping documents received in evidence. *See* Trial Exhibit 379.

**15.** As terms of art in the field of trademark law, "senior user" denotes "the first seller to adopt and use a mark in the United States," and "junior user" denotes "the second seller to adopt the mark, even though the junior user may be the first in time within a given remote territory." 1 J. McCarthy, *Trademarks and Unfair Competition* § 26:1 at 204 (1973).

"L.A.D." as a trademark. *See* Trial Exhibit 389. *See also* Transcript at 1507.

53. On May 11, 1984, Anheuser–Busch filed an application with the federal Patent and Trademark Office to register "LA" and an accompanying trade dress design as a trademark. *See* Trial Exhibits 319, 530. *See also* Transcript at 1510–13.

54. On May 23, 1984, the federal Patent and Trademark Office rejected the applications to register "L.A." and "LA," on the ground that the initials designated "Los Angeles." *See* Trial Exhibits 316, 318, 387. *See also* Transcript at 1508–10.

55. At the time of trial Anheuser–Busch had not succeeded in obtaining a federal trademark registration for "L.A.B.," "L.A. D.," "L.A.," or "LA". Anheuser–Busch had not withdrawn any of the applications which had not yet been rejected by the Patent and Trademark Office. *See* Transcript at 1514.

56. There is no evidence in the record that Heileman attempted to obtain federal trademark registration for "L.A." or "LA."

57. There is no evidence in the record that Miller attempted to obtain federal trademark registration for "L.A.," "LA," or "Sharp's LA."

### (4) *Strength of Mark*

58. Before Anheuser–Busch began to market its low alcohol beer in interstate commerce in 1984, this type of beer was not being produced or sold in the United States except in two local markets. *See* Transcript at 369–76, 427–28, 495–96, 923, 976–92, 1164, 1179–80, 1191, 1308, 1329, 2060, 2117, 2132, 2135, 2161, 2233–34.

59. Due to BATF policy in effect prior to April 27, 1984, consumers in most states had not been exposed to beer advertising or labels describing the alcoholic weakness of beer. *See* Transcript at 58–59, 297–99, 434, 984–85, 1226–35.

60. Prior to April of 1984, beer consumers used no generic or common descriptive name for low alcohol beer—a product that did not exist, except in two local markets. *See* Transcript at 427–28, 488, 923, 1308–09, 1603, 1609–12, 1628–29, 2060–62, 2078–80,

2132, 2218. *See also* Trial Exhibits 773, 774.

61. Anheuser–Busch has met its burden of proving by a preponderance of the evidence that LA was not a generic name for a type of beer when it began to market LA; when its competitors Heileman and Miller began to market their low alcohol beers; or by the time of trial. *See* Transcript at 1515–1874. *See also* Trial Exhibits 773, 774.

62. Anheuser–Busch copied the name "LA" from Australian beers such as Tooth LA. *See* Transcript at 2214–15, 2217. In Australia, the name "LA" is used to signify low or light alcohol beers. *See* Transcript at 51–54, 68, 109–16, 240–42, 944–48, 959, 2212–13. *See also* Trial Exhibits 74, 77, 100, 101, 102, 103, 400, 401, 426, 427.

63. After adopting and using the LA mark, Anheuser–Busch made superficial efforts to avoid genericizing the name LA and to use the name LA as a trademark. *See* Transcript at 158, 1027, 1224, 1244, 2223.

64. Although Anheuser–Busch personnel equated "LA" with low alcohol in communiques within the company and in some advertising and point-of-sale materials, it later attempted to disclaim the initialism by removing the periods from the letters; by testifying that the letters have no meaning; by changing its advertising message from "low alcohol" to "half the alcohol"; and by trying to promote the term "reduced alcohol" as the category descriptor for the new beer. *See* Transcript at 64, 100, 158–65, 169–70, 236–39, 247, 491–502, 1072, 1089–91, 1096–98, 1110, 1116–17, 1131–33, 1141, 1161, 1183–89, 1191–96, 1198–99, 1202–03, 1213–15, 1236–44, 1283, 1287–88, 1293, 1306–09, 2165, 2218–21, 2224. *See also* Trial Exhibits 10, 12, 39, 43, 50, 52, 53, 73, 76, 156, 243, 278, 301, 396, 397, 398, 442A, 442B, 442C, 442D, 521, 523, 723.

65. Anheuser–Busch was motivated to deny that "L" and "A" are initials for low alcohol because of BATF interpretation of advertising and labeling regulations prior to April 27, 1984, and because it was attempting to protect "LA" as a trademark.

*See* Transcript at 1166–67, 1213–15, 1226–35, 2216, 2223.

66. When introducing its new beer to consumers, Anheuser–Busch engaged in a publicity campaign in which it tacitly encouraged public relations and advertising agencies it had retained as well as media reporters and others unconnected with the company to describe LA to consumers as low, less or light in alcohol. *See* Transcript at 264–74 (and exhibits received therein), 432–33, 888–93 (and exhibits received therein), 1071–73 (and exhibits received therein), 1084–86, 1089–91, 1149–55, 1184, 1233–84 (and exhibits received therein), 2191, 2196–2204, 2206–07, 2218–19. *See also* Trial Exhibits 194, 278, 333, 456, 459, 463, 523.

67. Ordinary consumers, as well as secondary sources such as the news media, who have been exposed to LA beer in the context of its trade dress, packaging and advertising, perceive the initials "L" "A" as descriptive of beer containing low, light or less alcohol than regular beer. *See* Transcript at 334, 530–31, 673–74, 703–04, 708–12, 924, 1170–72, 1685, 2063, 2078, 2228, 2235, 2243. *See also* Trial Exhibits 194, 333, 435, 436, 456, 459, 463, 774.

68. Based on the evidence adduced at trial and having evaluated the credibility of the witnesses, the court finds that Anheuser–Busch's contention that the letters "L" "A" have no direct meaning when used in association with beer is not credible.

69. Regardless of whether the name LA is written with or without periods, it is pronounced as the initials "L" and "A". These initials directly denote the words "low alcohol" (or synonyms such as "less alcohol" or "light in alcohol") which describe the unique characteristic that distinguishes the beer at issue from other beers.

70. Because the "LA" mark conveys to the relevant public an immediate idea of the unique, low alcohol characteristic of the beer to which it is affixed, the court finds that "LA" is not an arbitrary or suggestive name as applied to beer.

71. "LA," the initials for words which describe the alcoholic weakness of beer, is a merely descriptive term for beer.

72. The court finds that Anheuser–Busch has failed to meet its heavy burden of proving that, by the time Heileman and Miller began to use the LA mark, it had used the LA name so long and so extensively in the same markets that significant numbers of consumers believed that the LA product emanated from a single source. In other words, based on the following subsidiary findings, the court finds that Anheuser–Busch has failed to prove that its merely descriptive LA mark had acquired secondary meaning at any time relevant to these actions:

(a) Anheuser–Busch had been continuously and exclusively [16] using the LA mark for beer for approximately one month when Heileman began to use the LA mark. *See* Transcript at 207–08, 334, 365, 392, 440–41, 467, 1014, 1017–18, 1027, 1229, 1454–55. *See also* Trial Exhibits 379, 713, 714, 767.

(b) Anheuser–Busch had been continuously, but not exclusively, using the LA mark on beer sold in commerce for approximately four and one-half months when Miller began to use the LA mark. *See* Transcript at 207–08, 1014, 1017–18, 1027, 1229, 1454–55, 2007. *See also* Trial Exhibits 713, 714, 767.

(c) Anheuser–Busch extensively advertised and publicized its LA beer in all media covering national, regional and local markets. Through August of 1984, Anheuser–Busch spent approximately $17,000,000.00 advertising its LA beer. In addition, Anheuser–Busch had committed $9,500,000.00 for permanent and paper point of sale materials. *See* Transcript at 1019–22, 1026–51, 1086–91. *See also* Trial Exhibits 723, 724, 725, 728, 729, 730, 733.

(d) By the time of trial Heileman had spent approximately $1,650,000.00 advertising its LA beers, plus an additional

---

16. Anheuser–Busch's use was exclusive with the exception of Stroh's use of the mark on SHAEFER LA which was briefly marketed in one town in Texas. *See* Transcript at 496, 2112.

*See also Anheuser–Busch, Inc. v. Stroh Brewery Company,* 587 F.Supp. 330, 338 (E.D.Mo.), *aff'd,* 750 F.2d 631 (8th Cir.1984).

$80,000.00 for point-of-sale displays. *See* Transcript at 444, 460–65, 2068. *See also* Trial Exhibit 399.

(e) By the time of trial Miller had spent approximately one and one half million dollars developing a market for its low alcohol beer. *See* Transcript at 950, 2006–10.

(f) At the time of trial Anheuser–Busch had sold approximately 200,000 barrels of its LA beer. One barrel is equivalent to 13,777 cases of twenty-four units of 12–ounce beers. Through August of 1984, Anheuser–Busch's sales of LA grossed approximately $20,000,-000.00. *See* Transcript at 1051–52. *See also* Trial Exhibit 714.

(g) At the time of trial Heileman had sold approximately 60,000 barrels of its LA beers. *See* Transcript at 2068.

(h) At the time of trial Anheuser–Busch was marketing its LA beer in all states except Connecticut. *See* Transcript at 1043–44. Heileman was marketing its LA beers under seven house marks in "most" states. *See Id.* at 446, 466. And Miller was marketing its Sharp's LA in five test markets in Georgia, Texas, Ohio, Illinois and California. *See Id.* at 2007. Within these markets the LA beers are all sold through the same channels. *See Id.* at 95, 342, 486, 1315.

(i) A majority of consumers who have been introduced to the LA mark on beer in the context of its trade dress, packaging and advertising recognize that LA describes the beer as containing low, light, or less alcohol. *See* Transcript at 334, 530–31, 673–74, 703–04, 708–12, 924, 1171, 1685, 2063, 2078, 2228, 2235, 2243. *See* Trial Exhibits 435, 436, 774.

73. Anheuser–Busch has failed to meet its burden of proving by a preponderance of the evidence that LA, as applied to beer, is a valid, legally protectible common-law trademark.

74. The court finds that "LA" is a merely descriptive mark for beer which had not acquired secondary meaning by the time Heileman or Miller began to use the mark on beer.

### (5) *Likelihood of Confusion*

75. Based on the following factors, the court finds that there is no significant likelihood that consumers will confuse "LA" from Anheuser–Busch with the LA beers sold by Heileman and Miller:

(a) The LA marks used by Anheuser–Busch, Heileman and Miller are virtually identical on the levels of sight, sound and meaning. The only differences are the type fonts of the initials and the use of periods by Heileman. *See, e.g.,* Trial Exhibits 210, 407, 410, 413, 416, 419, 422, 428, 429, 707, 708. *See also* Transcript at 1141.

(b) Heileman prominently displays its established house marks with L.A. as a category descriptor on all its low alcohol beers. *See* Trial Exhibits 407, 410, 413, 416, 419, 422. *See also* Transcript at 331.

(c) Miller prominently displays the single brand name "Sharp's" with LA as a category descriptor on its low alcohol beer. *See* Trial Exhibits 428, 429.

(d) Anheuser–Busch displays the corporate source designating phrase "from Anheuser–Busch" on its LA beer. *See* Trial Exhibits 210, 707.

(e) "LA" is a weak mark in that the court has found that it is merely descriptive and has not acquired secondary meaning.

(f) The LA beers of Anheuser–Busch, Heileman and Miller are marketed through the same channels of trade; advertised through the same media; compete for the same customers; and fulfill the same function. *See* Transcript at 61, 94–99, 103–04, 342, 420–22, 442–43, 484–86, 723–25, 728–30, 1311–19, 2084–85, 2116.

(g) Anheuser–Busch, Heileman and Miller positioned their LA beers in the premium price category. *See* Transcript at 96–98, 485, 1148, 1311, 1329.

(h) While beer is a low priced item, consumers use some degree of care and attention when making a beer purchase because of brand loyalty. *See* Transcript at 903, 1203.

(i) Although Heileman and Miller adopted the name LA only after they learned that Anheuser–Busch had adopted the name and only after they learned that Anheuser–Busch had received BATF approval for its "L.A." label, Heileman and Miller did not copy the LA mark with the intent to deceive the public into falsely believing that their LA beers emanate from Anheuser–Busch. They adopted and used the LA mark to convey the purpose and unique, low alcohol characteristic of their beers. *See* Transcript at 325–33, 345–48, 433–37, 446–48, 2131, 2138–40, 2236, 2246.

(j) Anheuser–Busch produced no evidence of actual confusion among consumers after Heileman began to use the LA mark in April of 1984, or after Miller began to use the mark in August of 1984. *Cf.* Transcript at 346–48, 446, 904–09.

(k) Survey evidence indicates that fewer than five percent of consumers are likely to be confused about the source of the parties' LA beers. *See* Transcript at 717–34. *See also* Trial Exhibit 440.

### (6) *Liability*

76. Anheuser–Busch Incorporated has not met its burden of proving by a preponderance of the evidence that the G. Heileman Brewing Company, Inc., by using the LA mark, has engaged in trademark infringement or any other acts of unfair competition.

77. Anheuser–Busch Incorporated has not met its burden of proving by a preponderance of the evidence that the Miller Brewing Company, by using the LA mark, has engaged in trademark infringement or any other acts of unfair competition.

### D. TRADEMARK DILUTION

78. As among the parties, Anheuser–Busch was the first to adopt and use the LA mark on beer sold in commerce in Illinois. *See* Trial Exhibits 379, 714. *See also* Transcript at 365–66, 467–79, 2007.

79. Based on the following factors, the court finds that the LA mark used by Anheuser–Busch on beer is not distinctive:

(a) The LA mark is not arbitrary. The court has found that LA is a merely descriptive mark which had not acquired secondary meaning in Illinois or any other state by the time the plaintiffs began to use it.

(b) Anheuser–Busch began to use the LA mark in Illinois in May of 1984, followed by Heileman in June of 1984, and by Miller in August of 1984. *See* Trial Exhibits 379, 714. *See also* Transcript at 365–66, 467–79, 2007.

(c) By the time of trial, Anheuser–Busch had spent approximately $27,000,000.00 advertising its LA beer. *See* Transcript at 1019–22, 1026–51, 1086–91. *See also* Trial Exhibits 723, 724, 725, 728, 729, 730, 733. However, there is no evidence showing what share of this advertising was directed toward Illinois.

(d) Anheuser–Busch, Heileman and Miller are all major brewers with national reputations.

80. The LA marks used by Heileman and Miller are virtually identical to the LA mark used by Anheuser–Busch. In addition, Heileman and Miller each spent over one and one half million dollars advertising their LA beers in states including Illinois. *See* Transcript at 444, 460–65, 950, 2006–10, 2068. *See also* Trial Exhibit 399. Nevertheless, LA is a weak mark, incapable of being diluted.

81. Anheuser–Busch, Heileman and Miller are competitors and their LA beers are directly competing products. *See* Transcript at 1203, 1313–18, 1327, 2032, 2086. The court has found that, by using the LA mark, Heileman and Miller did not engage in trademark infringement or unfair competition.

82. Anheuser–Busch Incorporated has not met its burden of proving by a preponderance of the evidence that the G. Heileman Brewing Company, Inc. diluted the LA mark used by Anheuser–Busch.

83. Anheuser–Busch Incorporated has not met its burden of proving by a preponderance of the evidence that the Miller Brewing Company diluted the LA mark used by Anheuser–Busch.

### E. ATTEMPT TO MONOPOLIZE

#### (1) *Elements of Claim*
##### SPECIFIC INTENT:

84. Although Anheuser–Busch personnel frequently spoke of plans to "preempt" the LA beer market,[17] the court finds that Heileman and Miller have failed to prove by a preponderance of the evidence that Anheuser–Busch had specific intent to control prices or to restrain competition unreasonably.

##### ANTICOMPETITIVE OR PREDATORY CONDUCT:

85. On April 2, 1984, Anheuser–Busch sent Heileman a letter stating that:

> The March 30, 1984 edition of THE WALL STREET JOURNAL reported an announcement by G. Heileman Brewing Company that in April it will begin producing two low-alcohol beers, to be marketed as Blatz L.A. and Black Label L.A. In 1983, our subsidiary, Anheuser–Busch, Inc., adopted and used, and is continuing to use, LA as its trademark for its new brand of beer.
>
> We therefore request that the G. Heileman Brewing Company refrain from any future use of LA in connection with any of its products.
>
> Please know that if you fail to comply strictly with this request, we will take all legal steps necessary to protect our rights in the name of our new brand of beer.

Complaint [of G. Heileman Brewing Company, Inc.] at Exhibit J. *See also* Transcript at 2116–17.

86. Heileman filed the instant complaint against Anheuser–Busch at 10:26 A.M. on April 18, 1984, according to the file stamp on the complaint.[18] Later that same day Anheuser–Busch filed a mirror-image lawsuit against Heileman in the United States District Court for the Southern District of Illinois. *See* Affidavit of Peggy L. Jones (April 26, 1984).

87. Anheuser–Busch filed a counterclaim for trademark infringement against Heileman on May 24, 1984. *See* Answer and Counterclaim [of Anheuser–Busch Incorporated].

88. Anheuser–Busch made no oral or written demand to Miller to cease and desist or refrain from using or making plans to use the LA mark prior to the time Miller filed its lawsuit against Anheuser–Busch. *See* Transcript at 2029.

89. Anheuser–Busch filed a counterclaim for trademark infringement against Miller on August 24, 1984, after Miller had begun to use the LA mark on beer sold in commerce on August 13, 1984. *See* Answer and Counterclaim [of Anheuser–Busch Incorporated]. *See also* Transcript at 2007.

90. On April 18, 1984, Anheuser–Busch filed a trademark infringement action against another competitor, the Stroh Brewery Company, which had announced plans to use the LA mark. After finding that the LA mark was suggestive and deserving of trademark protection, the United States District Court for the Eastern District of Missouri enjoined Stroh from using the LA mark in the United States and its territories and possessions. *See* Transcript at 368, 1057, 1305–06. *See also Anheuser–Busch, Inc. v. Stroh Brewery Company,* 587 F.Supp. 330 (E.D.Mo.), *aff'd,* 750 F.2d 631 (8th Cir.1984).

91. Based on Anheuser–Busch's vigorous prosecution of its case against Stroh and of its counterclaims in the instant lawsuits, the court finds that Anheuser–Busch was primarily motivated by a desire to obtain court-ordered relief rather than by a desire to achieve anticompetitive goals merely through the filing and maintenance of lawsuits. *See* Transcript at 1306.

---

**17.** *See e.g.,* Transcript at 168, 179, 1097, 1105–06, 1112–13, 1133, 1138, 1165, 1169, 1177–78, 1182, 1187–88, 1193, 1195, 1199, 1319–22, 1333, 1339, 2175, 2187, 2201–02, 2221–23. The court regards these preemption statements as little more than sales promotion bluster, even though Heileman and Miller attempted to endow them with a sinister connotation throughout the trial.

**18.** The court notes that Heileman's Certificate of Interest and other forms usually filed simultaneously with the Complaint were filed at 4:12 P.M. on April 18, 1984.

92. Heileman and Miller have failed to prove by clear and convincing evidence, or even by a preponderance of the evidence, that Anheuser–Busch made its cease and desist demand to Heileman in bad faith or that it engaged in any sham litigation over the LA mark.

93. Heileman and Miller have failed to prove by a preponderance of the evidence that Anheuser–Busch, by attempting to register LA as a trademark[19] or by using judicial process, engaged in anticompetitive or predatory conduct.

### DANGEROUS PROBABILITY OF SUCCESS:

94. The court finds that the United States is the geographic market relevant to the plaintiffs' attempt to monopolize claims because, at the time of trial, Anheuser–Busch was distributing its LA beer in all states except Connecticut; Heileman was distributing its regional LA beers in most states; and Miller was planning to distribute its Sharp's LA nationally. Therefore, the United States is the market area in which the seller operates and purchasers can practicably turn to competitors for supplies. *See* Transcript at 88–89, 446, 1043. *See also* Trial Exhibits 379, 714.

95. Based upon the following factors, the court finds that Heileman and Miller have not met their burden of establishing the existence of a relevant product submarket in low alcohol beer:

(a) Although there is some evidence that the beer industry recognized low alcohol beer as a distinct economic subcategory or segment, *see, e.g.,* Transcript at 884, 2226, no consumer submarket in low alcohol beer had been established at the time of trial. A preponderance of the evidence shows that low alcohol beer was, at best, an emerging segment. *See* Transcript at 156–57, 280, 500, 881, 883–84, 1098–99, 1137, 1164, 1169, 1179–83, 1191–92, 1201, 1328, 1329, 1332, 1346,

2132, 2161–63, 2174–75, 2178, 2199–2202, 2221. *See also* Trial Exhibit 205.

(b) The production facilities, customers, pricing structure, and channels of distribution are the same for low alcohol beer as for many other types of beer. *See* Transcript at 61, 94–96, 103–04, 342, 420–22, 442–43, 484–86, 723–25, 728–30, 733, 1311–19, 2084–85, 2116. *See also* Trial Exhibit 835.

(c) Other beverages, which contain less alcohol than regular beer or no alcohol, are close substitutes for low alcohol beer. *See* Transcript at 99, 2034–35, 2117–20.

(d) Light beer[20] is reasonably interchangeable with LA beer. Light and LA are both sold at premium retail prices. *See* Transcript at 1311, 1329. Both products are intended to be used to reduce or moderate unwanted effects of drinking regular beer. *See* Transcript at 293–94, 999–1001, 1111, 1157. Most, if not all, light beers contain less alcohol than regular beers, even though they may not contain as little alcohol as low alcohol beers. Most low alcohol beers contain fewer calories than regular beers. *See* Transcript at 50–51, 102, 245, 297, 411–12, 435, 533–34, 1329–30, 2063–69, 2073–74, 2122, 2152, 2178, 2193, 2228. *But see* Transcript at 297, 883.

(e) Low alcohol beer is not so unique or dominant in the market that there is no practical substitute for it. *See* Transcript at 99, 1318, 2034–35.

96. Based on the findings numbered 95(a)–(e) above, the court finds that, at a minimum, the relevant product market consists of all beers containing less alcohol than regular beer.

97. Based on the following factors, the court finds that it was not possible for Anheuser–Busch to achieve the monopoly power to control prices or exclude competition from the relevant market at the time

---

**19.** *See* Findings of Fact in Part III(C)(3), above.

**20.** Light beer is a low calorie beer. *See* Transcript at 50–51, 157, 423. Light beer is a recognized segment of the beer industry among consumers. *See* Transcript at 51, 279, 435, 882,

1164. Heileman and Anheuser–Busch positioned their LA beers to compete with Miller LITE. *See* Transcript at 244–45, 2064–65, 2075, 2089–92, 2193. *See also* Trial Exhibit 301.

the alleged anticompetitive events occurred:

(a) At the time of trial Anheuser–Busch had sold approximately 200,000 barrels of LA beer, while Heileman has sold approximately 60,000 barrels of its L.A. beers. *See* Transcript at 1051–52, 2068. No sales figures were presented for Miller's low alcohol beer sales, however Miller had captured a 52–55% share of the light beer market. *See* Transcript at 2210. *See also* Transcript at 60, 286, 438. At the time of trial light beer sales comprised twenty percent of the total beer market. *See* Transcript at 286, 2199. Low alcohol beer sales were estimated to comprise less than one percent of total beer sales. *See* Transcript at 2199. Other competitors were selling beer with less alcohol than regular beer, but the record contains no evidence of their actual numbers or market shares. *See* Transcript at 380–85, 890–91, 1056–58. *See also* Trial Exhibits 734, 735.

(b) The record contains no evidence of Anheuser–Busch's capacity to control prices.

(c) Although the Stroh Brewing Company was enjoined from using the LA mark, there is no evidence that Stroh or any other competitor was excluded from the relevant market or from selling beer with a low alcoholic content.

### (2) *Liability*

98. The G. Heileman Brewing Company, Inc. has not met its burden of proving by a preponderance of the evidence that it suffered an antitrust injury stemming from any predatory or anticompetitive conduct of Anheuser–Busch Incorporated or that Anheuser–Busch attempted to monopolize any relevant market of the beer industry by attempting to register trademarks or by filing or threatening to file lawsuits asserting trademark rights in the name "LA."

99. The Miller Brewing Company has not met its burden of proving by a preponderance of the evidence that it suffered an antitrust injury stemming from any predatory or anticompetitive conduct of Anheuser–Busch Incorporated or that Anheuser–Busch attempted to monopolize any relevant market of the beer industry by attempting to register trademarks or by filing or threatening to file lawsuits asserting rights in the name "LA."

### F. ATTORNEY FEES

100. Although Heileman and Miller have prevailed on their claims for declaratory relief, they have failed to meet their burden of proving by clear and convincing evidence or by a preponderance of the evidence that these cases involve exceptional circumstances. Anheuser–Busch has not engaged in misconduct during the course of these lawsuits, or fraud, or vexatious or frivolous litigation.

## VI. CONCLUSIONS OF LAW

### A. JURISDICTION

1. This court has diversity jurisdiction over the state statutory claims and the common-law claims in these consolidated cases in that the plaintiffs and the defendant are citizens of different states and the amounts in controversy are more than $10,-000.00. *See* 28 U.S.C. § 1332(a) & (c).

2. The court has personal jurisdiction over the parties to these actions in that they have been served pursuant to Wisconsin law, have appeared, and have submitted to the jurisdiction of this court. *See* U.S. Const. amends. V & XIV; Wis.Stat. § 801.05 (1985–1986).

3. This court has jurisdiction over the claims and counterclaims for unfair competition (including trademark infringement) arising under 15 U.S.C. § 1125(a) and the common law. *See* 15 U.S.C.A. § 1121 (West Supp.1987); 28 U.S.C. § 1332(a) & (c).

4. Because Heileman and Miller have established that they compete with Anheuser–Busch in the sale of beer and that, at the time they filed their complaints, they were likely to use the challenged LA mark, they have standing to raise their unfair competition claims under section 43(a) of the Lanham Trademark Act, 15 U.S.C. § 1125(a), under the test set forth in *Chromium Industries, Inc. v. Mirror Pol-*

*ishing & Plating Company, Inc.,* 448 F.Supp. 544, 555 (N.D. Ill.1978). *See also Exxon Corporation v. Humble Exploration Company, Inc.,* 695 F.2d 96, 103 n. 10 (5th Cir.1983); *Johnson & Johnson v. Carter–Wallace, Inc.,* 631 F.2d 186, 189 (2d Cir.1980).

5. Because none of the parties have perfected federal registration of the LA mark, the parties do not have standing to seek relief under sections 29, 32, 34, 35, 36, 37 or 38 of the Federal Trademark Act of 1946, as amended, 15 U.S.C. §§ 1051–1127.[21]

6. The court has jurisdiction over the plaintiffs' claims for relief for violations of section 2 of the Sherman Act, 15 U.S.C. § 2. *See* 15 U.S.C. §§ 15 & 26; 28 U.S.C. § 1337.

### B. UNFAIR COMPETITION

7. Section 43(a) of the Lanham Trademark Act, 15 U.S.C. § 1125(a), forbids the use of false designations of origin and false descriptions or representations in the advertising and sale of goods and services. The primary purpose of the Act is to eliminate deceitful practices in interstate commerce involving the misuse of trademarks.[22] Section 43(a) provides in relevant part that:

> (a) Any person who shall affix, apply, or annex, or use in connection with any goods or services, . . . a false designation of origin, or any false description or representation, including words or other symbols tending falsely to describe or represent the same, and shall cause such goods or services to enter into commerce, . . . shall be liable to a civil action by . . . any person who believes that he is or is likely to be damaged by the use of any such false description or representation.

15 U.S.C. § 1125(a).

■ 8. Section 43(a) of the Lanham Trademark Act and the common law of unfair competition encompass causes of action for trademark infringement as well as a wide range of causes of action for deceitful practices involving the misuse of trademarks. *See W.H. Brady Company v. Lem Products, Inc.,* 659 F.Supp. 1355, 1364 (N.D. Ill.1987). The same legal standards are applied to all types of unfair competition claims brought under either federal or state law. *See A.J. Canfield Company v. Concord Beverage Company,* 629 F.Supp. 200, 206 (E.D.Pa.1985), *aff'd sub nom. A.J. Canfield Company v. Honickman,* 808 F.2d 291 (3d Cir.1986).

■ 9. To prevail on a claim of unfair competition under section 43(a) of the Lanham Trademark Act based on an unregistered trademark, the claimant must prove:

> (a.) that it was the first to adopt and use the mark in commerce;
>
> (b.) that the trademark is valid, in other words, distinctive enough to warrant protection; the trademark must be found to be arbitrary or suggestive or it may be merely descriptive, if it has developed a secondary meaning linking the product with its source in the minds of the consuming public;
>
> (c.) that there is likelihood of confusion on the part of the consuming public.

*See W.H. Brady Company v. Lem Products, Inc.,* 659 F.Supp. 1355, 1364–65 (N.D. Ill.1987); *Pedi–Care, Inc. v. Pedi–A–Care Nursing, Inc.,* 656 F.Supp. 449, 453 (D.N.J. 1987); *Brooks Shoe Manufacturing Company, Inc. v. Suave Shoe Corporation,* 533 F.Supp. 75, 77 (S.D. Fla.1981), *aff'd,* 716 F.2d 854 (11th Cir.1983).

■ 10. The quantum of proof necessary to establish a claim of unfair competition is a preponderance of the evidence. *See Keebler Company v. Rovira Biscuit Corporation,* 624 F.2d 366, 373 (1st Cir.

---

**21.** The Federal Trademark Act of 1946 is popularly known as the Lanham Trademark Act. This is the name which will be used throughout this opinion.

**22.** The term "trademark" includes any word, name, symbol, or device or any combination thereof adopted and used by a manufacturer or merchant to identify and distinguish his goods, including a unique product, from those manufactured or sold by others and to indicate the source of the goods, even if that source is unknown. *See* 15 U.S.C.A. § 1127 (1982 West & Supp.1987). *See also Eagle Snacks, Inc. v. Nabisco Brands, Inc.,* 625 F.Supp. 571, 579 (D.N.J. 1985).

1980); *Big O Tire Dealers, Inc. v. Goodyear Tire & Rubber Company,* 561 F.2d 1365, 1370 (10th Cir.1977), *cert. denied,* 434 U.S. 1052, 98 S.Ct. 905, 54 L.Ed.2d 805 (1978).

### (1) *Appropriation and Use*

■ 11. In the case of a claimant seeking relief for the alleged infringement of an unregistered mark, the burden is upon the claimant to establish its right to the exclusive use of the mark. *See Reese Publishing Company, Inc. v. Hampton International Communications, Inc.,* 620 F.2d 7, 11 (2d Cir.1980). This burden is carried by showing that the claimant has acquired the ownership of the unregistered mark by the appropriation and use of the mark in commerce prior in time to the occurrence of the use of the mark by the claimed infringer. *See United Drug Company v. Theodore Rectanus Company,* 248 U.S. 90, 97, 39 S.Ct. 48, 50–51, 63 L.Ed. 141 (1918); *Keebler Company v. Rovira Biscuit Corporation,* 624 F.2d 366, 373 (1st Cir.1980); *Kardex Systems, Inc. v. Sistemco, N.V.,* 583 F.Supp. 803, 810 (D. Me.1984).

■ 12. The common-law right to a trademark is based upon prior use, that is, the first use of the mark in connection with a peculiar line of business. Registration does not create the underlying right in a trademark. That right which accrues from the use of a particular name or symbol is essentially a common-law property right. *See Volkswagenwerk Aktiengesellschaft v. Wheeler,* 814 F.2d 812, 815–16 (1st Cir. 1987); *Pedi–Care, Inc. v. Pedi–A–Care Nursing, Inc.,* 656 F.Supp. 449, 454 (D.N.J. 1987); *Caesar's World, Inc. v. Caesar's Palace,* 490 F.Supp. 818, 822 (D.N.J.1980).

■ 13. Refusal by the United States Patent and Trademark Office to register a mark does not preclude the owner of the mark from its right to use it. *See Volkswagenwerk Aktiengesellschaft v. Wheeler,* 814 F.2d 812, 819 (1st Cir.1987).

■ 14. Common-law trademark rights are acquired on a state-by-state basis. *See SODIMA v. International Yogurt Company, Inc.,* 662 F.Supp. 839, 853 & n. 8 (D.Or. 1987).

### (2) *Strength of Mark*

■ 15. When a mark is not registered, there is no presumption of the mark's validity and the claimant has the burden of proving by a preponderance of the evidence that its mark is protectible. *See Gimix, Inc. v. J S & A Group, Inc.,* 699 F.2d 901, 907–08 (7th Cir.1983); *National Conference of Bar Examiners v. Multistate Legal Studies, Inc.,* 692 F.2d 478, 488 (7th Cir.1982), *cert. denied,* 464 U.S. 814, 104 S.Ct. 69, 78 L.Ed.2d 83 (1983); *Reese Publishing Company v. Hampton International Communications, Inc.,* 620 F.2d 7, 11 (2d Cir.1980); *Merritt Forbes & Company, Inc. v. Newman Investment Securities, Inc.,* 604 F.Supp. 943, 954 (S.D.N.Y.1985).

■ 16. Courts have identified four categories of trademark distinctiveness or strength. Arrayed in an ascending order which roughly reflects their eligibility to trademark status and the degree of protection accorded, these classes are: (1) generic or common descriptive, (2) merely descriptive, (3) suggestive, and (4) arbitrary or fanciful. *See Abercrombie & Fitch Company v. Hunting World, Inc.,* 537 F.2d 4, 9 (2d Cir.1976).

### GENERIC OR COMMON DESCRIPTIVE:

■ 17. A generic term is one that refers, or has come to be understood as referring, to the genus of which the particular product is a species. *See Park 'n Fly, Inc. v. Dollar Park and Fly, Inc.,* 469 U.S. 189, 193–94, 105 S.Ct. 658, 661–62, 83 L.Ed. 2d 582 (1985); *Abercrombie & Fitch Company v. Hunting World, Inc.,* 537 F.2d 4, 9 (2d Cir.1976). A corollary verbal formulation of the meaning underlying the word "generic" is the phrase "the common descriptive name" as a designation for a product. Neither designation affords trademark protection. This is true even though the name acquires a secondary meaning by becoming identified with a particular producer. *See National Conference of Bar*

*Examiners v. Multistate Legal Studies, Inc.*, 692 F.2d 478, 487 (7th Cir.1982), *cert. denied*, 464 U.S. 814, 104 S.Ct. 69, 78 L.Ed. 2d 83 (1983).

18. The test for whether a term is generic is whether its primary significance in the minds of the consuming public is a product category or genus rather than a product's source or producer. *See Kellogg Company v. National Biscuit Company*, 305 U.S. 111, 118, 59 S.Ct. 109, 113, 83 L.Ed. 73 (1938); *Surgicenters of America, Inc. v. Medical Dental Surgeries, Company*, 601 F.2d 1011, 1016 (9th Cir.1979); *Bayer Company, Inc. v. United Drug Company*, 272 F. 505, 509 (S.D.N.Y.1921).

19. Anheuser–Busch, as claimant to protection for an unregistered mark, bears the burden of proving that "LA" is not generic. *See Technical Publishing Company v. Lebhar–Friedman, Inc.*, 729 F.2d 1136, 1139 (7th Cir.1984); *National Conference of Bar Examiners v. Multistate Legal Studies, Inc.*, 692 F.2d 478, 488 (7th Cir. 1982), *cert. denied*, 464 U.S. 814, 104 S.Ct. 69, 78 L.Ed.2d 83 (1983).

### MERELY DESCRIPTIVE:

20. A merely descriptive term specifically describes a characteristic, quality or ingredient of an article of trade, as, for example, its color, odor, function, dimension, or ingredients. *See Park 'n Fly, Inc. v. Dollar Park and Fly, Inc.*, 469 U.S. 189, 193–94, 105 S.Ct. 658, 662, 83 L.Ed.2d 582 (1985); *Henri's Food Products Company, Inc. v. Tasty Snacks, Inc.*, 817 F.2d 1303, 1306 (7th Cir.1987); *Soweco, Inc. v. Shell Oil Company*, 617 F.2d 1178, 1183 (5th Cir.1980), *cert. denied*, 450 U.S. 981, 101 S.Ct. 1516, 67 L.Ed.2d 816 (1981); *Union Carbide Corporation v. Ever–Ready, Inc.*, 531 F.2d 366, 378 (7th Cir.), *cert. denied*, 429 U.S. 830, 97 S.Ct. 91, 50 L.Ed.2d 94 (1976).

21. The descriptiveness of a mark, when applied to the goods involved, is to be determined from the standpoint of the average prospective purchaser. *See In re Omaha National Corporation*, 819 F.2d 1117, 1119 (Fed.Cir.1987); *Applica-*

*tion of Abcor Development Corporation*, 588 F.2d 811, 814 (C.C.P.A.1978); *Bayer Company, Inc. v. United Drug Company*, 272 F. 505, 509 (S.D.N.Y.1921). What the designation means to those in the industry is not determinative. *See Big O Tire Dealers v. Goodyear Tire & Rubber Company*, 561 F.2d 1365, 1369 (10th Cir.1977), *cert. denied*, 434 U.S. 1052, 98 S.Ct. 905, 54 L.Ed.2d 805 (1978).

22. Evidence of the public's understanding of a term may be obtained from any competent source, such as purchaser testimony, consumer surveys, listings in dictionaries, trade journals, newspapers, and other publications. *See In re Merrill Lynch, Pierce, Fenner and Smith, Inc.*, 828 F.2d 1567, 1570 (Fed.Cir.1987). Evidence of the context in which a mark is used on labels, packages, or in advertising material directed to the goods is also probative of the reaction of prospective purchasers to the mark. *See Application of Abcor Development Corporation*, 588 F.2d 811, 814 (C.C.P.A.1978).

23. A mark which is merely descriptive can, by acquiring a secondary meaning, become a valid trademark. *See Miller Brewing Company v. G. Heileman Brewing Company, Inc.*, 561 F.2d 75, 79 (7th Cir.1977), *cert. denied*, 434 U.S. 1025, 98 S.Ct. 751, 54 L.Ed.2d 772 (1978); *Union Carbide Corporation v. Ever–Ready, Inc.*, 531 F.2d 366, 380 (7th Cir.), *cert. denied*, 429 U.S. 830, 97 S.Ct. 91, 50 L.Ed.2d 94 (1976).

24. A mark has acquired secondary meaning when it has been used so long and so exclusively by one producer with reference to its article that, in that trade and to that branch of the purchasing public, the word or phrase has come to mean that the article was the first producer's trademark. *See G & C Merriam Company v. Saalfield*, 198 F. 369 (6th Cir.1912), *cert. denied*, 243 U.S. 651, 37 S.Ct. 478, 61 L.Ed. 947 (1917). *See also Gimix, Inc. v. JS & A Group, Inc.*, 699 F.2d 901, 907 (7th Cir.1983); *Union Carbide Corporation v. Ever–Ready, Inc.*, 531 F.2d 366, 380 (7th Cir.), *cert. denied*, 429 U.S. 830, 97 S.Ct. 91, 50 L.Ed.2d 94 (1976).

**1468**

25. Proof of secondary meaning entails rigorous evidentiary requirements and the party seeking to prove secondary meaning has a "heavy" burden of showing that the efforts undertaken to associate the product with one source have been effective. *See 20th Century Wear v. Sanmark–Stardust, Inc.,* 815 F.2d 8, 10 (2d Cir.1987); *Eagle Snacks, Inc. v. Nabisco Brands, Inc.,* 625 F.Supp. 571, 582 (D.N.J. 1985).

26. Secondary meaning can be proved by direct or circumstantial evidence. The variables to be considered in determining whether a mark has secondary meaning include:

1. the duration, continuity, and exclusive use of the mark;
2. the efforts made in the direction of promoting a conscious connection, in the public's mind, between the mark and a particular source of origin, including the extent of advertising and promotion and the amount of money spent thereon;
3. the volume of sales, including figures showing sales of the claimant's product or the number of people who have consumed it;
4. identification of the parties' respective markets;
5. direct evidence of public recognition in the the form of consumer testimony and consumer surveys.

*See Union Carbide Corporation v. Ever-Ready, Inc.,* 531 F.2d 366, 380 (7th Cir.), *cert. denied,* 429 U.S. 830, 97 S.Ct. 91, 50 L.Ed.2d 94 (1976); *Sears, Roebuck and Company v. Sears Financial Network,* 576 F.Supp. 857, 862 (D.D.C.1983); *Brooks Shoe Manufacturing Company, Inc. v. Suave Shoe Corporation,* 533 F.Supp. 75, 78 (S.D.Fla.1981), *aff'd,* 716 F.2d 854 (11th Cir.1983).

27. To establish secondary meaning it is not necessary for the public to be aware of the name of the manufacturer from which a product emanates. It is sufficient if the public is aware that the product comes from a single, though anonymous, source. *See Union Carbide Corpo-*ration v. Ever–Ready, Inc., 531 F.2d 366, 380 (7th Cir.), *cert. denied,* 429 U.S. 830, 97 S.Ct. 91, 50 L.Ed.2d 94 (1976).

28. Anheuser–Busch has the burden of proving that secondary meaning existed at the time Heileman and Miller commenced using the LA mark in commerce. *See 20th Century Wear, Inc. v. Sanmark–Stardust, Inc.,* 747 F.2d 81, 90 (2d Cir.1984), *cert. denied,* 470 U.S. 1052, 105 S.Ct. 1755, 84 L.Ed.2d 818 (1985); *Scott Paper Company v. Scott's Liquid Gold, Inc.,* 589 F.2d 1225, 1231 (3d Cir.1978).

### SUGGESTIVE:

29. A suggestive term suggests rather than describes an ingredient or characteristic of the goods and requires the observer or listener to use imagination and perception to determine the nature of the goods. Such a term can be protected without proof of a secondary meaning. *See Miller Brewing Company v. G. Heileman Brewing Company,* 561 F.2d 75, 79 (7th Cir.1977), *cert. denied,* 434 U.S. 1025, 98 S.Ct. 751, 54 L.Ed.2d 772 (1978); *Eagle Snacks, Inc. v. Nabisco Brands, Inc.,* 625 F.Supp. 571, 580 (D.N.J.1985).

### ARBITRARY OR FANCIFUL:

30. Arbitrary or fanciful marks are designated as "strong marks." They may be coined words or words that are common in linguistic usage but which, when used with the products they represent, neither suggest nor describe any characteristic of those goods. Arbitrary or fanciful marks are entitled to protection against all users and are not vulnerable to possible attack as being merely descriptive. *See Miller Brewing Company v. G. Heileman Brewing Company,* 561 F.2d 75, 79 (7th Cir.1977), *cert. denied,* 434 U.S. 1025, 98 S.Ct. 751, 54 L.Ed.2d 772 (1978); *Tisch Hotels, Inc. v. Americana Inn,* 350 F.2d 609, 611 (7th Cir.1965); *Eagle Snacks, Inc. v. Nabisco Brands, Inc.,* 625 F.Supp. 571, 580 (D.N.J.1985); *Exxon Corporation v. Humble Exploration Company,* 524 F.Supp. 450, 459–60 (N.D.Tex.1981) (name "Humble" as applied to oil company found

to be "arbitrary"), *aff'd in relevant part,* 695 F.2d 96 (5th Cir.1983).

31. In prior litigation in which Anheuser–Busch, Inc. was the plaintiff, the federal district court in the Eastern District of Missouri found that the mark "LA" is not an arbitrary or fanciful mark when affixed to a can or bottle of beer. *See Anheuser–Busch, Inc. v. Stroh Brewery Company,* 587 F.Supp. 330, 335 (W.D.Mo.), *aff'd,* 750 F.2d 631 (8th Cir.1984). Therefore, as a matter of law the doctrine of nonmutual collateral estoppel precludes Anheuser–Busch, Inc. from relitigating the issue of whether "LA" is an arbitrary or fanciful mark entitled to protection against all users. *See Blonder–Tongue Laboratories, Inc. v. University of Illinois Foundation,* 402 U.S. 313, 332–34, 91 S.Ct. 1434, 1444–45, 28 L.Ed.2d 788 (1971); *Miller Brewing Company v. Falstaff Brewing Corporation,* 655 F.2d 5, 9 (1st Cir.1981); *Miller Brewing Company v. Jos. Schlitz Brewing Company,* 605 F.2d 990, 992–96 (7th Cir.1979), *cert. denied,* 444 U.S. 1102, 100 S.Ct. 1067, 62 L.Ed.2d 787 (1980).

## VALIDITY:

32. Under trademark law an abbreviation, like any other unregistered mark, will only be protected if it has acquired secondary meaning. *See Continental Corrugated Container Corporation v. Continental Group, Inc.,* 462 F.Supp. 200, 204 (S.D.N.Y.1978).

33. Letters may be valid trademarks if they are entirely fanciful and arbitrary, if they have no connection with the article or any of its features, or if they are designed solely, or at least primarily, to indicate origin. They are not valid if they describe or refer to the article or its characteristics. *See Nature's Bounty, Inc. v. Basic Organics,* 432 F.Supp. 546, 551 (E.D. N.Y.1977) (term "B–100" held merely descriptive as applied to vitamins).

34. Having found that "LA" (or "L.A.") is a merely descriptive mark which has not acquired secondary meaning at any time relevant to the claims asserted in these actions, the court concludes as a matter of law that "LA" (with out without periods) is not a valid, legally protectible trademark.

### (3) *Likelihood of Confusion*

35. If a senior user of a mark cannot demonstrate that the mark is distinctive enough to warrant protection, the senior user can still maintain a claim under section 43(a) of the Lanham Trademark Act if there is a likelihood of consumer confusion due to the failure of the junior user to identify itself adequately as the source of the product. *See Miller Brewing Company v. Jos. Schlitz Brewing Company,* 605 F.2d 990, 997 (7th Cir.1979), *cert. denied,* 444 U.S. 1102, 100 S.Ct. 1067, 62 L.Ed.2d 787 (1980). *See also Liquid Controls Corporation v. Liquid Control Corporation,* 802 F.2d 934, 939–41 (7th Cir.1986); *Blau Plumbing, Inc. v. S.O.S. Fix–It, Inc.,* 781 F.2d 604, 610 (7th Cir.1986); *Technical Publishing Company v. Lebhar–Friedman, Inc.,* 729 F.2d 1136, 1142 (7th Cir. 1984); *W.H. Brady Company v. Lem Products, Inc.,* 659 F.Supp. 1355, 1365–55 (N.D.Ill.1987).

36. The claimant has the burden of proving likelihood of confusion by a preponderance of the evidence. *See E.I. DuPont de Nemours and Company v. Yoshida International, Inc.,* 393 F.Supp. 502, 510 n. 4 (E.D.N.Y.1975). When a mark is recently adopted and is not registered, doubts about the likelihood of confusion are resolved against the party claiming exclusive rights to the mark. *See AMF Incorporated v. Sleekcraft Boats,* 599 F.2d 341, 352 n. 13 (9th Cir.1979).

37. Likelihood of confusion exists when consumers viewing the mark would probably assume that the product or service it represents is associated with the source of a different product or service identified by a similar mark. *See James Burrough Ltd. v. Sign of the Beefeater, Inc.,* 540 F.2d 266, 275 (7th Cir.1976).

38. Whether or not a likelihood of confusion exists must be determined from the viewpoint of the general public and without regard to any particular geograph-

ic area. *See Tisch Hotels, Inc. v. Americana Inn,* 350 F.2d 609, 614 n. 6 (7th Cir. 1965).

■ 39. Although secondary meaning must be shown to exist at the time the second user commences using the allegedly infringing mark, there is no such limitation on proving likelihood of confusion. *See Amstar Corporation v. Domino's Pizza, Inc.,* 615 F.2d 252, 259 (5th Cir.), *cert. denied,* 449 U.S. 899, 101 S.Ct. 268, 66 L.Ed.2d 129 (1980); *Brooks Shoe Manufacturing Company, Inc. v. Suave Shoe Corporation,* 533 F.Supp. 75, 77–78 n. 4 (S.D. Fla.1981), *aff'd,* 716 F.2d 854 (11th Cir. 1983).

■ 40. The factors to be considered in determining whether there is a likelihood of confusion are:

1. the degree of similarity between the owner's mark and the alleged infringing mark;

2. the strength of the owner's mark;

3. whether the goods are marketed through the same channels of trade and advertised through the same media;

4. the extent to which the targets of the parties' sales efforts are the same;

5. the relationship of the goods in the minds of the public because of the similarity of function;

6. the price of the goods and other factors indicative of the care and attention expected of consumers when making a purchase;

7. the intent of the defendant in adopting the mark;

8. the length of time the defendant has used the mark without evidence of actual confusion arising;

9. the evidence of actual confusion;

10. other facts suggesting that the consuming public might expect the prior owner to manufacture a product in the defendant's market.

*See Ziebart International Corporation v. After Market Associates, Inc.,* 802 F.2d 220, 226 (7th Cir.1986); *Scott Paper Company v. Scott's Liquid Gold, Inc.,* 589 F.2d 1225, 1229 (3d Cir.1978); *Caesars World, Inc. v. Caesar's Palace,* 490 F.Supp. 818, 823–24 (D.N.J.1980).

41. No one factor is conclusive, nor are the presence of all factors necessary. *See Schmidt v. Honeysweet Hams, Inc.,* 656 F.Supp. 92, 96 (N.D.Ga.1986). However, the similarity of the marks, the intent of the claimed infringers, and evidence of actual confusion are the "more important" factors. *See Ziebart International Corporation v. After Market Associates, Inc.,* 802 F.2d 220, 226 (7th Cir.1986).

■ 42. Knowledge of prior use alone does not in itself constitute a showing of bad faith. *See E.R. Squibb & Sons, Inc. v. Cooper Laboratories, Inc.,* 536 F.Supp. 523, 532 (S.D.N.Y.1982). Moreover, selecting a mark because it conveys the product's purpose or characteristics has been held to demonstrate good faith. *See E.S. Originals, Inc. v. Stride Rite Corporation,* 656 F.Supp. 484, 490 (S.D.N.Y. 1987).

■ 43. The use of a strong house mark virtually precludes confusion between similar marks. *See Vitarroz Corporation v. Borden, Inc.,* 644 F.2d 960, 968–69 (2d Cir.1981); *McGregor–Doniger Inc. v. Drizzle Inc.,* 599 F.2d 1126, 1133–34 (2d Cir.1979); *E.S. Originals Inc. v. Stride Rite Corporation,* 656 F.Supp. 484, 488 (S.D.N.Y.1987); *Victory Pipe Craftsmen, Inc. v. Faberge, Inc.,* 582 F.Supp. 551, 557 (N.D.Ill.1984); *Uniroyal, Inc. v. Kinney Shoe Corporation,* 453 F.Supp. 1352, 1355–56 (S.D.N.Y.1978).

### (4) *Common Law of Wisconsin*

44. The Wisconsin Supreme Court has adopted the elements of the tort of unfair competition found in the *Restatement (Second) of Torts* §§ 715–17 (Tent.Draft No. 8, 1963)[23] as the common law of Wisconsin.

---

**23.** The *Restatement (Second) of Torts* in its final form does not have sections dealing with the fields of unfair competition and trade regula-

tion. The American Law Institute takes the position that these fields have evolved into bodies of law in their own right, no longer depend-

*See generally First Wisconsin National Bank of Milwaukee v. Wichman*, 85 Wis. 2d 54, 63, 270 N.W.2d 168, 172 (1978). The *Restatement* takes the position that adoption and use of a trademark gives rise to the right to bring an action for infringement. However mere use of a trademark does not lead automatically to exclusive rights in that name. Rather, to be entitled to prevent others from using a name, the claimant must first prove that it is a valid technical, or strong, mark or that it is a nontechnical mark which has acquired secondary meaning. Then, the claimant must show that the effect of the use has been to identify the particular product and to distinguish it from others and that the alleged infringer's use is likely to cause confusion and deception. *See First Wisconsin National Bank of Milwaukee*, 85 Wis.2d at 62–63, 270 N.W.2d at 172, citing *Restatement (Second) of Torts* § 17 comment *a* (Tent.Draft No. 8, 1963). *See also Blue Ribbon Feed Company, Inc. v. Farmers Union Central Exchange, Inc.*, 731 F.2d 415, 418 (7th Cir.1984); *Hirsch v. S.C. Johnson & Son, Inc.*, 90 Wis.2d 379, 399–403, 280 N.W.2d 129, 138–140 (1979).

45. Section 717 of the *Restatement (Second) of Torts* provides that one infringes a trademark if:

without a privilege to do so, he uses on or in connection with his goods, services or business a designation which so resembles the other's previously used mark or trade name as to be likely to

(a) cause confusion, mistake or deception, or

(b) cause prospective purchasers to believe that

(i) the actor's goods or services are those of the other, or

(ii) the actor's goods or services emanate from the same source as the other's goods or services, or

(iii) the actor's goods or services are approved or sponsored by the other, or

(iv) the actor's business is the business of, or is in some manner associat-

ed or connected with, the other, even though the actor does not use the designation with a purpose to deceive.

*Restatement (Second) of Torts* § 717 (Tent.Draft No. 8, 1963).

46. Under Wisconsin law a claimant can show infringement without showing that the trademark has previously been identified with a product. It is sufficient to show that the trademark was one used to identify the claimant's product and that the use of the name by another caused confusion or mistake in respect to the sponsorship of the goods. *See Hirsch v. S.C. Johnson & Son, Inc.*, 90 Wis.2d 379, 401–02, 280 N.W.2d 129, 139 (1979).

### (5) *Liability*

47. Having found that the LA mark is not distinctive and that there is insufficient evidence of a likelihood of consumer confusion between the Heileman and Anheuser–Busch LA beers, the court concludes that the G. Heileman Brewing Company, Inc. is not liable to Anheuser–Busch Incorporated for unfair competition by using the LA mark in violation of section 43(a) of the Lanham Trademark Act, 15 U.S.C. § 1125(a), the law of Wisconsin, or common law.

48. Having found that the LA mark is not distinctive and that there is insufficient evidence of a likelihood of consumer confusion between the Miller and Anheuser–Busch LA beers, the court concludes that the Miller Brewing Company is not liable to Anheuser–Busch Incorporated for unfair competition by using the LA mark in violation of section 43(a) of the Lanham Trademark Act, 15 U.S.C. § 1125(a), or common law.

### C. TRADEMARK DILUTION

49. The Illinois Anti–Dilution Act, Ill. Rev.Stat. ch. 140, § 22 provides in pertinent part that:

[e]very person ... adopting and using a mark [or] trade name, ... may proceed

ent upon tort law. Nevertheless, the *Restatement* test continues to be followed by Wisconsin's and other states' courts. *See American*

*Association for the Advancement of Science v. Hearst Corporation*, 498 F.Supp. 244, 259 n. 5 (D.D.C.1980).

by suit, and the circuit court shall grant injunctions, to enjoin subsequent use by another of the same or any similar mark [or] trade name ... if there exists a likelihood of injury to business reputation or of dilution of the distinctive quality of the mark [or] trade name ... of the prior user notwithstanding the absence of competition between the parties or of confusion as to the source of goods or services.

Ill.Rev.Stat. ch. 140, § 22.

■■■ 50. Under the Illinois Anti–Dilution Act, the relevant factors to be considered by the court are: (1) the distinctiveness of the mark, and (2) whether the mark is being diluted. *See Hyatt Corporation v. Hyatt Legal Services*, 736 F.2d 1153, 1157 (7th Cir.), *cert. denied*, 469 U.S. 1019, 105 S.Ct. 434, 83 L.Ed.2d 361 (1984). *See also McGraw–Edison Company v. Walt Disney Productions*, 787 F.2d 1163, 1174 (7th Cir.1986); *W.H. Brady Company v. Lem Products, Inc.*, 659 F.Supp. 1355, 1368 (N.D.Ill.1987); *Source Services Corporation v. Source Telecomputing Corporation*, 635 F.Supp. 600, 615 (N.D.Ill.1986).

■■■ 51. In determining the distinctiveness of a trademark, the court looks to whether the mark is arbitrary, the length of time the first user has employed the mark, the scope of the first user's advertising, the nature and extent of the first user's business, and the scope of the first user's reputation. *See Hyatt Corporation v. Hyatt Legal Services*, 736 F.2d 1153, 1158 (7th Cir.), *cert. denied*, 469 U.S. 1019, 105 S.Ct. 434, 83 L.Ed.2d 361 (1984); *W.H. Brady Company v. Lem Products, Inc.*, 659 F.Supp. 1355, 1368 (N.D.Ill.1987).

■■■ 52. In determining whether a subsequent user has diluted an alleged mark, the court should look to the similarity of the marks and the extent of the subsequent user's marketing efforts. *See Hyatt Corporation v. Hyatt Legal Services*, 736 F.2d 1153, 1158 (7th Cir.), *cert. denied*, 469 U.S. 1019, 105 S.Ct. 434, 83 L.Ed.2d 361 (1984); *W.H. Brady Company v. Lem Products, Inc.*, 659 F.Supp. 1355, 1368 (N.D.Ill.1987).

■■■ 53. The protections of the Illinois Anti–Dilution Statute are unavailable to a competitor which cannot obtain relief under the laws of trademark infringement or unfair competition. *See EZ Loader Boat Trailers, Inc. v. Cox Trailers, Inc.*, 746 F.2d 375, 380 (7th Cir.1984), citing *Filter Dynamics International, Inc. v. Astron Battery, Inc.*, 19 Ill.App.3d 299, 314–15, 311 N.E.2d 386, 398–99 (1974); *Victory Pipe Craftsmen, Inc. v. Faberge, Inc.*, 582 F.Supp. 551, 559 (N.D.Ill.1984).

■■■ 54. Having found that the LA mark is not distinctive and that, by using the LA mark, Heileman did not engage in trademark infringement or unfair competition, the court concludes that the G. Heileman Brewing Company, Inc. is not liable to Anheuser–Busch Incorporated for trademark dilution under the Illinois Anti-Dilution Act, Ill.Rev.Stat. ch. 140, § 22.

55. Having found that the LA mark is not distinctive and that, by using the LA mark, Miller did not engage in trademark infringement or unfair competition, the court concludes that the Miller Brewing Company is not liable to Anheuser–Busch Incorporated for trademark dilution under the Illinois Anti–Dilution Act, Ill.Rev.Stat. ch. 140, § 22.

### D. ATTEMPT TO MONOPOLIZE

56. Under Section 2 of the Sherman Act, no person may "monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations ..." 15 U.S.C. § 2.

■■■ 57. A company attempts to monopolize in violation of Section 2 when it engages in a course of conduct which would, if successful, accomplish monopolization, and which, though falling short, so closely approaches monopolization as to create a dangerous probability of it. *See Lektro–Vend Corporation v. Vendo Company*, 660 F.2d 255, 269–70 (7th Cir.1981), *cert. denied*, 455 U.S. 921, 102 S.Ct. 1277, 71 L.Ed.2d 461 (1982).

**(1) *Elements of Claims***

■ 58. In order to prove an attempt to monopolize, a plaintiff must prove by a preponderance of the evidence: (1) a specific intent to achieve a monopoly in a relevant market; (2) predatory or anticompetitive conduct in furtherance of the purpose to monopolize; and (3) a dangerous probability of success in the relevant market. *See Lektro–Vend Corporation v. Vendo Company*, 660 F.2d 255, 270 (7th Cir.1981), *cert. denied*, 455 U.S. 921, 102 S.Ct. 1277, 71 L.Ed.2d 461 (1982); *Chillicothe Sand & Gravel Company v. Martin Marietta Corporation*, 615 F.2d 427, 430 (7th Cir.1980). These elements are conjunctive. *See Conoco, Inc. v. Inman Oil Company, Inc.*, 774 F.2d 895, 906 (8th Cir.1985).

■ 59. The test to be applied in determining whether a trademark is being unlawfully used to confer a monopoly in a certain product is the same as in any other case wherein an unlawful monopoly, or attempt to monopolize, is alleged under Section 2 of the Sherman Act. There is a violation of that provision only if the defendant's actions have led to or resulted in a dangerous probability that it will gain a monopoly over the relevant market. *See Car–Freshner Corporation v. Auto Aid Manufacturing Corporation*, 438 F.Supp. 82, 87 (N.D.N.Y.1977).

■ 60. In general, the power that manufacturers have over their trademarked products is not the power that makes an illegal monopoly. *See United States v. E.I. du Pont de Nemours & Company*, 351 U.S. 377, 393, 76 S.Ct. 994, 1006, 100 L.Ed. 1264 (1956).

### SPECIFIC INTENT:

■ 61. In the context of an attempted monopoly claim, specific intent refers not to the defendant's general intent to do a particular act, but to an overall anticompetitive intent expressed through its actions to destroy competition and to build monopoly. *See Times–Picayune Publishing Company v. United States*, 345 U.S. 594, 626, 73 S.Ct. 872, 890, 97 L.Ed. 1277 (1953).

■ 62. The specific intent element requires proof that the defendant acted with the purpose of achieving monopoly power in the relevant market. Specific intent does not merely mean intent to prevail over one's rivals; it goes beyond that to include an intent to control prices or to restrain competition unreasonably. *See Aspen Skiing Company v. Aspen Highlands Skiing Corporation*, 472 U.S. 585, 600–05, 105 S.Ct. 2847, 2856–59, 86 L.Ed.2d 467 (1985); *United States v. Empire Gas Corporation*, 537 F.2d 296, 302 (8th Cir.1976), *cert. denied*, 429 U.S. 1122, 97 S.Ct. 1158, 51 L.Ed.2d 572 (1977).

■ 63. Specific intent can be proven by direct evidence of statements made by responsible officers or employees of the defendant or it can be inferred indirectly from the defendant's per se unlawful conduct or from otherwise lawful conduct, if the natural and predictable result of the conduct is to control prices or to exclude or destroy competition in the relevant market. *See Conoco Inc. v. Inman Oil Company, Inc.*, 774 F.2d 895, 905 (8th Cir.1985).

■ 64. A manifestation of intent to triumph in the competitive market, or to exclude competition and to expand one's own business, in the absence of unfair, anticompetitive or predatory conduct, is not enough to establish an antitrust violation. *See Great Escape, Inc. v. Union City Body Company, Inc.*, 791 F.2d 532, 541 (7th Cir.1986); *Lektro–Vend Corporation v. Vendo Corporation*, 660 F.2d 255, 273 (7th Cir.1981), *cert. denied*, 455 U.S. 921, 102 S.Ct. 1277, 71 L.Ed.2d 461 (1982).

### ANTICOMPETITIVE OR PREDATORY CONDUCT:

■ 65. To be labeled "anticompetitive" or "predatory" the conduct involved must be such that its anticipated benefits are dependent upon its tendency to frustrate or eliminate competition and thereby enhance the defendant's long term ability to reap the benefits of monopoly power. Such conduct leads to the acquisition of monopoly power by means other than superior product or business acumen. *See Chil-*

*licothe Sand & Gravel Company v. Martin Marietta Corporation*, 615 F.2d 427, 430 (7th Cir.1980). *See also Aspen Skiing Company v. Aspen Highlands Skiing Corporation*, 472 U.S. 585, 600–05, 105 S.Ct. 2847, 2856–59, 86 L.Ed.2d 467 (1985). To be anticompetitive, it is not necessary that such conduct be unlawful in and of itself, so long as it has the effect of achieving monopoly power. However, anticompetitive conduct is conduct without legitimate business purpose that makes sense only because it eliminates competition. *See General Industries Corporation v. Hartz Mountain Corporation*, 810 F.2d 795, 804 (8th Cir.1987); *Great Escape, Inc. v. Union City Body Corporation, Inc.*, 791 F.2d 532, 541 (7th Cir.1986).

66. If litigation is used as an integral part of a scheme attempting to monopolize and exclude competition from the marketplace, that litigation can lose its first amendment protection and constitute forbidden anticompetitive conduct. *See Walker Process Equipment v. Food Machinery & Chemical Corporation*, 382 U.S. 172, 174, 86 S.Ct. 347, 348–49, 15 L.Ed.2d 247 (1965).

## DANGEROUS PROBABILITY OF SUCCESS:

67. The plaintiffs must prove that there was a dangerous probability that the defendant would sooner or later succeed in achieving its intended monopoly if it continued to engage in anticompetitive conduct that is the same or similar to that charged. *See American Tobacco Company v. United States*, 328 U.S. 781, 785, 66 S.Ct. 1125, 1127, 90 L.Ed. 1575 (1946). "[T]he Sherman Act's prohibition against attempted monopolization does not require that the attempt in fact ripen into an actual monopoly. It is the attempt which is the offense." *Lektro–Vend Corporation v. Vendo Company*, 660 F.2d 255, 270 (7th Cir.1981), *cert. denied*, 455 U.S. 921, 102 S.Ct. 1277, 71 L.Ed.2d 461 (1982).

68. The dangerous probability should be evaluated as of the time the alleged anticompetitive events occurred. *See General Industries Corporation v.*

*Hartz Mountain Corporation*, 810 F.2d 795, 807 (8th Cir.1987).

69. In evaluating whether it was possible for the defendant to achieve its goal of monopoly power at the time the alleged anticompetitive events occurred, the court can consider: the defendant's market power, including sales and profits; the defendant's subsequent market performance; the size and number of competitors in the market; increasing or decreasing concentration within the relevant market; and the defendant's capacity to control prices and exclude competitors. *See Lektro–Vend Corporation v. Vendo Company*, 660 F.2d 255, 270–71 (7th Cir.1981), *cert. denied*, 455 U.S. 921, 102 S.Ct. 1277, 71 L.Ed.2d 461 (1982).

## RELEVANT MARKET:

70. In proving whether the defendant possessed sufficient power to come dangerously close to achieving monopoly power, the plaintiffs must prove the relevant geographic and product markets within which that dangerous probability occurred. *See Photovest Corporation v. Fotomat Corporation*, 606 F.2d 704, 711–13 (7th Cir.1979), *cert. denied*, 445 U.S. 917, 100 S.Ct. 1278, 63 L.Ed.2d 601 (1980); *United States v. Empire Gas Corporation*, 537 F.2d 296, 302 (8th Cir.1976), *cert. denied*, 429 U.S. 1122, 97 S.Ct. 1158, 51 L.Ed.2d (1977); *Bernard Food Industries, Inc. v. Dietene Company*, 415 F.2d 1279, 1284 (7th Cir.1969), *cert. denied*, 397 U.S. 912, 90 S.Ct. 911, 25 L.Ed.2d 92 (1970).

71. A relevant geographic market is defined as the area of effective competition within which the seller operates and to which the purchaser can practically turn for supplies. *See Otter Tail Power Company v. United States*, 410 U.S. 366, 369 n. 1, 93 S.Ct. 1022, 1026 n. 1, 35 L.Ed.2d 359 (1973).

72. A relevant product market is comprised of those commodities reasonably interchangeable by consumers for the same purpose. In determining the product market, the court must decide whether the

product is unique or has close substitutes, as to which there are substantial cross-elasticities of demand. *See Fishman v. Estate of Wirtz*, 807 F.2d 520, 531 (7th Cir.1986).

73. Price, use and qualities must be considered in determining whether products are reasonably interchangeable. *See United States v. E.I. du Pont de Nemours & Company*, 351 U.S. 377, 404, 76 S.Ct. 994, 1012, 100 L.Ed. 1264 (1956).

74. The outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity [24] of demand between the product itself and substitutes for it. However, within this broad market, well-defined submarkets may exist which, in themselves, constitute product markets for antitrust purposes. The boundaries of such a submarket may be determined by examining such practical indicia as industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors. *See Brown Shoe Company v. United States*, 370 U.S. 294, 325, 82 S.Ct. 1502, 1523–24, 8 L.Ed.2d 510 (1962); *Photovest Corporation v. Fotomat Corporation*, 606 F.2d 704, 712 (7th Cir. 1979), *cert. denied*, 445 U.S. 917, 100 S.Ct. 1278, 63 L.Ed.2d 601 (1980).

75. A single product will only qualify as a submarket when it is so unique and dominant in the market that there is no practical substitute. *See Frito–Lay, Inc. v. Bachman Company*, 659 F.Supp. 1129, 1136–37 (S.D.N.Y.1986).

### ANTITRUST INJURY:

76. Because this is a private antitrust action in which the plaintiffs are seeking relief under Sections 4 (treble damages) and 16 (injunctive relief) of the Clayton Act, 15 U.S.C. §§ 15 and 26, the plaintiffs must prove that they have suffered an "antitrust injury," which is an "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendant's acts unlawful." *See Brunswick Corporation v. Pueblo Bowl–O–Mat, Inc.*, 429 U.S. 477, 489, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977). *See also generally Cargill, Inc. v. Monfort of Colorado, Inc.*, —— U.S. ——, 107 S.Ct. 484, 93 L.Ed.2d 427 (1986); *Matsushita Electric Industrial Company, Ltd. v. Zenith Radio Corporation*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Local Beauty Supply, Inc. v. Lamaur, Inc.*, 787 F.2d 1197 (7th Cir.1986). In other words, in a private antitrust action, the plaintiffs must allege specific damage to themselves arising from the allegedly wrongful acts of the defendant. *See Matsushita Electric Industrial Company, Ltd.*, 106 S.Ct. at 1356. *See also Fishman v. Estate of Wirtz*, 807 F.2d 520, 532 (7th Cir.1986) (the concept of antitrust injury is akin to a standing requirement). The plaintiffs must also prove an adverse effect on competition as distinguished from the effects upon the plaintiffs' own businesses. *See Brunswick*, 429 U.S. at 488, 97 S.Ct. at 697; *General Industries Corporation v. Hartz Mountain Corporation*, 810 F.2d 795, 807 (8th Cir. 1987).

### (2) *The Noerr–Pennington Doctrine*

77. The invocation of the judicial process is protected from antitrust scrutiny by the *Noerr–Pennington* doctrine which holds that the First Amendment to the United States Constitution immunizes from antitrust liability bona fide lobbying and litigation efforts, regardless of any anticompetitive motive behind those efforts. *See generally California Motor Transport Company v. Trucking Unlimited*, 404 U.S. 508, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972); *United Mine Workers of America v. Pennington*, 381 U.S. 657, 85 S.Ct. 1585,

---

**24.** Products that are similar to each other or that are substitutes for each other display positive cross-elasticity. That is, if the price of "A" remains constant, an increase in the price of "B" will generate more sales of "A" as buyers switch to it. High cross-elasticity means that if the price of "A" remains constant, an X% increase in the price of "B" will generate a greater X% increase in the sales of "A." *See Photovest Corporation v. Fotomat Corporation*, 606 F.2d 704, 713 n. 12 (7th Cir.1979), *cert. denied*, 445 U.S. 917, 100 S.Ct. 1278, 63 L.Ed.2d 601 (1980).

14 L.Ed.2d 626 (1965); *Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961); *Premier Electrical Construction Company v. National Electrical Contractors Association, Inc.*, 814 F.2d 358, 371 (7th Cir.1987).

 78. The *Noerr–Pennington* doctrine does not immunize "sham" lawsuits brought for the purpose of harming one's competitors, not by the result, but by the process of the litigation. *See Winterland Concessions Company v. Trela*, 735 F.2d 257, 263–64 (7th Cir.1984); *Grip–Pak, Inc. v. Illinois Tool Works, Inc.*, 694 F.2d 466, 472 (7th Cir.1982), *cert. denied*, 461 U.S. 958, 103 S.Ct. 2430, 77 L.Ed.2d 1317 (1983). A suit brought only because of the costs litigation imposes also fits the "sham" exception to the *Noerr–Pennington* doctrine. *See Premier Electrical Construction Company v. National Electrical Contractors Association, Inc.*, 814 F.2d 358, 372 (7th Cir.1987).

 79. In the Seventh Circuit, the plaintiffs need not show a pattern of baseless repetitive claims in order to recover under the antitrust laws; even a single baseless, sham lawsuit lacks "the constitutional significance that warrants immunity from the antitrust laws." *MCI Communications v. American Telephone and Telegraph Company*, 708 F.2d 1081, 1155 (7th Cir.), *cert. denied*, 464 U.S. 891, 104 S.Ct. 234, 78 L.Ed.2d 226 (1983).

 80. In invoking the "sham exception" to the *Noerr–Pennington* doctrine, the plaintiffs have the burden of proving that the defendant's activities were not really efforts to vindicate rights in court, but instead were efforts to interfere directly with their businesses. The plaintiffs must prove the defendant's bad faith by clear and convincing evidence. *See MCI Communications v. American Telephone and Telegraph Company*, 708 F.2d 1081, 1155 (7th Cir.), *cert. denied*, 464 U.S. 891, 104 S.Ct. 234, 78 L.Ed.2d 226 (1983).[25]

 81. The "sham exception" focuses attention on the factors motivating the initiation and prosecution of the suit. It is not dispositive that the ultimate relief will be beneficial to the petitioner and will serve its purposes. It must be shown that the desire for relief was a significant factor underlying the actual bringing and prosecution of the suit. Thus, determining whether the petitioning conduct was a sham often involves questions of motive or subjective intent. The issue of intent that controls is whether the litigant wished to obtain its anticompetitive end through obtaining court-ordered relief or simply through the filing and maintenance of the lawsuit. *See In re Burlington Northern, Inc.*, 822 F.2d 518, 527–28 (5th Cir.1987).

 82. Petitioning must be motivated by a genuine desire for relief which is both honest and reasonable. Where a party had no reasonable expectation of obtaining a favorable ruling, its efforts to do so were a sham. *See In re Burlington Northern, Inc.*, 822 F.2d 518, 529 (5th Cir.1987); *Litton Systems, Inc. v. AT & T*, 700 F.2d 785, 811–12 (2d Cir.1983), *cert. denied*, 464 U.S. 1073, 104 S.Ct. 984, 79 L.Ed.2d 220 (1984).

 83. Success on the merits does not necessarily preclude antitrust plaintiffs from proving that the defendant's earlier litigation activities were a sham.[26] The determinative inquiry is not whether the suit was won or lost, but whether it was significantly motivated by a genuine desire for judicial relief. Of course, the success of the claim presented is persuasive evidence that the litigant in fact wanted the relief. It is highly unlikely that a party with a meritorious claim will not be significantly motivated by a desire to obtain relief

---

**25.** Other circuits allow the proponent of the sham exception to meet the lesser, preponderance of the evidence quantum of proof. *See, e.g., Litton Systems, Inc. v. American Telephone and Telegraph Company*, 700 F.2d 785, 813–14 (2d Cir.1983), *cert. denied*, 464 U.S. 1073, 104 S.Ct. 984, 79 L.Ed.2d 220 (1984).

**26.** *But see Coca–Cola Company v. Overland, Inc.*, 692 F.2d 1250, 1257 n. 17 (9th Cir.1982) (noting that the court had discovered no case directly supporting the proposition that the bringing of meritorious trademark infringement suits can constitute sham suits violative of the antitrust laws).

on that claim. Thus, antitrust plaintiffs attempting to base liability on successful petitioning must overcome a strong inference that *Noerr–Pennington* applies and in many cases may be unable to do so. But reliance on the success of the earlier claim cannot substitute for proper consideration of any evidence the plaintiffs might provide of the defendant's motivation. *See In re Burlington Northern, Inc.*, 822 F.2d 518, 528 (5th Cir.1987).

### (3) *Liability*

84. Having found that the G. Heileman Brewing Company, Inc. failed to meet its burden of proving essential elements of its claim for attempted monopolization, the court concludes that Anheuser–Busch Incorporated is not liable to the G. Heileman Brewing Company, Inc. for attempting to monopolize trade in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

85. Having found that the Miller Brewing Company failed to meet its burden of proving essential elements of its claim for attempted monopolization, the court concludes that Anheuser–Busch Incorporated is not liable to the Miller Brewing Company for attempting to monopolize trade in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

### E. RELIEF

86. Because none of the parties to these consolidated cases are registrants of the mark at issue, the parties do not have standing to seek the statutory remedies provided in the Lanham Trademark Act, 15 U.S.C. §§ 1111, 1114, 1116, 1117, 1118, 1119, 1120. *See Reliable Tire Distributors, Inc. v. Kelly Springfield Tire Company*, 592 F.Supp. 127, 136 (E.D.Pa.1984).

87. In deciding whether to enter a permanent injunction, the court must determine whether the plaintiffs have succeeded on the merits of their claims and whether a balancing of the equities favors the grant of injunctive relief. *See Banff, Ltd. v.*

**27.** Declaratory judgment actions involving

*Federated Department Stores, Inc.*, 657 F.Supp. 336, 338 (S.D.N.Y.1987).

88. Declaratory relief is available at the discretion of the district court. *See* 28 U.S.C. § 2201. *See also Tempco Electric Heater Corporation v. Omega Engineering, Inc.*, 819 F.2d 746, 747 (7th Cir.1987); *Chesebrough–Pond's, Inc. v. Faberge, Incorporated*, 666 F.2d 393, 396 (9th Cir.), *cert. denied*, 459 U.S. 967, 103 S.Ct. 294, 74 L.Ed.2d 277 (1982).

89. Federal courts are not empowered to issue advisory opinions. *See* U.S. Const. art. III. *See also Aetna Life Insurance Company v. Haworth*, 300 U.S. 227, 241, 57 S.Ct. 461, 464, 81 L.Ed. 617 (1937).

90. Parties seeking relief under the Declaratory Judgment Act, 28 U.S.C. §§ 2201–02, must present a "case or controversy" within the meaning of Article III of the United States Constitution. *See Aetna Life Insurance Company v. Haworth*, 300 U.S. 227, 240, 57 S.Ct. 461, 463–64, 81 L.Ed. 617 (1937); *Koch Refining v. Farmers Union Central Exchange, Inc.*, 831 F.2d 1339, 1353 (7th Cir.1987).

91. The test for determining whether an actual case or controversy exists in a declaratory judgment action involving trademarks is two-pronged: (1) the declaratory plaintiff must have a real and reasonable apprehension of litigation; and (2) the declaratory plaintiff must have engaged in a course of conduct which brought it into adversarial conflict with the declaratory defendant. *See Windsurfing International v. AMF Incorporated*, 828 F.2d 755, 757 (Fed.Cir.1987).

92. In an action seeking a declaratory judgment of noninfringement, the actual controversy requirement is satisfied when a defendant's conduct has "created on the part of the declaratory plaintiff a reasonable apprehension that it will face an infringement suit if it commences or continues the activity in question" and when the plaintiff has actually used the trademark at issue or has prepared to use it. *See Indium Corporation of America v. Semi-Alloys, Inc.*, 781 F.2d 879, 883 (Fed.Cir.1985) (patent action)[27] (quoting *Jervis B. Webb*

trademarks are analogous to those involving

*Company v. Southern Systems, Inc.,* 742 F.2d 1388, 1398–99 (Fed.Cir.1984)), *cert. denied,* — U.S. ——, 107 S.Ct. 84, 93 L.Ed. 2d 37 (1986).

■ 93. The declaratory judgment plaintiff carries the burden of proving the existence of facts underlying his allegations of the existence of an actual controversy. *See Jervis B. Webb Company v. Southern Systems, Inc.,* 742 F.2d 1388, 1399 (Fed.Cir.1984).

■ 94. A purely subjective apprehension of an infringement suit is insufficient to satisfy the actual controversy requirement. *See Indium Corporation of America v. Semi–Alloys, Inc.,* 781 F.2d 879, 883 (Fed.Cir.1985), *cert. denied,* — U.S. ——, 107 S.Ct. 84, 93 L.Ed.2d 37 (1986). The threat of injury must be real and immediate, not conjectural or hypothetical. *See Foster ·v. Center Township of LaPorte County,* 798 F.2d 237, 242 (7th Cir.1986). *See also Koch Refining v. Farmers Union Central Exchange, Inc.,* 831 F.2d 1339, 1353 (7th Cir.1987); *Merrick v. Sharp & Dohme,* 185 F.2d 713, 717 (7th Cir.1950), *cert. denied,* 340 U.S. 954, 71 S.Ct. 573, 95 L.Ed. 687 (1951).

■ 95. The test for an actual case or controversy is an objective one. Reasonable apprehension and the other jurisdictional prerequisites must exist at the time suit is filed. *See Indium Corporation of America v. Semi–Alloys, Inc.,* 781 F.2d 879, 883 (Fed.Cir.1985), *cert. denied,* — U.S. ——, 107 S.Ct. 84, 93 L.Ed.2d 37 (1986).

■ 96. Consolidation does not result in a merger of suits or parties such that federal jurisdiction in one case can be engrafted upon a case with which it is consolidated. *See Johnson v. Manhattan Railway Company,* 289 U.S. 479, 496, 53 S.Ct. 721, 727, 77 L.Ed. 1331 (1933); *Xaros v. U.S. Fidelity and Guaranty Company,* 820 F.2d 1176, 1180 n. 1 (11th Cir.1987).

■ 97. Because Heileman has established that it had a reasonable apprehen-

patents. Thus, guidance in trademark cases is often taken from patent cases. *See Windsurfing*

sion that it would face an infringement suit and because, at the time of filing, it was prepared to use the LA trademark, the court concludes that Heileman has standing to maintain its claims for declaratory relief against Anheuser–Busch. *See Windsurfing International Inc. v. AMF Incorporated,* 828 F.2d 755, 757 (Fed.Cir.1987).

98. Because Miller has established that it competes with Anheuser–Busch in the sale of beer and that, at the time it filed its complaint, it was likely to use the challenged LA mark, the court concludes that Miller has standing to maintain its claims for declaratory relief under the test set forth in *Chromium Industries, Inc. v. Mirror Polishing & Plating Company, Inc.,* 448 F.Supp. 544, 555 (N.D.Ill.1978).

■ 99. In actions arising under section 43(a) of the Lanham Trademark Act, 15 U.S.C. § 1125(a), a prevailing party requesting attorney fees pursuant to 15 U.S. C. § 1117 bears a heavy burden of proving exceptional circumstances by clear and convincing evidence. Exceptional circumstances include inequitable conduct during litigation, fraud, and vexatious or frivolous litigation. *See Olsonite Corporation v. Bemis Manufacturing Company,* 610 F.Supp. 1011, 1026 (E.D.Wis.1985).

■ 100. Because Heileman and Miller have not met their burden of proving that this case involves "exceptional circumstances," the court concludes that Anheuser–Busch Incorporated is not liable to the G. Heileman Brewing Company, Inc. or to the Miller Brewing Company for attorney fees under 15 U.S.C. § 1117.

## VII. DISCUSSION

### A. STANDING

#### (1) *Statutory Relief*

■ Heileman framed its complaint in this action as if Anheuser–Busch had succeeded in obtaining federal registration for the LA mark. Although the record shows that Anheuser–Busch applied for registrations, its initial applications were

*International, Inc. v. AMF Incorporated,* 828 F.2d 755, 757 (Fed.Cir.1987).

rejected and other applications had not been acted upon by the time of trial.[28] Nevertheless, Heileman's prayer for relief included a request for a declaratory judgment of noninfringement under the Lanham Trademark Act; for cancellation of Anheuser–Busch's trademark registrations for LA pursuant to 15 U.S.C. § 1114(1); and for an order that Anheuser–Busch disclaim LA as a trademark pursuant to 15 U.S.C. §§ 1056 and 1119. An opponent of a trademark does not have standing to seek such relief in a district court unless the mark at issue has been registered by the United States Patent and Trademark Office (PTO). *Cf. Reliable Tire Distributors, Inc. v. Kelly Springfield Tire Company,* 592 F.Supp. 127, 136 (E.D.Pa.1984). Because Anheuser–Busch was not a registrant of the LA mark, Heileman's claims for statutory relief, which were never withdrawn, must be dismissed for lack of standing.

### (2) *Declaratory Relief*

Because the LA mark is not registered, the plaintiffs must look to section 43(a) of the Lanham Trademark Act, 15 U.S.C. § 1125(a), and common law as the source of their causes of action for declaratory relief. Federal courts are not empowered to issue advisory opinions, *see* U.S.Const. art. III,

so Heileman and Miller have standing to seek a declaratory judgment only if their actions present a justiciable case or controversy.[29] *See Aetna Life Insurance Company v. Haworth,* 300 U.S. 227, 240, 57 S.Ct. 461, 463–64, 81 L.Ed. 617 (1937).

One district court in this circuit has construed the "likely to be damaged" language of section 43(a) to provide standing to a broad class of suitors.[30] In *Chromium Industries v. Mirror Polishing & Plating Company, Inc.,* 448 F.Supp. 544, 555 (N.D.Ill.1978), the court stated that: "For trademarks, standing under § 43(a) is established if the plaintiff competes with defendant in the sale of goods covered by the term and uses or is likely to use the challenged mark." *Id.* at 555. Both Heileman and Miller are competitors of Anheuser–Busch and both alleged in their complaints that they were likely to use the LA mark. Therefore, under the *Chromium Industries* test, they have standing to maintain their claims for declaratory judgments. However, this court does not believe that the *Chromium Industries* test, which was modeled on a trademark registration opposition proceeding under 15 U.S.C.A. § 1063 (West Supp.1987), is supported by the weight of authority.[31]

---

**28.** Although Heileman and Miller could have filed an opposition to registration in the Patent and Trademark Office pursuant to 15 U.S.C.A. § 1063 (West Supp.1987), the record does not reveal that they did so. Instead, they have attempted to accomplish the same ends in this court.

**29.** In general, an actual trademark infringer is allowed to seek relief under the Declaratory Judgments Act when there is a trademark infringement controversy because:

One who is subjected to charges of infringement and the threat of legal proceedings need not wait until his accuser chooses to bring suit to secure a determination of his rights. One of the purposes of the Declaratory Judgments Act is to avoid the unfairness of allowing one party to create a controversy by making such charges but, by withholding suit, to prevent the other party from conclusively refuting them.

*Topp–Cola Company v. Coca–Cola Company,* 314 F.2d 124, 125 (2d Cir.1963).

**30.** Section 43(a) of the Lanham Trademark Act provides that:

Any person who shall affix, apply, or annex, or use in connection with any goods or services, or any container or containers for goods, a false designation of origin, or any false description or representation, including words or other symbols tending falsely to describe or represent the same, and shall cause such goods or services to enter into commerce, and any person who shall with knowledge of the falsity of such designation or origin or description or representation cause or procure the same to be transported or used in commerce or deliver the same to any carrier to be transported or used, shall be liable to a civil action by any person doing business in the locality falsely indicated as that of origin or in the region in which said locality is situated, or by any person who believes that he is or is likely to be damaged by the use of any false description or representation.

15 U.S.C. § 1125(a).

**31.** There is no appellate decision affirming the *Chromium Industries* judgment and the ruling regarding standing has never been cited as authority or precedent in any Seventh Circuit ap-

More recently, the Seventh Circuit has explained that a declaratory judgment is available where a party desires a declaration of the legal effect of a proposed or past course of action. Essentially, two related but distinct fact situations are contemplated: (1) the controversy has ripened to a point where one of the parties could invoke a coercive remedy (i.e. a suit for damages or an injunction) but has not done so; and (2) although the controversy is real and immediate, it has not ripened to such a point, and it would be unfair or inefficient to require the parties to wait for a decision. *See Tempco Electric Heater Corporation v. Omega Engineering, Inc.*, 819 F.2d 746, 749 (7th Cir.1987). These consolidated cases are, at best, of the second type.

Even in situations of the second type, an actual controversy must exist. In *Windsurfing International Inc. v. AMF Incorporated*, 828 F.2d 755 (Fed.Cir.1987), a case involving a registered trademark, the Federal Circuit rejected the contention that the mere competitor status of the parties can serve as a basis for the court's jurisdiction. *Id.* at 758–59. Instead, the court held that:

> The test for determining whether an actual case or controversy exists in a declaratory judgment action involving trademarks is two-pronged. First, the declaratory plaintiff must have a real and reasonable apprehension of litigation. Second, the declaratory plaintiff must have engaged in a course of conduct which brought it into adversarial conflict with the declaratory defendant.

*Id.* at 757 (citations omitted). These jurisdictional prerequisites must exist at the time the suit is filed. *See Indium Corporation of America v. Semi–Alloys, Inc.*, 781 F.2d 879, 883 (Fed.Cir.1985), *cert. denied*, —— U.S. ——, 107 S.Ct. 84, 93 L.Ed. 2d 37 (1986).

At trial Heileman established that it had received a cease and desist letter from An-

heuser–Busch and that, at the time it filed its complaint, it was ready, willing and able to use the LA mark. The evidence also revealed that Heileman actually used the LA mark in commerce the day after it filed its lawsuit (although it waited until it had secured a temporary restraining order before selling its LA beers through retail outlets). Based on these facts, Heileman had standing to maintain its claims for declaratory relief at the time it filed its complaint. *See Windsurfing International*, 828 F.2d at 757.

■ Miller's standing, however, is more problematical. The evidence reveals that it had never received a threat or a demand to cease and desist from Anheuser–Busch. Miller's only basis for considering itself threatened was the fact that Anheuser–Busch had recently filed suits against Heileman and Stroh. *See* Complaint [of the Miller Brewing Company] at ¶ 11. Moreover, there was no evidence that Miller had actually brewed any low alcohol beer, announced its new product, or engaged in any introductory advertising at the time it filed its complaint. The only evidence that Miller had made any preparations to sell a low alcohol beer was some vague testimony that Miller had spent money developing a market and that its new products brand manager had traveled to Australia to study the low alcohol beer market there. *See* Transcript at 931–39, 2010–13, 2126, 2132–34, 2237. Miller did not begin to sell its beer in test markets for over two months after it filed its complaint. Given these facts, its claims were not ripe at the time it filed its complaint. *See Wembley, Inc. v. Superba Cravats, Inc.*, 315 F.2d 87, 89–90 (2d Cir.1963) ("Major stress should be placed on the 'definite' intention of the plaintiff to take 'immediate' action to utilize its potential and this intention should be 'evident' from the preparatory steps outlined in its complaint.");

pellate decision. *But see Exxon Corporation v. Humble Exploration Company, Inc.*, 695 F.2d 96, 103 n. 10 (5th Cir.1983); *Johnson & Johnson v. Carter–Wallace, Inc.*, 631 F.2d 186, 189 (2d Cir. 1980). Moreover, the *Chromium Industries* court applied its standing test in the context of a threshold motion to dismiss. The court ruled

that, although the parties were competitors, the plaintiff had not alleged an injury even under its broadly construed test for standing because it had "not alleged that it currently uses or is likely to use this term ["easy release"] in its marketing efforts." *Chromium Industries,* 448 F.Supp. at 556.

*Banff, Ltd. v. Federated Department Stores, Inc.*, 657 F.Supp. 336, 339 (S.D.N.Y. 1987) ("Without actual use or the immediate intention to use the trademark at issue, there is no justiciable controversy or case within the meaning of Article III of the United States Constitution.").

In ruling that a party in much the same circumstances did not have standing to maintain a declaratory judgment action, the *Windsurfing* court reasoned that:

> In its complaint and counterclaim, AMF alleged merely that "AMF is interested in using the mark descriptively in connection with its products." AMF cites testimony that AMF has a "desire" to use "windsurfer" in its advertising and promotion, and that other members of the trade have the same "desire." Rather than use the mark, get sued, and fight it out in court, AMF was saying, "We would like to use the mark, but before we do, we want a court to say we may do so safely." Thus AMF's complaint and counterclaim sought an advisory opinion, something a federal court may not give. *Aetna Life Ins.*, 300 U.S. at 241, 57 S.Ct. at 464.

*Windsurfing International*, 828 F.2d at 758.

Similarly, in *Polaroid Corporation v. Berkey Photo, Inc.*, 425 F.Supp. 605, 607 (D.Del.1976), Berkey counterclaimed for a judgment declaring that it was free to use the registered trademark "POLAROID" in a generic sense. Berkey had not actually tried to use the POLAROID name and Polaroid had not charged Berkey with any infringing activity, although Polaroid admitted that it would take steps to protect its mark should Berkey attempt to use it. The court outlined the controversy as follows:

> Berkey bottoms its claim of justiciability on its desire to use the Polaroid trademark generically, which presently is being thwarted by plaintiff's vigilance in protecting its trademark; thereby placing defendant in "reasonable apprehension" of litigation ... should it attempt to transgress the Polaroid guidelines. Defendant further complains that at

least on one occasion in the past it altered its advertising practices to comport with the Polaroid regulations.

*Id.* at 607 (citation omitted).

The court then stated that:

> The emerging issue is whether a justiciable controversy is presented where there is no current infringing activity, nor charge of infringement, but only the ever ready vigilance of Polaroid to protect its mark should it be used by a competitor. It is concluded that where the record is devoid, as it is here, of any current activity which effectuates an actual injury suffered by this defendant, a justiciable controversy does not exist.

*Id.* In granting Polaroid's motion to dismiss the court explained that:

> At this stage in the proceedings, Berkey's interest is no more adverse to that of Polaroid than any other distributor or would-be distributor of cameras. Berkey's bald assertion, that because it happens to be in the same field as Polaroid, it "contemplates" using the name now enjoyed by Polaroid, is insufficient to defeat plaintiff's motion. While competitors may be loosely considered adversaries in a business sense, they are not *per se* adversaries in a legal sense, until there is demonstrated some concrete controversy between them. Moreover, even though litigation need not be over, even though litigation need not be actually threatened to procure relief under the Federal Declaratory Judgment Act, the most liberal interpretation of justiciability will not admit to an active controversy in the absence of either some imminent infringing conduct or some assertion of same.

*Id.* at 609 (citation omitted).

The same considerations apply to the instant action. However, Anheuser–Busch did not challenge Miller's standing and the facts which could have defeated jurisdiction were not revealed until the trial. Meanwhile, Miller's claims had become ripe. On August 13, 1984, it began to sell its Sharp's LA in test markets and on August 24, 1984, Anheuser–Busch filed a counterclaim alleging trademark infringement and unfair

competition. Miller's premature filing allowed it to choose its own forum and benefit from the rulings made in the *Heileman* case before actually risking use of the mark. Several of the witnesses testified that the parties to these lawsuits had learned a lesson from the Miller LITE litigation in which the defendant, Heileman, ultimately won a Pyrrhic victory when the court of appeals declared that the LITE mark is generic. *See* Transcript at 283–86, 1115, 2209–10, 2221–23. *See also Miller Brewing Company v. G. Heileman Brewing Company, Inc.,* 561 F.2d 75 (7th Cir. 1977), *cert. denied,* 434 U.S. 1025, 98 S.Ct. 751, 54 L.Ed.2d 772 (1978). Meanwhile, the injunction entered by the district court prevented Heileman from using the LITE (or light) name for seven months. During that time Miller gained the ascendency in the low calorie beer market and it remains the leading seller of low calorie beer today. *See* Transcript at 285, 346, 2088, 2187, 2222.

The lesson learned from this prior litigation accounts for the overeagerness of Heileman and Miller to gain a procedural advantage by being the ones to initiate the litigation. This court, however, does not believe that federal courts should be placed in the position of serving as part of a marketing strategy for beer or any other product. It would be inefficient to dismiss Miller's declaratory judgment claims at this point, particularly since they did ripen into a justiciable controversy before trial, but to avoid this situation in the future the court will have to hold a hearing at the outset to determine whether a declaratory judgment plaintiff has standing to maintain its claims.

## B. CHOICE of LAW

Heileman, Miller and Anheuser–Busch are each asserting claims for unfair competition under the common law of "various states," as well as under federal law. *See* Complaint [of the G. Heileman Brewing Company, Inc.] at ¶ 28; Complaint [of the Miller Brewing Company] at ¶ 12; Answer to Amended Complaint and Amended Counterclaim at ¶ 30; Answer and Counterclaim at ¶ 25. Common-law unfair competition is a tort which is governed by state law. *See Data Cash Systems, Inc. v. JS & A Group, Inc.,* 480 F.Supp. 1063, 1071 (N.D.Ill.1979), *aff'd,* 628 F.2d 1038 (7th Cir. 1980). *See also Terry v. International Dairy Queen, Inc.,* 554 F.Supp. 1088, 1098 (N.D.Ind.1983). This is because common-law rights in a trademark are acquired on a state-by-state basis by using a specific trademark in a specific area. *See Natural Footwear Limited v. Hart, Schaffner & Marx,* 760 F.2d 1383, 1406 n. 61 (3d Cir.), *cert. denied,* 474 U.S. 920, 106 S.Ct. 249, 88 L.Ed.2d 257 (1985). The forum state's choice of law principles are supposed to determine which states' laws apply. *See generally Klaxon Company v. Stentor Electric Manufacturing Company,* 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). However, in this case the parties have made no attempt to brief or argue whether the law of one state as opposed to that of another is controlling or would make any difference.[32] The unfair competition claims alleged by all three parties are centered on the issue of whether Anheuser–Busch should be entitled to the exclusive use of the LA mark on beer. Thus, in situations such as this, where Anheuser–Busch is using the disputed mark nationally in competition with Heileman in most states and with Miller in five states, the laws of each of the fifty states potentially apply.

Courts have long recognized the choice of law problems inherent in multistate unfair competition actions, calling them "bewilderingly complicated." *See Campbell Soup Company v. Armour & Company,* 175 F.2d 795, 796 (3d Cir.), *cert. denied,* 338 U.S. 847, 70 S.Ct. 88, 94 L.Ed. 518 (1949). *See also generally* Note, *The*

---

**32.** The only exceptions are Heileman's request for a judgment declaring that it is not unfairly competing with Anheuser–Busch under any Wisconsin Statute, *see* Complaint [of the G. Heileman Brewing Company] at ¶ 23(c), and Anheuser–Busch's claim for relief under the Illinois Anti–Dilution Act, *see* Answer to Amended Complaint and Amended Counterclaim at ¶ 29; Answer and Counterclaim at ¶ 24.

*Choice of Law in Multistate Unfair Competition: A Legal–Industrial Enigma*, 60 Harvard Law Review 1315 (1947). Courts which have confronted the problem (which is often ignored by the parties), have managed to avoid having to make a choice of law or having to analyze the claims on a state-by-state basis by concluding that choosing a particular state's law would make no difference to the outcome because there are no discernible modulations from jurisdiction to jurisdiction or under federal law. *See International Order of Job's Daughters v. Lindeburg and Company*, 633 F.2d 912, 915–17 (9th Cir.1980), *cert. denied*, 452 U.S. 941, 101 S.Ct. 3086, 69 L.Ed.2d 956 (1981); *Keebler Company v. Rovira Biscuit Corporation*, 624 F.2d 366, 372 (1st Cir.1980); *Le Societe Anonyme des Parfums Le Galion v. Jean Patou, Inc.*, 495 F.2d 1265, 1270 n. 5 (2d Cir.1974). *See also Maternally Yours, Inc. v. Your Maternity Shop, Inc.*, 234 F.2d 538, 545 (2d Cir.1956) (Clark, C.J., concurring) ("so far as I can discover, we have never found any difference in ultimate result, and so quite often lump federal and New York law together ... or—even more conveniently— eschew all reference to the matter"). After observing that unfair competition law is either undeveloped or not significantly different in the various states, one court resolved the problem pragmatically by deciding that:

> In view of the miniscule likelihood of any effect upon the result to be achieved, the Court has no hesitation in applying the law as articulated in what appear to it to be the best-reasoned cases, whether state or federal and wherever arising.

*Kardex Systems, Inc. v. Sistemco N.V.*, 583 F.Supp. 803, 810–11 n. 3 (D.Me.1984). In the absence of any showing by the parties of any outcome determinative conflicts among the various states' laws, this court has adopted this approach and has based its judgment on the body of law set forth in the Conclusions of Law above. *See Maternally Yours*, 234 F.2d at 546 ("we are entitled to go directly to the apposite federal precedents without subterfuge or ornamental rationalization").

## C. STRENGTH OF LA MARK

The parties devoted most of their efforts at trial to litigating their dispute over the classification of the LA mark. In its pleadings, Anheuser–Busch, the first user of the mark, claimed that LA is a "unique, arbitrary and fanciful" mark or, in the alternative, that it is "suggestive." *See* Answer to Amended Complaint and Amended Counterclaim at ¶¶ 7 & 8. After trial, Anheuser–Busch appears to have abandoned its theory that "LA" is arbitrary and now argues that:

> LA is merely suggestive of a number of concepts, including "low alcohol" or "light alcohol" or "light adventure" or "lifestyle alternative" or "Light Alcohol from Anheuser–Busch."

Defendant–Counterclaimant's Post–Trial Brief at 8. Heileman and Miller, on the other hand, maintain that LA is a common descriptive or generic term. *See* Complaint [of the G. Heileman Brewing Company] at ¶ 8; Complaint [of the Miller Brewing Company] at ¶ 6. After these lawsuits were commenced, the United States District Court for the Eastern District of Missouri held that LA is a suggestive mark. *See Anheuser–Busch, Inc. v. Stroh Brewery Company*, 587 F.Supp. 330, 337–38 (E.D. Mo.), *aff'd*, 750 F.2d 631 (8th Cir.1984). Based on the evidence adduced at trial, this court has found that the term "LA" is merely descriptive when applied to beer.

Numerous courts have commented on the difficulty of classifying a mark within one of the four traditional categories of trademark strength: (1) arbitrary, (2) suggestive, (3) merely descriptive, or (4) generic. *See, e.g., A.J. Canfield Company v. Honickman*, 808 F.2d 291, 296–97 & n. 8 (3d Cir.1986) (and cases cited therein). Given the overlap of these categories, it is not unusual for courts ruling on the same marks under similar facts to arrive at different conclusions *Compare A.J. Canfield Company v. Honickman*, 808 F.2d 291 (3d Cir.1986) ("chocolate fudge" a generic mark for a soft drink) *with A.J. Canfield Company v. Vess Beverages, Inc.*, 796 F.2d 903 (7th Cir.1986) ("chocolate fudge" a merely descriptive mark for a soft drink).

Dissatisfied with simply assigning marks to the traditional four categories, the Seventh Circuit, in recent years, has focused instead on the function of the mark at issue. *See Blau Plumbing, Inc. v. S.O. S. Fix-It, Inc.*, 781 F.2d 604, 608 (7th Cir. 1986) ("Labels should not determine rights."). *See also Scandia Down Corporation v. Euroquilt, Inc.*, 772 F.2d 1423, 1431 n. 3 (7th Cir.1985), *cert. denied*, 475 U.S. 1147, 106 S.Ct. 1801, 90 L.Ed.2d 346 (1986); *Walt–West Enterprises, Inc. v. Gannett Company, Inc.*, 695 F.2d 1050, 1057 (7th Cir.1982). The court has pointed out that the main function of trademark protection is:

> to allow a firm to affix an identifying mark to its product ... offering that will, because it is distinctive and no competitor may use a confusingly similar designation, enable the consumer to discover in the least possible amount of time and with the least possible amount of headscratching whether a particular brand is that firm's brand or a competitor's brand.

*Blau Plumbing*, 781 F.2d at 609. Trademarks are not properly used as patent substitutes to further or perpetuate product monopolies. Rather, they are meant to protect consumers from being misled as to the enterprise from which the goods emanate. It is this source denoting function which trademark laws protect, and nothing more. *See Calvin Klein Cosmetics Corporation v. Lenox Laboratories*, 815 F.2d 500, 503 (8th Cir.1987); *Smith v. Chanel, Inc.*, 402 F.2d 562, 566–69 (9th Cir.1968).

The traditional method of testing whether a mark is generic is by use of a "primary significance" test. This type of test has its origin in the case of *Kellogg Company v. National Biscuit Company*, 305 U.S. 111, 59 S.Ct. 109, 83 L.Ed. 73 (1938), where Kellogg was claiming that it was entitled to the exclusive use of the term "shredded wheat." The Court ruled that:

> [T]o establish a trade name in the term "shredded wheat" the plaintiff must show more than a subordinate meaning which applies to it. It must show that the primary significance of the term in

the minds of the consuming public is not the product but the producer.

*Id.* at 118, 59 S.Ct. at 113. *See also Bayer Company v. United Drug Company*, 272 F. 505, 509 (S.D.N.Y.1921) ("The single question ... in all these cases, is merely one of fact: What do buyers understand by the word for whose use the parties are contending?"); 15 U.S.C.A. § 1064(c) (West Supp.1987). Even though it is unlikely that the name of a completely new product such as LA beer could have any significance to consumers, the parties, in support of their respective positions, each offered survey evidence aimed at determining the primary meaning of "LA" in the minds of ordinary beer buyers.

### (1) *The Primary Significance Surveys*

As is true in too many cases, the "method of poll taking adopted by each of the parties reflects their respective views of the law and each method was designed to elicit the kind of evidence each wished to bring out." *American Thermos Products Company v. Aladdin Industries, Inc.*, 207 F.Supp. 9, 20 (D.Conn.1962), *aff'd sub nom. King–Seeley Thermos Company v. Aladdin Industries, Inc.*, 321 F.2d 577 (2d Cir. 1963). Well before the four primary meaning surveys were taken, each party had chosen to use the LA mark in a manner calculated to elicit "correct" responses from possible interviewees. Anheuser–Busch rejected a line extension approach and decided to use "LA" as a single brand mark with a less prominent corporate source indicator, "from Anheuser–Busch." Heileman, on the other hand, chose to pursue the line extension approach by using its well-established house marks followed by an equally prominent "L.A." as a category descriptor. Early in its marketing efforts, Heileman included an asterisk after the L.A. initials directing the consumer to the explanation "low alcohol." *See* Transcript at 335, 366–67, 437, 481, 483, 2051–52, 2087. The use of the asterisk was soon discontinued, but both Heileman and Anheuser–Busch continued to educate the public about the meaning of LA through advertising and point-of-sale materials. *See, e.g.*, Trial Exhibits 442, 740. Miller took a third

approach by adopting a single brand name, Sharp's, followed by an equally prominent "LA" as a category descriptor. It was obvious that Anheuser–Busch hoped that consumers surveyed would perceive LA as a brand name, while Heileman and Miller hoped it would be viewed as the common descriptor of a beer category. The plaintiffs also hoped that consumers would exhibit minimum confusion due to the equal prominence given to the house or single brand marks on their LA beer labels.

 Despite this built-in bias, the parties attempted to qualify their respective surveys as trustworthy and accurate by establishing that:

1. the proper universe was selected and examined;

2. a representative sample was drawn from that universe;

3. a fair and correct method of questioning the interviewees was used;

4. the persons conducting the survey were recognized experts;

5. the data gathered was accurately reported;

6. the sample, the questionnaire and the interviewing were in accordance with generally accepted standards of objective procedure and statistics in the field of such surveys;

7. the sample and the interviews were conducted independently of the attorneys in the case;

8. the interviewers were adequately trained in the field and had no knowledge of the litigation purposes for which the survey was to be used.

*See* Handbook of Recommended Procedures for the Trial of Protracted Cases, 25 F.R.D. 351, 429 (1960). *See* Transcript at 509–658, 661–874, 1515–1875. Nevertheless, the surveys were severely flawed and of little value to the court.[33]

Anheuser–Busch offered two surveys in support of its claim that LA is a legally protectible mark. Both were conducted by Dr. Yoram Wind, Lauder Professor and Professor of Marketing at the Wharton School of the University of Pennsylvania. *See* Trial Exhibit 772. Wind's own testimony established that he exercised little supervision over the collection or interpretation of data for either survey. *See* Transcript at 1564–68, 1574–98. His first study (Wind I) was conducted among 1,051 consumers at shopping malls in fifteen cities on April 19, 20 and 21, 1984. *See* Trial Exhibit 733. Potential interviewees were screened for the following characteristics:

—meet security requirements (not known by interviewer, has not participated in any survey other than a political poll in the past six months, does not work for a company that manufactures or distributes beer, a market research company or an advertising agency, gives the interviewer his/her telephone number);

—is legal drinking age or older and fits within age/sex quotas;

—has purchased beer;

—fits income and race quotas;

—agrees to participate.

*See* Transcript at 1544–45. The objective of the survey was "to determine whether consumers perceived LA as a brand name of beer produced by Anheuser–Busch or alternatively as a generic non-brand designation for the category of low or light-alcohol beer." *See* Transcript at 1542. After being screened, those selected were shown a can of LA from Anheuser–Busch or LA advertising[34] or both. Then each person was asked: How do you describe the product?; What type of beer is it?; What is the brand name of the new product?; and, What company produces the brand? Finally, the consumer was asked whether he or

---

**33.** It is the burden of the proffering party to prove the quality of survey evidence. However, even though a survey may not meet all criteria, the results may still be admitted and given lesser weight. *See SquirtCo v. Seven–Up Company,* 628 F.2d 1086, 1091 (8th Cir.1980); *American*

*Home Products Corporation v. Barr Laboratories, Inc.,* 656 F.Supp. 1058, 1062 (D.N.J.1987).

**34.** The promotional material used the phrases "light in alcohol," "half the alcohol," or "reduced alcohol," but not "low alcohol." *See* **Transcript** at 1546.

she had ever seen, heard about or tried LA. *See* Transcript at 1548–54.

Dr. Wind purposely set out to isolate the responses of consumers who had not been "contaminated" by advertising or any other exposure to LA. *See* Transcript at 1569–73, 1772–94. At the time this survey was taken Heileman had only made a token shipment of its LA beer and Miller had not publicized or sold any Sharp's LA. Anheuser–Busch had been selling its LA beer to retail customers for less than three weeks in eight of the fifteen cities where the survey was conducted. Seven of the fifteen sites selected had had no LA sales and were in jurisdictions where advertising the alcoholic weakness of beer was forbidden. *See* Transcript at 1543. *See also Id.* at 367, 2157 (beer could not be advertised as being low in alcohol in Mississippi). Moreover, the questionnaires of those who had had prior exposure to LA (369 out of 1,051) were disregarded in tabulating the answers to the first three questions about the description, type and brand of the product. *See* Trial Exhibit 773 at 300016. It is not surprising, then, that only about 4.9% of those surveyed who had had no prior exposure to LA associated the name "LA" with light, low or less alcohol. *See* Transcript at 1613. It is equally unsurprising that 76.5% of these same consumers guessed that the brand[35] name of the new beer was "LA." *See* Transcript at 1614, 1757–58, 1806. Hoping for this type of response, Anheuser–Busch had deliberately designed its label with large "L" "A" letters dominating the trade dress. *See* Deposition of Zanvel A. Zack at 28. *See also* Transcript at

1756–58. Under these circumstances, the court agrees with the dissenting judge in the *Stroh* appeal who observed that: "The perceptions of a group of wholly uninformed consumers are ... simply legally irrelevant." *Anheuser–Busch, Inc. v. Stroh Brewery Company*, 750 F.2d 631, 645 (8th Cir.1984). *See also* Burgunder, *An Economic Approach to Genericism*, 23 American Business Law Journal 391, 413–14 n. 84 (1985).

The survey also revealed that about 80% of those who had had prior exposure to LA, as well as those who had not, named Anheuser–Busch as the source of the beer after being shown a can labeled "LA from Anheuser–Busch." *See* Transcript at 1628, 1692. The responses led Dr. Wind to conclude that "LA" is perceived and understood by consumers as the brand name of the new product, and not a generic descriptor of the type of beer. *See* Transcript at 1628–29. However, the court believes that this only shows that a mark can have a dual function when there is only one producer of the product.[36] *See* Transcript at 910, 914, 1885.

During the cross-examination of Dr. Wind, Miller and Heileman were able to point out many coding errors which affected the results of the survey. *See* Transcript at 1808–29, 1880–82. Some of the criticized coding was plainly erroneous. Other disputes arose because the consumers surveyed gave multiple answers or answers which could arguably be classified in more than one category. Wind's report gave no indication of the order in which the multiple responses came to mind. *Cf.* Cov-

---

**35.** The Wind survey respondents were not tested to determine what they understood by the concept "brand name." *See* Transcript at 1568–70. Many courts have recommended the methodology of the survey conducted in the case of *E.I. DuPont de Nemours & Company v. Yoshida International, Inc.*, 393 F.Supp. 502 (E.D.N.Y.1975) in which the term "Teflon" was at issue. That survey offered the examples of "Chevrolet" to illustrate what it meant by a brand name and "automobile" to illustrate what it meant by a product type. Then, respondents were asked to classify other brand names and product names among which was "Teflon." However, other courts have cautioned that this type of test is helpful only when the distinction between the brand name and the product genus is obvious.

*See A.J. Canfield Company v. Honickman*, 808 F.2d 291, 303 (3d Cir.1986). These courts have expressed doubts that any consumer survey can be helpful when a category descriptor is used as a brand name. *See Id.* at 302.

**36.** A trademark has a dual function if it identifies particular product characteristics while at the same time indicating its source. *See A.J. Canfield v. Honickman*, 808 F.2d 291, 300 (3d Cir.1986); *American Thermos Products Company v. Aladdin Industries, Inc.*, 207 F.Supp. 9, 20 (D.Conn.1962), *aff'd. sub nom. King–Seeley Thermos Company v. Aladdin Industries, Inc.*, 321 F.2d 577 (2d Cir.1963).

erdale, *Trademarks and Generic Words: An Effect-on-Competition Test,* 51 University of Chicago Law Review 868, 886 (1984) (if many survey respondents give multiple responses, the court would have to consider absolute frequency of use and the order in which the terms came to mind). While a certain number of errors and good-faith disputes are unavoidable in quantifying survey data, these errors, combined with the built-in bias, plus the flaws in the universe, design and supervision of the survey have caused the court to place very little weight on the results of Wind I.

Wind II fares little better. *See* Trial Exhibit 774. This survey was conducted among 800 beer drinking consumers in eight cities [37] in September of 1984. The objectives of this study were to determine: (1) whether consumers perceive LA to be the brand name for a low alcohol beer or a descriptor of the low alcohol beer category, and (2) how consumers describe this type of beer. *See* Transcript at 1666. These consumers, prescreened to select only those who had consumed beer within the past thirty days, were shown five photographs of low alcohol beers, including the Anheuser–Busch product, but not including any product from Miller or Heileman.[38] *See* Transcript at 1834, 1869. Sixty-two percent of those surveyed described the beers as some form of low alcohol; while sixty percent identified LA as the brand name. *See* Transcript at 1686, 1693. Again, the plaintiffs were able to point out numerous coding errors in this survey. *See* Transcript at 1675–81, 1714–21, 1843–58, 1872–75, 1883–85, 1901–07.

Miller offered its own version of a primary meaning survey taken by the Admar Research Company, Inc. and directed by Dr. Henry Ostberg, Admar's president. *See* Trial Exhibit 435. Eight hundred and ten male and female beer drinkers at twelve shopping malls in eight cities were questioned during the period June 21–23, 1984. After an initial screening which included a determination that the subjects had consumed beer during the past seven days and were familiar with LA from Anheuser–Busch, the interviewees were shown photographs of a can and bottle of Budweiser, Schlitz, Miller High Life and "LA from Anheuser–Busch." Those who were familiar with LA were then asked what "LA" on the Anheuser–Busch can and bottle means, if anything. *See* Transcript at 525. Fifty-two percent said the meaning of LA is low or light alcohol.[39] *See* Transcript at 530, 567. Eleven percent said LA is a brand name. *See* Transcript at 532–33. While the Ostberg survey does not indicate whether consumers think of LA or low alcohol as a type of beer, it does show that a majority of consumers, who by June had been exposed to advertising and sales of LA, recognized that LA stands for low alcohol.

Heileman also contributed a survey designed to discover what, if anything, the term LA, as used in connection with beer, means to consumers. *See* Trial Exhibit 436; Transcript at 672. Its Beer Display Study was conducted by Legal Marketing Research, Inc. and directed by its president John Bunge. From July 11 through August 4, 1984, 536 consumers, who had purchased beer within the past month, were interviewed in shopping malls in five cities in which Heileman and Anheuser–Busch LA beers were being sold. Those selected were first asked to name all the types of beer they could remember. Only 6.3% (37 people) mentioned LA or low alcohol beer. *See* Transcript at 745. This stage of the survey was described as "unaided awareness" by Bunge. *See* Transcript at 687–88.

---

37. LA from Anheuser–Busch and at least one other low alcohol beer was being sold in each of the survey sites. *See* Transcript at 1864–69.

38. *See Loctite Corporation v. National Starch and Chemical Corporation,* 516 F.Supp. 190, 206 (S.D.N.Y.1981) (criticizing a primary significance survey in which test subjects were not shown the products of each party).

39. The survey results appear to have been somewhat stretched to reach a percentage over 50%. Multiple answers given by a single respondent were all tallied. *See* Transcript at 531. Seventeen percent gave answers that fell into more than one category, *see* Transcript at 608, leading to numerous discretionary coding decisions which were challenged by the defendant. *See* Transcript at 569–633.

The next stage was "aided" (by advertising and probing questions) awareness. *See Id.* at 687–91. At this stage each interviewee was shown one of two displays meant to stimulate beer sections in liquor stores: 271 saw Display 1, made up of only Anheuser–Busch LA products and accompanying advertising; 265 saw Display 2, made up of both Anheuser–Busch and Heileman LA products and advertising. The interviewee was then led away from the display and asked: "Does the term LA, as used in connection with beer, mean anything in particular to you?" Transcript at 693. A majority (69.4% of those viewing Display 1 and 75.8% of those viewing Display 2) said "yes." Next, those who said "yes" were asked: "As used in connection with beer, what does the term LA mean?" Of those who said LA has some meaning, 67% of those viewing Display 1 and 71% of those viewing Display 2 said that meaning was "low alcohol."[40] Based on these statistics, Bunge concluded that "the term LA as used in connection with beer really has several [meanings]. The primary meaning of which, ... is the concept of low, light, less alcohol." Transcript at 673.

Anheuser–Busch attacked this survey as biased because the Heileman advertising and point-of-sale materials included in Display 2 translated LA as "low alcohol." *See* Transcript at 755–63. However, the disparity between the responses to the two displays was small, so these materials could have had little effect on the ultimate result. *See* Transcript at 866. The defendant also criticized the validity of the percentages because many of the subjects gave multiple answers and were counted in more than one category. *See* Transcript at 747–99. The court agrees that there was too much aiding of awareness and probing. However, Bunge did attempt to record the answers which first came to mind in his study's tables.

Within the context of this survey's design, the central question "As used in connection with beer, what does the term LA mean?" leads the interviewee to "translate" the LA initials rather than to name the type of beer on display (even though, ultimately, the two answers may be identical). Therefore, the court believes that the Beer Display Study does little to establish that LA is the generic name for a type of beer. However, it does indicate that by the time this survey was conducted a majority of consumers understood LA to be descriptive of the low alcohol characteristic of the beer.

### (2) *Classification of the LA Mark*

In many trademark infringement or cancellation suits, properly conducted surveys can be of assistance to the finder of fact in evaluating consumer perceptions. However, the situation at hand presents an atypical factual situation. In the usual "genericide" case a venerable mark has come under attack because, over the course of years consumers have come to regard it as a name for the genus of a product rather than as a brand name of a particular product from a single source. *See, e.g., Kellogg Company v. National Biscuit Company,* 305 U.S. 111, 59 S.Ct. 109, 83 L.Ed. 73 (1938) (shredded wheat); *Donald E. Duncan, Inc. v. Royal Tops Manufacturing Company,* 343 F.2d 655 (7th Cir. 1965) (yo-yo). In contrast, low alcohol beer was virtually a new product when Anheuser–Busch began to use the LA mark in 1984. Prior to April 27 of that year, the federal Bureau of Alcohol, Tobacco and Firearms (BATF) and the laws of many states would not allow beer to be advertised or labeled with any indication of the level of alcoholic strength or weakness.

■ Were it not for these historical facts, the court would have no trouble finding that LA is a generic or common descriptive term for a type of beer,[41] despite

---

**40.** When all 536 interviewees are considered, 50.2% (269) stated that LA means low alcohol. *See* Transcript at 716.

**41.** Recently, the Seventh Circuit has explained that "an adjective can be generic term when that word is a part of a common descriptive name of

a *kind* of goods. In order to be generic, however (as the word implies), the word in question must serve to denominate a type, a kind, a genus or a subcategory of goods." *Henri's Food Products Company, Inc. v. Tasty Snacks, Inc.,* 817 F.2d 1303, 1305–06 (7th Cir.1987) (footnote omitted).

any survey results to the contrary. The initials clearly stand for low alcohol—the adjectives which describe the unique characteristic of a kind of beer. *See Henri's Food Products Company v. Tasty Snacks, Inc.,* 817 F.2d 1303, 1305–06 (7th Cir.1987). Some courts, without benefit of consumer surveys, have held that a term is a common descriptor primarily because the word or words are the most common terms which can be used to denominate the product genus. *See, e.g., Technical Publishing Company Division of Dun–Donnelley Publishing Corporation v. Lebhar–Friedman, Inc.,* 729 F.2d 1136 (7th Cir.1984) ("Software News" generic when applied to a trade magazine dealing with the softwear industry). In *A.J. Canfield Company v. Honickman,* 808 F.2d 291, 301–03 (3d Cir. 1986), the court ruled that the name "chocolate fudge," as used for a soft drink, is generic [42] because "[t]o the extent that a trademark also communicates functional characteristics, it does not function as a trademark." *Id.* at 305. Until shortly before that case arose, the plaintiff Canfield had been the sole user of the unregistered "Chocolate Fudge" mark and the sole producer of Diet Chocolate Fudge Soda. The name had only recently been appropriated for use by the defendant and other soft drink manufacturers. In this situation the court reasoned that the survey Canfield offered had no probative value:

> In contrast to the advocates of this survey technique, we do not believe that a direct survey of public views can truly measure consumer understanding if a term identifies a product that arguably constitutes its own genus. As we have discussed above, generic marks signifying goods produced by only one manufacturer may function both as generic terms, signifying the product genus, and as brand names, indicating continuity of source. Faced with a mark like shredded wheat, the consumer has no reason to define it either as the name of a brand or

as the name of a genus because the term functions most efficiently as both. Accordingly, a survey inquiring whether a designation like shredded wheat is a brand name or a product name forces respondents to make a false dichotomy. Because consumers will never have had a reason to consider the question before, such a survey might not elicit real attitudes but merely answers developed on the spot that would be highly susceptible to the influences of survey phraseology.

Perhaps more significantly, directly surveying the public without first differentiating the product brand from the product genus—or at least without first offering a definition for the distinction—would not, in the context of this case, test the meaning of words to the public but would rather request a legal conclusion. A conscientious survey respondent, when asked whether a term is a brand name or product name, might ask, "Exactly what do you mean by product name and what do you mean by brand name?" Using the primary significance test and taking account of the anonymous source rule, we would be compelled to answer: "A brand name primarily signifies a product brand while a product name primarily signifies a product genus." The respondent then asks: "How do I distinguish a product brand from a product genus?" If we seek to answer this question with the results of this survey, we can only answer in a circular fashion: "That question depends on the answers we obtain from you and other respondents." We simply cannot circumvent the requirement of defining the distinction between product brand and product genus by asking the public to tell us if a name is a brand name or the name of a product genus; we can only ignore it.

*A.J. Canfield Company v. Honickman,* 808 F.2d at 302 (footnotes omitted).

---

**42.** The court determined that "chocolate fudge soda" rather than "soda" or "chocolate soda" was the product genus and held that: "If a producer introduces a product that differs from an established product class in a particular characteristic, and uses a common descriptive term of that characteristic as the name of the product, then the product should be considered its own genus. Whether the term that identifies the product is generic then depends on the competitors' need to use it." *A.J. Canfield Company,* 808 F.2d at 305–06.

For the same reasons, Dr. Wind's conclusion that consumers understood "LA" to be a brand name are of no probative value under the circumstances of this case. Nevertheless, the surveys have been of some help to Anheuser–Busch in sustaining its burden of proving that "LA" is not a generic term. The Wind surveys, as well as those of Ostberg and Bunge, reveal that many consumers were not aware of low alcohol beer at all, so it was not surprising that the poll takers found that these consumers, as well as those with only recent exposure to the product, had not formed a consensus that "LA" or "low alcohol" is the name of a distinctive type of beer. While Canfield's "Diet Chocolate Fudge" had been on the market for thirteen years when Canfield's trademark claim arose, LA had been sold to consumers for less than a month when Heileman filed its lawsuit. As the surveys indicate, consumers had had no reason to call beer with less alcohol anything until it became available in the marketplace. Nevertheless, the law requires that generic or common descriptive usage be determined from the point of view of the relevant consumer.[43] *See Kellogg Company v. National Biscuit Company,* 305 U.S. 111, 118, 59 S.Ct. 109, 113, 83 L.Ed. 73 (1938); *In re Merrill Lynch, Pierce, Fenner and Smith,* 828 F.2d 1567, 1569 (Fed. Cir.1987). For this reason, the court cannot find that "LA" was born generic.[44] *See* Greenbaum, Ginsburg & Weinberg, *A Proposal for Evaluating Genericism After "Anti–Monopoly,"* 73 Trademark Reporter 101, 105 (1984).

Faced with a similar situation in *Gimex, Inc. v. JS & A Group, Inc.,* 699 F.2d 901 (7th Cir.1983), the Seventh Circuit explained that:

[W]ords may be classified as generic in two distinct ways. A manufacturer may select a word which is already in common use and apply it to his product according to that common meaning; the use of "light" in relation to beer is an example of this first type of generic term.[45] However, a manufacturer may also invent a word which thereafter enters common usage and becomes generic. *See* 3 R. Callman, *The Law of Unfair Competition and Monopolies* § 74.2 (3d ed. 1969).

*Gimex,* 699 F.2d at 905. In that case the court of appeals ruled that "Auto Page" is not a generic term for an automatic dialing device which connects an automatic telephone answering service with a paging terminal. The court noted that, although the words "auto" and "page" are generic, they are each capable of multiple meanings and were not combined as the name "Auto Page" until used by the plaintiff Gimex in

**43.** The plaintiffs attempted to show that LA and "low alcohol" were generic terms within the beer industry and that LA had gained currency as a category descriptor for beer in Australia. *See, e.g.,* Transcript at 51–54, 68, 109–16, 240–42, 415, 944–48, 959, 2212–13, 2225–28. *See also* Trial Exhibits 74, 77, 100, 101, 102, 103, 400, 401, 426, 427. However, industry and foreign usage are not indicative of a term's generic use by ordinary consumers. *See Big O Tire Dealers v. Goodyear Tire & Rubber Company,* 561 F.2d 1365, 1369 (10th Cir.1977) (industry usage not determinative, *cert. denied,* 434 U.S. 1052, 98 S.Ct. 905, 54 L.Ed.2d 805 (1978); *Donald F. Duncan, Inc. v. Royal Tops Manufacturing Company, Inc.,* 343 F.2d 655, 661–62 (7th Cir.1965) (generic use of term "yo-yo" in Philippine Islands not dispositive of whether "yo-yo" is generic among consumers in the United States).

**44.** At the time LA beer was introduced there was merely a hope or expectation by those entering the low alcohol field that LA would become a product category. In its introductory stage, LA beer was little more than a fad. "[O]ne can capitalize on a market or fad created

by another provided that it is not accomplished by confusing the public into mistakenly purchasing the product in the belief that the product is the product of the competitor." *American Footwear Corporation v. General Footwear Company, Limited,* 609 F.2d 655, 662 (2d Cir.1979) (term "bionic" could be used in the absence of confusion). *See also International Order of Job's Daughters v. Lindeburg and Company,* 633 F.2d 912, 919 (9th Cir.1980), *cert. denied,* 452 U.S. 941, 101 S.Ct. 3086, 69 L.Ed.2d 956 (1981).

**45.** In the Miller LITE litigation, the court of appeals relied heavily on a standard dictionary definition of "light" in ruling that "LITE" (or light) is a common descriptor for beer. *See Miller Brewing Company v. G. Heileman Brewing Company,* 561 F.2d 75, 80–81 (7th Cir.1977), *cert. denied,* 434 U.S. 1025, 98 S.Ct. 751, 54 L.Ed.2d 772 (1978). In the instant case none of the parties presented evidence that either "LA" or "low alcohol" is defined by any lexicon as a type of beer.

its patent application. At that time the public had not been exposed to the type of product at issue. Thus, because "Auto Page" was not a commonly understood or commonly used term prior to its association with the plaintiff's invention, the court concluded that it is not a generic term, but is merely descriptive. *Id.* at 906–07. *See also Trak Inc. v. Benner Ski KG*, 475 F.Supp. 1076, 1079 (D.Mass.1979) (no consumer consensus as to generic term for new product). Likewise, in Anheuser–Busch's case against Stroh, Stroh's vice president testified that at the time of that trial (May 7, 1984) LA was not a generic name as far as consumers were concerned, but that if Anheuser–Busch and several other breweries used it, it would become generic. *See Anheuser–Busch, Inc. v. Stroh Brewery Company*, 587 F.Supp. 330, 338 (E.D.Mo.), *aff'd*, 750 F.2d 631 (8th Cir. 1984).

■■■ Although the Stroh prediction had not materialized by the time of this trial, the record shows that, after several weeks of exposure to LA beer through retail outlets, advertising and news reports, a majority of consumers surveyed recognized that LA describes the beer as being low in alcoholic content. *See* Trial Exhibits 435, 436, 774. Anheuser–Busch contends that the media publicity and advertising—some of which it generated itself—"contaminated" these consumer perceptions by translating "LA" as low alcohol. However, as the plaintiffs correctly point out, in determining whether a mark is merely descriptive, a fact finder must consider the mark as it is applied to the goods in question:

> Evidence of the context in which a mark is used on labels, packages, or in advertising material directed to the goods is probative of the reaction of prospective purchasers to the mark. To hold otherwise would be to separate the concept of the average prospective purchaser from the world of reality.

*Application of Abcor Development Corporation*, 588 F.2d 811, 814 (C.C.P.A.1978). *See also* Transcript at 539, 1601, 1779–86, 1792, 2078–87.

Anheuser Busch points out that it has never objected to competitors using the phrase "low alcohol" or any of its variants to describe beer. *See* Answer to Amended Complaint and Amended Counterclaim at ¶¶ 18, 19, 20. *See also* Transcript at 1303–04. It is only claiming trademark rights to the term "LA." Despite the evidence that LA is descriptive, Anheuser–Busch maintains that it is a protectible mark because the letters "L" and "A" are not initials for low alcohol or anything else, but are merely suggestive of a number of things, including low alcohol, light in alcohol, less alcohol, light adventure, lifestyle alternative, and "low in alcohol from Anheuser–Busch."

■■■ The problem with this theory is that even these suggested meanings are words beginning with "L" and "A," so that, even under the defendant's reasoning, the letters are being used as initials. Initials do not "suggest" or "connote" the words for which they stand, they directly denote those words.[46] For example,

---

**46.** The dictionary defines "initial" as: "Denoting the first letter or letters of a word." *American Heritage Dictionary of the English Language* 676 (1969). "Denote" is defined as: "To refer to specifically; mean explicitly." *Id.* at 353. In contrast "connote" means: "To suggest or imply in addition to literal meaning." *Id.* at 283.

In the Stroh case, the district court stated that: [I]t is apparent from the [Wind] study that consumers do not generally recognize the term LA to immediately *connote* low alcohol when they see such on plaintiff's product. Rather, it is this Court's opinion that the study supports a conclusion that LA, when placed prominently on a can of beer as the sole brand name, stands for an idea which requires some operation of the imagination to connect it with the product, and therefore is suggestive in nature.

*Anheuser–Busch, Inc. v. Stroh Brewery Company*, 587 F.Supp. 330, 337 (E.D.Mo.), *aff'd*, 750 F.2d 631 (8th Cir.1984) (emphasis supplied). It is well-established that "[a] term is suggestive if it requires imagination, thought and perception to reach a conclusion as to the nature of the goods." *Abercrombie & Fitch v. Hunting World, Inc.*, 537 F.2d 4, 11 (2d Cir.1976); *Gear, Inc. v. L.A. Gear California, Inc.*, 670 F.Supp. 508, 514 (S.D.N.Y.1987). However, the "imagination, thought and perception" refers to the mental process required to connect a name that is incongruous or figurative with the product (e.g., "Roach Motel" with an insect trap or "TIDE" with soap), not the intermediate thought process needed to translate initials into the name which

throughout the trial the plaintiffs drew the court's attention to internal communiques among Anheuser–Busch executives which were signed with initials. *See, e.g.,* Transcript at 131–32, 181, 184, 201, 243, 1106, 1250, 1253, 1282, 1325. When shown memos signed by "A.A.B. III" none of the defendant's personnel testified that these initials suggest a variety of possibilities or that the letters have no meaning. They all recognized that when the initials "A.A.B. III" are attached to an Anheuser–Busch document they directly denote the chief executive officer, August A. Busch III. Similarly, the initials "L" and "A" on a can of beer directly denote low alcohol. Other meanings, such as "light adventure," which were later concocted by the parties, are little more than plays on words or initials.[47] Despite any other possible associations, the primary function of the LA initialism is to describe to consumers the unique selling point of the beer—namely, that it is low in alcohol.

The Seventh Circuit has explained that merely descriptive terms are unsuited to the function of trademarks because they are poor means of distinguishing one source of goods from another and because they are often necessary to the description of all goods of a similar nature. *See Gimix, Inc. v. JS & A Group, Inc.,* 699 F.2d 901, 909 (7th Cir.1983); *M.B.H. Enterprises, Inc. v. WOKY, Inc.,* 633 F.2d 50, 54 (7th Cir.1980).

Anheuser–Busch witnesses testified that it is not necessary to use "LA" to describe the beer in question because other phrases such as "low alcohol," "light in alcohol," "less alcohol," and "reduced alcohol" remain available for common use. *See* Transcript at 1310, 2245. However, the plaintiffs' expert John Nevin disagreed, pointing out that "LA" is the most acceptable term because consumers naturally tend to shorten or abbreviate product names. *See* Transcript at 884–89. *Accord American Thermos Products Company v. Aladdin Industries, Inc.,* 207 F.Supp. 9, 20 (D.Conn. 1972), *aff'd sub nom. King–Seely Thermos Company v. Aladdin Industries, Inc.,* 321 F.2d 577 (2d Cir.1963). Moreover, the words "less" and "low" are thought to have negative connotations, while the phrase "light in alcohol" could be confused with a different product—light alcohol. *See* Transcript at 297, 941–42, 1114, 1154, 2195.

After the BATF abandoned its restrictions on the advertising of alcoholic weakness, the use of "LA" as a subterfuge for denoting low alcohol without spelling it out became moot. However, the testimony from both sides revealed that the main value of the LA initialism lay in the hope that "LA" would become "the bar call of the Eighties." *See* Trial Exhibit 243 at 12. *See also* Transcript at 806, 1114, 1167, 1180, 1198. While the parties extolled the virtues of low alcohol beer as being part of a trend toward moderate drinking and a healthier lifestyle, *see* Transcript at 883, 1110–11, they also implied that customers who are supposedly seeking these values would be embarrassed to ask for a low alcohol beer in a public establishment. *See* Transcript at 941–42. Consequently, although there are alternate terms which can describe LA beer, the LA name is clearly the most desirable. *See* Transcript at 912, 2019, 2028, 2217, 2221.

directly describes the salient characteristic of the product.

The Missouri court also referred to "LA" as an acronym. *See Anheuser–Busch,* 587 F.Supp. at 334–35 & n. 7. However, "LA" is not a true a acronym which is a "word formed from the initial letters of a name." *See American Heritage Dictionary of the English Language* 12. As noted throughout this opinion, the initials "L" "A" are not used or pronounced as a word when they are applied to beer. A true acronym could be a word which is arbitrary or suggestive on its own without reference to the underlying words. *See, e.g., Merritt Forbes & Company Incorporated*

*v. Newman Investment Securities, Inc.,* 604 F.Supp. 943, 955–56 (S.D.N.Y.1985) (denying summary judgment because the acronym "TOP's" standing for the generic term "tender option security program," may conceivably constitute a valid and protectible service mark). In contrast, "LA" is nothing more than initials.

**47.** Reporters have even joined in this play. *See* Trial Exhibit 493 (Advertising Age headline from August 23, 1984, proclaiming "Light Audience so far for 'L.A.' ").

Under the law of this circuit, abbreviations for generic phrases are themselves treated as generic.[48] *See National Conference of Bar Examiners v. Multistate Legal Studies*, 692 F.2d 478, 488 (7th Cir.1982), *cert. denied*, 464 U.S. 814, 104 S.Ct. 69, 78 L.Ed.2d 83 (1983). Likewise, an abbreviation for a merely descriptive term will be protected only if it has acquired secondary meaning. *See Continental Corrugated Container Corporation v. Continental Group, Inc.*, 462 F.Supp. 200, 204 (S.D.N.Y.1978).

Anheuser–Busch made no serious attempt to establish that the "LA" mark had acquired secondary meaning during the brief interval between April 2, 1984, when it began using the LA mark and April 24, when Heileman also began to use the mark. A merely descriptive term has acquired secondary meaning if, through long and exclusive use, the public has come to associate the mark only with the senior user's business. *See American Footwear Corporation v. General Footwear Company*, 609 F.2d 655, 663 (2d Cir.1979); *Union Carbide Corporation v. Ever–Ready, Inc.*, 531 F.2d 366, 380 (7th Cir.), *cert. denied*, 429 U.S. 830, 97 S.Ct. 91, 50 L.Ed.2d 94 (1976). The senior user has the burden of proving that its mark possessed secondary meaning at the time the junior user commenced its use of the mark. *See Saratoga Vichy Spring Company, Inc. v. Lehman*, 625 F.2d 1037, 1043 (2d Cir.1980).

The undisputed evidence shows that Anheuser–Busch sold 200,000 barrels of LA beer and spent $27,000,000.00 on advertising by the time of trial. However, a large expenditure of money does not in itself create legally protectible rights. *See American Footwear Corporation*, 609 F.2d at 663; *Eagle Snacks, Inc. v. Nabisco Brands, Inc.*, 625 F.Supp. 571, 583 (D.N.J. 1985). This evidence cannot overcome the fact that there had not been adequate time for the "LA" mark to acquire secondary meaning. *See* Transcript at 734–35. The court has found no other case in which there has been a finding that secondary meaning had developed in a matter of weeks. To the contrary, in *Gimex, Inc. v. JS & A Group, Inc.*, 699 F.2d 901, 907 (7th Cir.1983), the court stated that "the period of time involved here from the introduction of the plaintiff's product in 1975 until the introduction of Iwata's similar product in 1980, is so brief as to cast serious doubt upon the very possibility of having established a strong secondary meaning...." Under even less doubtful circumstances, this court has found that the "LA" mark had not acquired a secondary meaning at any time relevant to these actions.

In sum, although Anheuser–Busch met its burden of proving that "LA" was not generic when it first began to use the mark or by the time of trial, it failed to prove that LA is a suggestive or arbitrary mark or that it had acquired secondary meaning at the time Heileman began to use it. Therefore, the court has found that, by using the LA mark, Heileman and Miller have not engaged in common-law trademark infringement or any other form of unfair competition.

---

**48.** A few courts in other districts have advanced the proposition that the abbreviation itself must have become generic or descriptive by virtue of being commonly understood in order to be ineligible for trademark status. *See, e.g., Merritt Forbes & Company Incorporated v. Newman Investment Securities, Inc.*, 604 F.Supp. 943, 956 (S.D.N.Y.1985) (and cases cited therein); *Kampgrounds of America v. North Delaware A–OK Campground, Inc.*, 415 F.Supp. 1288, 1292 (D.Del.1976) (and cases cited therein). However, in *Merritt Forbes* and in *Kampgrounds of America* more than merely initials were at issue. In *Merritt Forbes* the initials formed an acronym, TOP's, while in *Kampgrounds*, the KOA mark was deemed protectible when considered in combination with other aspects of trade dress. These cases fail to recognize that initials are merely short forms of the words for which they stand and should be accorded the same degree of protection as those words.

In another case cited by the defendant, *Modern Optics v. Univis Lens Company*, 234 F.2d 504 (C.C.P.A.1956), the court ruled that the initials "CV," standing for continuous vision, were not merely descriptive of trifocal lenses. The court reasoned that trifocal lenses had been sold for over fifty years without the terms "continuous vision" or "CV" being used to describe them. *Id.* at 505. Thus, the court found that the term "CV" was neither the necessary nor the obvious descriptor for the product. In contrast, "LA" was used from the outset to describe the unique characteristic of the new type of beer.

### (3) Likelihood of Confusion

Because this is not a trademark opposition or cancellation action, the parties' efforts to establish that LA is either a generic or a suggestive mark were disproportionate to their efforts to address the issue of confusion. These actions have been brought under the Lanham Trademark Act, 15 U.S.C. § 1125(a), and the common law of trademark infringement and unfair competition. The crucial issue in any action for unfair competition is whether there is any likelihood that an appreciable number of ordinary purchasers are likely to be misled, or indeed simply confused, as to the source of the goods in question. *See Mushroom Makers, Inc. v. R.G. Barry Corporation,* 580 F.2d 44, 47 (2d Cir.1978) (per curiam), *cert. denied,* 439 U.S. 1116, 99 S.Ct. 1022, 59 L.Ed.2d 75 (1979); *Maternally Yours, Inc. v. Your Maternity Shop, Inc.,* 234 F.2d 538, 542 (2d Cir.1956). Even if the court had ruled that LA is a generic mark, Anheuser–Busch, as the first user, could maintain a claim for unfair competition by showing a likelihood of confusion. *See Technical Trademark Publishing Company Division of Dun–Donnelley Publishing Corporation v. Lebhar–Friedman, Inc.,* 729 F.2d 1136, 1142 (7th Cir. 1984).

Anheuser–Busch, as the claimant to trademark protection, bears the burden of proving a likelihood of confusion. *See Lindy Pen Company, Inc. v. Bic Pen Corporation,* 725 F.2d 1240, 1243 (9th Cir. 1984), *cert. denied,* 469 U.S. 1188, 105 S.Ct. 955, 83 L.Ed.2d 962 (1985). However, the defendant did not offer a relevant consumer survey or any evidence of actual confusion in its case-in-chief. The evidence at trial revealed that, although the LA marks used by the parties are virtually identical on the levels of sight, sound and meaning, Heileman displayed the L.A. mark with an equally prominent house mark, while Miller displayed the LA mark with an equally prominent single brand name, Sharp's. The weight of authority holds that the conspicuous use of housemarks virtually dispels any confusion that might otherwise result from the use of identical marks. *See*

*Lindy Pen Company,* 725 F.2d at 1245 & n. 4 (no confusion where "BIC" and "LINDY" prominently displayed on "Auditor's" pens); *Vitarroz Corporation v. Borden, Inc.,* 644 F.2d 960, 968–69 (2d Cir.1981) ("Bravo's" and "Bravo" not confusing on snack food where name of manufacturers prominently displayed); *McGregor–Doniger Inc. v. Drizzle Inc.,* 599 F.2d 1126, 1133–34 (2d Cir.1979) ("DRIZZLE" and "drizzler" coats not confusing where latter paired with prominent display of manufacturer's name); *Uniroyal, Inc. v. Kinney Shoe Corporation,* 453 F.Supp. 1352, 1355–56 (S.D.N.Y.1978) (no likelihood of confusion between "KEDS" and "Kinney KIDS" children's sneakers); *Ye Olde Tavern Cheese Products, Inc. v. Planters Peanuts Division,* 261 F.Supp. 200, 206 (N.D.Ill. 1966) ("Planters Ye Olde Tavern Nuts" not likely to be confused with competitor's "Ye Olde Tavern" food products where "Planters" name is very well known), *aff'd mem.,* 394 F.2d 833 (7th Cir.1967) (per curiam). *See also* Transcript at 905–09.

In addition, the court has found that the LA mark is a weak, merely descriptive mark which had not acquired secondary meaning. The parties' beers bearing this mark are all sold at the same prices, through the same channels. They are advertised through the same media, compete for the same customers, and fulfill the same function. *See* Transcript at 94–99, 104, 485–86, 1311–19, 1329. However, by law, beer can only be sold in licensed outlets and in standard sized containers with labels approved by the BATF. Thus, consumers presumably are used to choosing among competing beers and, although beer is a relatively low priced item, they do exhibit a degree of brand loyalty. *See* Transcript at 903, 1203.

More importantly, there was no evidence or contention that Heileman and Miller hoped to pass off their low alcohol beers as "LA from Anheuser–Busch." Rather, in adopting and using the LA mark, they were motivated by a desire to use a name which described the product and which was most likely to be accepted by consumers. *See* Transcript at 325–33, 345–48, 433–37,

446–48, 2131, 2138–40, 2236. Although Heileman and Miller were fully aware that Anheuser–Busch had already adopted the LA mark when they named their own LA beers, knowledge of prior use alone does not in itself constitute bad faith. Selecting a mark because it conveys the product's purpose or characteristics has been held to demonstrate good faith. *See E.S. Originals Inc. v. Stride Rite Corporation*, 656 F.Supp. 484, 490 (S.D.N.Y.1987); *Eagle Snacks, Inc. v. Nabisco Brands, Inc.*, 625 F.Supp. 571, 583 (D.N.J.1985).

None of the parties offered any probative evidence of actual confusion among consumers, but Heileman introduced its Beer Label Study which was meant to determine whether there is a significant likelihood of confusion. *See* Trial Exhibit 440. This survey was conducted by Legal Marketing Research, Inc. under the direction of its president John Bunge during the period from July 11 through August 4 of 1984 in five cities where Heileman and Anheuser–Busch LA beers were being sold.

Five hundred and thirty consumers who said they had purchased beer within the past month were shown either a can of LA from Anheuser–Busch or a can of a Heileman LA beer. After being allowed to examine the can at length, each consumer was asked: "What company or organization puts out that product?" The interviewee was then shown the other can and the question was repeated. Those who answered either question with "I don't know" were asked whether they thought the beers were put out by the same or different companies. Out of all 530 respondents, only twenty-four (4.5%) of the interviewees said they thought both low alcohol beers were put out by the same producer because both were labeled with the LA mark. *See* Transcript at 728–29. Most of the 400 people who recognized that the beers came from different producers said they came to this conclusion by reading the names of the producers on the beer labels. *See* Transcript at 731, 801–03, 826.

The Beer Display Study's method of presentation did little to duplicate market conditions. *Cf. Calvin Klein Cosmetics Corporation v. Lenox Laboratories, Inc.*, 815 F.2d 500, 504 (8th Cir.1987) ("A realistic evaluation of consumer confusion must attempt to recreate the conditions in which buying decisions are made, and the court should try to determine not what it would do, but what a reasonable purchaser in market conditions would do."). However, by showing the beer products to the interviewees in monadic sequence, Bunge managed to avoid the criticisms made of side-by-side comparisions. "The test is not whether the consumer will know the difference if he sees the competing products on the same shelf. It is whether he will know the difference if [one product] is *singly* presented and he has heard of [the competing product]." *American Home Products v. Johnson Chemical Company*, 589 F.2d 103, 107 (2d Cir.1978). *See also James Burrough Ltd. v. Sign of the Beefeater, Inc.*, 540 F.2d 266, 275 (7th Cir.1976); *Union Carbide Corporation v. Ever–Ready Incorporated*, 531 F.2d 366, 382 (7th Cir. 1976), *cert. denied*, 429 U.S. 830, 97 S.Ct. 91, 50 L.Ed.2d 94 (1976); *Sterling Drug, Inc. v. Lincoln Laboratories, Inc.*, 322 F.2d 968, 971 (7th Cir.1963); *American Automobile Association (Incorporated) v. AAA Insurance Agency, Inc.*, 618 F.Supp. 787, 792 (W.D.Tex.1985); *American Association for Advancement of Science v. Hearst Corporation*, 498 F.Supp. 244, 259 (D.D.C.1980).

Anheuser–Busch made little headway challenging the design and methodology of the Beer Label Study,[49] but it did dispute the finding of a 4.5% level of confusion. The defendant contends that all 62 people who thought the two beers were produced by the same source should have been counted as confused, not just those who attributed their confusion to the presence of the LA mark on both cans. *See* Transcript at 803–18. Under this reasoning,

---

**49.** The defendant also suggests that even those people who named different sources for each beer should have been asked whether they thought the different sources were part of the same company. *See* Transcript at 818–25. The court finds no merit to this proposal, since this was not a survey of consumers' knowledge of corporate structures.

11.6% of the interviewees were confused, and at least two courts have found that this percentage indicates a significant level of confusion. *See James Burrough Ltd. v. Lesher,* 309 F.Supp. 1154 (S.D.Ind.1969) (11%); *Jockey International, Inc. v. Burkard,* 185 U.S.P.Q. 201 (S.D.Cal.1975) (11.4%).

Within the confines of the classifications made by Bunge, the 4.5% percentage of confusion falls well within the range which other courts have determined weighs against a finding of infringement. *See Henri's Food Products Company, Inc. v. Kraft, Inc.,* 717 F.2d 352, 358–59 (7th Cir. 1983) (and cases cited therein); *James Burrough Ltd. v. Sign of the Beefeater, Inc.,* 540 F.2d 266, 277–79 (7th Cir.1976) (and cases cited therein); *Union Carbide Corporation v. Ever–Ready Inc.,* 531 F.2d 366, 386 (7th Cir.) (and cases cited therein), *cert. denied,* 429 U.S. 830, 97 S.Ct. 91, 50 L.Ed. 2d 94 (1976).

Despite the narrowness of Bunge's classification of "confused" responses, the court has given some weight to the results of the Beer Label Study, particularly because the defendant offered no contradictory survey of its own. The low level of consumer confusion found, plus the plaintiffs' lack of intent to deceive or "pass off," and the lack of evidence of actual confusion have lead the court to find that it is unlikely that a significant number of consumers will be confused among the LA beers of Anheuser–Busch, Heileman and Miller.

### D. PLAINTIFFS' UNFAIR COMPETITION CLAIMS

In addition to claims for declaratory relief and antitrust violations, Heileman and Miller both asserted claims, arising under section 43(a) of the Lanham Trademark Act, 15 U.S.C. § 1125(a), and common law, alleging that Anheuser–Busch engaged in unfair competition.[50] Heileman contends that Anheuser–Busch's claimed exclusivity in the LA mark would effectively deny it entry into the low alcohol beer market; that Anheuser–Busch has threatened litigation over use of the LA mark; and that Anheuser–Busch has misused its trademark applications for LA to restrain trade in the low alcohol beer market. As a result, Heileman concludes that: "Defendant's aforesaid acts and false representations constitute violations of the federal law of unfair competition as set forth in 15 U.S.C. § 1125(a)" and the common law. Complaint at ¶¶ 28 & 29.

Heileman explains that it is alleging:

> ... that the abbreviation L.A. is a generic term when used with low alcohol beer, and hence cannot become a trademark under *any* circumstances. Busch fully knew the generic nature of the L.A. abbreviation, but nevertheless, filed various trademark applications, and adopted a label on which the abbreviation L.A. is marked with the symbol "TM." Busch also represented to Heileman and others, that it holds preemptive trademark rights in the abbreviation L.A. for use in connection with L.A. beer. Count III further alleges that Busch's false representations constitute violations of the Lanham Act, that Heileman and defendant are in competition with respect to L.A. beers, and that Heileman is damaged by Busch's false representations. Thus, Count III properly pleads a cause under § 43(a).

Plaintiff's Brief in Opposition to Motion for Dismissal at 23–24 (footnote and citations omitted).

Similarly, Miller alleges that:

> A–B's assertion of exclusive rights in the initialism "LA," and its efforts to enforce the same, are inconsistent with the trademark laws of the United States

---

**50.** The plaintiffs have not pressed these unfair competition claims in their posttrial summations or briefs. Therefore, it appears that these claims have been abandoned. *See 20th Century Wear, Inc. v. Sanmark–Stardust, Inc.,* 747 F.2d 81, 92 & n. 14 (2d Cir.1984), *cert. denied,* 470 U.S. 1052, 105 S.Ct. 1755, 84 L.Ed.2d 818 (1985); *Fogel v. Chestnutt,* 533 F.2d 731, 738 n. 7 (2d Cir.1975), *cert. denied,* 429 U.S. 824, 97 S.Ct. 77, 50 L.Ed.2d 86 (1976); *E.S. Originals Inc. v. Stride Rite Corporation,* 656 F.Supp. 484, 485 & n. 1, 491 & n. 13 (S.D.N.Y.1987). Even if the plaintiffs do not consider these claims abandoned, the court, in its ruling above, concludes that they are not entitled to relief.

(15 U.S.C. §§ 1051 et seq.) and of the various states, and with principles of unfair competition embodied in federal law (15 U.S.C. § 1125(a)) and the various states' common and statutory law all of which contemplate protection only for designations capable of distinguishing the goods of one party from those of others.

A–B's use of "LA" and its assertion of and attempts to enforce exclusive rights therein constitute unfair competition, in that such actions give an erroneous impression of ownership by A–B and will hinder Miller in competing under the most apt, convenient and desirable term for indicating low alcohol content.

Complaint at ¶¶ 12, 13 & 14.

In moving to dismiss these claims at the outset of this litigation, Anheuser–Busch pointed out that they are merely restatements of the plaintiffs' antitrust allegations and are not actionable under section 43(a) of the Lanham Trademark Act. *See* Memorandum in Support of Defendant's Motion to Dismiss at 7–8. Section 43(a) has been interpreted broadly to provide a cause of action for a wide variety of deceptive practices. *See, e.g., Data Cash Systems, Inc. v. JS & A Group, Inc.,* 480 F.Supp. 1063, 1070 (N.D.Ill.1979), *aff'd,* 628 F.2d 1038 (7th Cir.1980); *In re Uranium Antitrust Litigation,* 473 F.Supp. 393, 407 (N.D.Ill.1979) ("Act covers something more than just trademark misuse and something less than all forms of unfair competition"). But there is no direct precedent for the type of claims the plaintiffs are raising.

Heileman relies on the single case of *Chromium Industries v. Mirror Polishing & Plating Company, Inc.,* 448 F.Supp. 544 (N.D.Ill.1978), in which the court ruled that the defendant's claim of exclusivity in a federally registered trademark posed a sufficient threat of harassment and litigation to create a cognizable injury. However, the threat of harassment and litigation in *Chromium Industries* was directed toward customers of the plaintiff Chromium, not toward Chromium itself. The court noted that: "Mirror's [the defendant's] claim of exclusivity will tend to divert purchasers from Chromium to Mirror so as to avoid potential harassment of patent or trademark infringement suits." *Id.* at 554. By contrast, in the cases at hand, the record contains no evidence that purchasers have been diverted or threatened with litigation. Furthermore, at trial the plaintiffs were unable to show that they had been effectively denied entry into the low alcohol beer market or that Anheuser–Busch had successfully used its registration applications to restrain trade. The only injury the plaintiffs have been able to allege is that they incurred the expense of this litigation. But because Heileman and Miller did not meet their burden of proving that Anheuser–Busch has engaged in unfair competition, they are not entitled to attorney fees or any other relief for these claims.

## E. ATTEMPT TO MONOPOLIZE

In Count IV of its complaint, Heileman alleged that Anheuser–Busch is attempting to monopolize the low alcohol beer submarket in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2, by "making excessive, unfounded and reckless complaints, demands and threats of litigation." Complaint [of G. Heileman Brewing Company, Inc.] at ¶ 32. Heileman further charges that:

Defendant by its aforesaid acts, seeks to forestall plaintiff and others in their lawful use of the abbreviation "L.A." in the normal and proper promotion and sale of low alcohol beers; defendant's acts constitute a misuse of defendant's alleged trademark which defendant employs as one of its means of effectuating its aforesaid attempted monopolization and unreasonable restraint in violation of the antitrust laws.

*Id.* at ¶ 34.

Miller's complaint alleges that:

On information and belief, A–B's assertion of exclusive rights in "LA" and attempted enforcement thereof have not been done in good faith to prevent confusion, but rather have been done in an attempt to monopolize trade among the

several States in the low alcohol beer market, in violation of 15 U.S.C. § 2. Complaint [of the Miller Brewing Company] at ¶ 15.

The gravamen of the plaintiffs' Sherman Act claims is that Anheuser–Busch attempted to monopolize the low alcohol beer market in the United States by preventing competitors from using the LA name. The defendant allegedly tried to accomplish this illegal end by applying for LA trademark registrations (even though, according to the plaintiffs, the mark is clearly unprotectible) and by threatening competitors with baseless litigation. However, the excessive "threats," "demands," and "complaints" alleged in Heileman's complaint turned out to be nothing more than one cease and desist letter the plaintiff received from Anheuser–Busch. *See* Complaint [of the G. Heileman Brewing Company, Inc.] at Exhibit J. Anheuser–Busch's lawsuits

against Heileman and Stroh and the counterclaims in these cases were not filed until after Heileman commenced its own case in this court.

 At trial, the plaintiffs' antitrust claims failed because they were unable to prove that the trademark applications, or the "threats," or the actual litigation constituted predatory or anticompetitive acts which resulted in Anheuser–Busch's achieving a dangerous probability of successfully monopolizing the relevant market. The evidence at trial revealed that Anheuser–Busch had a colorable basis for attempting to register the LA trademark, even though this court ultimately concluded that the mark is not protectible. Likewise, the court was not persuaded that the threatened or actual litigation was merely a sham.[51] One favorable court ruling does

---

**51.** Courts have ruled that even a single sham lawsuit can serve as the basis for a cognizable claim under Section 2 of the Sherman Act. *See, e.g., MCI Communications v. American Telephone and Telegraph Company,* 708 F.2d 1081, 1155 (7th Cir.), *cert. denied,* 464 U.S. 891, 104 S.Ct. 234, 78 L.Ed.2d 226 (1983). However, such claims have been notably unsuccessful in the context of trademark and copyright litigation. *See Coca–Cola Company v. Overland, Inc.,* 692 F.2d 1250, 2157 n. 17 (9th Cir.1982) ("We merely pause to note that we have found no case directly supporting the proposition that the bringing of meritorious suits can constitute sham suits violative of the antitrust laws."). *See also Columbia Pictures Industries, Inc. v. Redd Horne, Inc.,* 749 F.2d 154, 161 (3d Cir.1984) ("a good faith attempt to enforce a copyright does not violate the antitrust laws"); *Alberto–Culver Company v. Andrea Dumon, Inc.,* 466 F.2d 705, 711 (7th Cir.1972) ("plaintiff's good faith effort to enforce its copyright and trademark is not the kind of exclusionary conduct condemned by § 2 of the Sherman Act"); *Drop Dead Company v. S.C. Johnson & Son, Inc.,* 326 F.2d 87, 96 (9th Cir.1963) (registering multiple marks for wax products, mass advertising, mass sales and bringing of colorable infringement suits are lawful acts which do not "constitute the sort of aggressive competition and promotion that antitrust law seeks to protect, particularly within the limits of lawful monopolies granted by Congress"); *Toro Company v. R & R Products Company,* 600 F.Supp. 400, 401–02 (D.Minn.1984) ("The good faith attempt to protect a copyright interest, even if unsuccessful, is a defense to an action for attempted monopolization."), *aff'd,* 787 F.2d 1208 (8th Cir.1986); *Car–Freshner Corporation v. Auto Aid Manufacturing Corpora-*

*tion,* 438 F.Supp. 82, 87 (N.D.N.Y.1977) ("... under any set of facts which could be proven by the defendants in support of their antitrust counterclaim, the acts of the plaintiffs in registering and enforcing the trademark in issue did not create a dangerous probability that the plaintiff would gain monopoly power in the market for auto air freshners. Rather, the acts complained of merely represent fair and aggressive competition which does not constitute a violation of the antitrust laws."); *Armstrong Cork Company v. Armstrong Plastic Covers Company,* 434 F.Supp. 860, 872 (E.D.Mo.1977) ("good faith enforcement by the plaintiff of its trademark rights does not constitute an antitrust violation or a trademark misuse"); *Sam S. Goldstein Industries, Inc. v. General Electric Company,* 264 F.Supp. 403, 406 (S.D.N.Y.1967) (plaintiff's antitrust claim that defendant, by seeking to monopolize the word "Americana" as a trademark, seeks to render it impossible for any other company to represent that its products are American in origin is patently frivolous).

In contrast, misuse of patent claims have met with more success. *See, e.g., Walker Process Equipment, Inc. v. Food Machinery & Chemical Corporation,* 382 U.S. 172, 86 S.Ct. 347, 15 L.Ed.2d 247 (1965). In *Alberto–Culver Company v. Andrea Dumon, Inc.,* 295 F.Supp. 1155, 1158 (N.D.Ill.1969), *aff'd in part, rev'd in part,* 466 F.2d 705 (7th Cir.1972), the court explained that "the consequences of a label copyright or trademark infringement case are different than those of a patent infringement case" in which a claim ant is more likely to prevail on antitrust grounds. The owner of a patent is granted a monopoly over a particular product or inven-

not necessarily negate claims of this type. *See In re Burlington Northern, Inc.*, 822 F.2d 518, 528 (5th Cir.1987). However, the plaintiffs' position that Anheuser–Busch pursued trademark registrations and infringement suits in bad faith was undeniably damaged when, prior to this trial, the United States District Court for the Eastern District of Missouri ruled in Anheuser–Busch's favor that "LA" is a suggestive and therefore protectible trademark. *See generally Anheuser–Busch Incorporated v. Stroh Brewery Company*, 587 F.Supp. 330 (E.D.Mo.), *aff'd*, 750 F.2d 631 (8th Cir. 1984).

Besides being unable to prove that Anheuser–Busch engaged in predatory, anticompetitive acts of filing sham trademark applications and lawsuits, the plaintiffs were unable to prove their contention that the low alcohol beer market in the United States is the relevant product market.[52] The court was not persuaded that a consumer submarket in low alcohol beer had actually been established or that there are no close substitutes for low alcohol beer. The plaintiffs' own marketing expert, John Nevin, testified without dispute that it takes a minimum of three months to create consumer awareness of a new product and a minimum of three months after that to reinforce that awareness. *See* Transcript at 923. By the time of trial, LA beers were just beginning to be sold throughout the United States and, despite statements to the contrary by witnesses for Heileman, a preponderance of the evidence shows that the development of a low alcohol segment of the beer market remained only a hope or expectancy. *See* Transcript at 156–57, 280, 500, 881, 883–84, 1098–99, 1137, 1164, 1169, 1179–83, 1191–92, 1201, 1328–29, 1332, 1346, 2132, 2161–63, 2174–75, 2178, 2199–2202, 2221. *See also* Trial Exhibit 205.

The evidence also shows that there are close substitutes for low alcohol beer. The unique selling point of LA beer is that it contains less alcohol than regular beer. However, the record contains substantial evidence that light (low calorie) beer also contains less alcohol, while low alcohol beer, in turn, can contain fewer calories than regular beer. *See* Transcript at 102, 245, 297, 411–12, 423, 435, 533–34, 1329–30, 2063, 2065, 2073–74, 2122, 2152, 2193, 2228.

In the Miller LITE litigation, the Seventh Circuit ruled that LITE (or light) is a generic name for a category of beer, in part because a dictionary defined the word "light" as meaning "low alcohol content." *See Miller Brewing Company v. G. Heileman Brewing Company*, 561 F.2d 75, 80 (7th Cir.1977), *cert. denied*, 434 U.S. 1025, 98 S.Ct. 751, 54 L.Ed.2d 772 (1978). Miller, which had registered LITE as a trademark, grudgingly conceded that "the caloric content of beer depends primarily on alcoholic content," *Id.* at 81; while Heileman, which was arguing that "light" or "LITE" is a generic category descriptor, assured the court that "low in calories" adds nothing to "low in alcoholic content."[53] *Id.* at 81 n. 11. The court of appeals accepted these representations and noted that: "In any event, we can take judicial notice that alcoholic and caloric content go hand in hand." *Id.*

---

tion, while the owner of a trademark merely acquires rights to a name. *See Calvin Klein Cosmetics Corporation v. Lenox Laboratories*, 815 F.2d 500, 503 (8th Cir.1987). Thus, a patent owner can exclude competitors from marketing a particular product, whereas a trademark owner can only exclude competitors from using a particular name. Even if Heileman and Miller were not able to use the LA name, they could still market low alcohol beers under other names.

**52.** An antitrust plaintiff has the burden of proving that the defendant possessed sufficient power to come dangerously close to achieving monopoly power and the plaintiff must also prove the boundaries of the relevant geographic and product markets within which that dangerous probability occurred. *See Photovest Corporation v. Fotomat Corporation*, 606 F.2d 704, 711–13 (7th Cir.1979), *cert. denied*, 445 U.S. 917, 100 S.Ct. 1278, 63 L.Ed.2d 601 (1980). Anheuser–Busch maintains that the relevant product market is simply beer. *See* Defendant–Counterclaimant's ("Busch") Pretrial Memorandum of Law at 21–22.

**53.** Heileman tried to change its position in the instant case. On direct examination Heileman's chief executive officer Russell Cleary was asked: "Does your low-calorie products or do your low-calorie products have low alcohol?" Clearly answered, "No." *See* Transcript at 297. *See also* Transcript at 50, 102, 297, 435, 883.

In the instant cases the parties did not go so far as to admit that low alcohol beer is simply old beer in new bottles, but the plaintiffs did not meet their burden of showing that LA beer is so unique and dominant in the market that there is no acceptable substitute. *See Frito–Lay, Inc. v. Bachman Company,* 659 F.Supp. 1129, 1136–37 (S.D.N.Y.1986). Consequently, the court has ruled that, at a minimum, the relevant product market is comprised of light beers and all other beers which contain less alcohol than regular beer. The plaintiffs made no attempt to show that Anheuser–Busch had a reasonable probability of dominating this submarket, nor could they. Light beer sales far exceed the sales of all other beers in this submarket and it is undisputed that Miller has captured a better than fifty-percent share of light beer sales. *See* Transcript at 60, 286, 438, 2210.

In the end, the plaintiffs failed to meet their burden of proving any of the elements of their Sherman Act claims (with the exception of the relevant geographic market). Accordingly, relief will be denied and judgment will be entered in favor of Anheuser–Busch on the antitrust claims.

### ORDER

Based on the Findings of Fact and Conclusions of Law set forth above, the court ORDERS that judgment be entered declaring that the use of the term "LA" (or "L.A.") by the G. Heileman Brewing Company, Inc. and by the Miller Brewing Company on their low alcohol beers does not infringe any rights of or constitute unfair competition with Anheuser–Busch Incorporated.

IT IS FURTHER ORDERED that the plaintiffs' requests for permanent injunctive relief ARE DENIED. Given the court's findings and conclusions, the court would not expect that Anheuser–Busch will continue to interfere with the use of the "LA" name for low alcohol beer by Heileman and Miller. The plaintiffs have produced no evidence that Anheuser–Busch will continue to threaten lawsuits, nor have they otherwise established the possibility of prospective irreparable injury.

IT IS FURTHER ORDERED that the G. Heileman Brewing Company, Inc.'s claims for relief pursuant to 15 U.S.C. §§ 1056, 1114 & 1119 ARE DISMISSED for lack of standing.

IT IS FURTHER ORDERED that judgment be entered against plaintiffs G. Heileman Brewing Company, Inc. and the Miller Brewing Company and in favor of defendant Anheuser–Busch Incorporated on the plaintiffs' claims that the defendant is engaging in acts of unfair competition under 15 U.S.C. § 1125(a) or the common law.

IT IS FURTHER ORDERED that judgment be entered against plaintiffs G. Heileman Brewing Company, Inc. and the Miller Brewing Company and in favor of defendant Anheuser–Busch Incorporated on the plaintiffs' claims that the defendant has attempted to monopolize the low alcohol beer market in the United States in violation of 15 U.S.C. § 2.

IT IS FURTHER ORDERED that the plaintiffs' requests for attorney fees pursuant to 15 U.S.C. § 1117 ARE DENIED.

IT IS FURTHER ORDERED that Anheuser–Busch Incorporated's Motion for Preliminary Injunction (filed June 11, 1984) IS DENIED.

IT IS FURTHER ORDERED that judgment be entered in favor of plaintiffs G. Heileman Brewing Company, Inc. and the Miller Brewing Company and against defendant Anheuser–Busch Incorporated on the defendant's claims that the plaintiffs engaged in common-law trademark infringement of the LA mark.

IT IS FURTHER ORDERED that judgment be entered in favor of plaintiffs G. Heileman Brewing Company, Inc. and the Miller Brewing Company and against defendant Anheuser–Busch Incorporated on the defendant's claims arising under 15 U.S.C. § 1125(a) and the common law that the plaintiffs engaged in acts of unfair competition.

IT IS FURTHER ORDERED that judgment be entered in favor of plaintiffs G. Heileman Brewing Company, Inc. and the Miller Brewing Company and against defendant Anheuser–Busch Incorporated on

the defendant's claims arising under the Illinois Anti–Dilution Act, III, Rev.Stat. ch. 140, § 22, that the plaintiffs have diluted the LA mark.

IT IS FURTHER ORDERED that Anheuser–Busch Incorporated's requests for attorney fees and costs ARE DENIED.

IT IS FURTHER ORDERED that Civil Action No. 84–C–511 IS DISMISSED with each party to bear its own costs.

IT IS FURTHER ORDERED that Civil Action No. 84–C–738 IS DISMISSED with each party to bear its own costs.